LAWRENCE M. PEARSON (NY SBN 3954591)
JEANNE M. CHRISTENSEN (NY SBN 2622124)
ALFREDO J. PELICCI (NY SBN 5775820)
ANTHONY G. BIZIEN (NJ SBN 236942021)
(All to be admitted *pro hac vice*)
**WIGDOR LLP**
85 Fifth Avenue, Fifth Floor
New York, NY 10003
Tel.: (212) 257-6800
Fax: (212) 257-6845
lpearson@wigdorlaw.com
jchristensen@wigdorlaw.com
apelicci@wigdorlaw.com

OMAR H. BENGALI (CA SBN 276055)
**GIRARD BENGALI, APC**
355 S. Grand Street, Suite 2450
Los Angeles, CA 90071
Tel.: (323) 403-5687
Fax: (323) 302-8305
obengali@girardbengali.com

*Attorneys for Plaintiff Cindy Warner*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CINDY WARNER,<br><br>          Plaintiff,<br><br>     vs.<br><br>AMAZON.COM, INC., AMAZON WEB SERVICES, INC., and TODD WEATHERBY, in his individual and professional capacities,<br><br>          Defendants. | Case No. _____<br><br>**COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1

## TABLE OF CONTENTS

2

PRELIMINARY STATEMENT ...................................................................... 3

3

ADMINISTRATIVE PROCEDURES .......................................................... 10

4

5

JURISDICTION AND VENUE ................................................................... 10

6

PARTIES ..................................................................................................... 11

7

FACTUAL ALLEGATIONS ....................................................................... 12

8

9

I.    Ms. Warner's Career Before and Recruitment to Amazon, and Her Role
      and Accomplishments in One Year at Amazon ............................... 12

10

11

II.   Management Refuses to Provide Ms. Warner with Additional
      Responsibilities or Allow Her to Apply for a Promotion, Contrary to
      What She Had Been Promised by Amazon ...................................... 15

12

13

III.  Ms. Warner Is the Target of Abusive Treatment and Unmistakably Sexist
      Epithets in the Presence of Human Resources Personnel, Demonstrating
      the Gender Bias of Her Immediate Male Supervisors ..................... 20

14

15

16

IV.   The Disparate Treatment and Verbal Abuse of Ms. Warner by AWS's
      Management Is Only One of the Most Recent Examples of
      Discrimination and Retaliatory Conduct Against Ms. Warner and Others
      that Have Been Overlooked by Amazon .......................................... 26

17

18

19

V.    Amazon Terminates Ms. Warner, In an Act of Open Retaliation for
      Retaining Attorneys and Coming Forward with Legal Claims Against the
      Company .......................................................................................... 33

20

21

22    FIRST CAUSE OF ACTION ...................................................................... 35

23    SECOND CAUSE OF ACTION .................................................................. 36

24

25    THIRD CAUSE OF ACTION ...................................................................... 37

26    FOURTH CAUSE OF ACTION .................................................................. 38

27

28

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY
MOTION TO STRIKE SECOND AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PRAYER FOR RELIEF ........................................... 38

JURY DEMAND ................................................... 40

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY
MOTION TO STRIKE SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff Cindy Warner ("Plaintiff" or "Ms. Warner"), by and through her undersigned counsel, Wigdor LLP, as and for the Complaint in this action against Defendants Amazon.com, Inc. ("Amazon.com"), Amazon Web Services, Inc. ("AWS") (together, "Amazon" or the "Company"), and Todd Weatherby, in his individual and professional capacities, (collectively, "Defendants") hereby states and alleges as follows:

## PRELIMINARY STATEMENT

1.      By now, the public is sadly familiar with accounts regarding the brutal demands of working in Amazon's warehouses and fulfillment centers, as well as along the Company's delivery routes.  In a 2020 Documentary by PBS and FRONTLINE entitled, "Amazon Empire: The Rise and Reign of Jeff Bezos," a former Amazon worker summed up the Company's well-known mistreatment of its warehouse employees, "**We're not treated as human beings. We're not even treated as robots. We're treated as part of the data stream.**"[1]

2.      Executive leadership also has shown contempt for these workers beyond a fixation on the bottom line.  For example, in March 2020 the Company's General Counsel, David Zapolsky, ridiculed and plotted character assassination against a Black hourly employee, Christian Smalls, who was leading protests against unsafe work conditions during the pandemic.  Mr. Zapolsky said of Mr. Smalls: "He's not smart or articulate, and to the extent the press wants to focus on us versus him, we will be in a much stronger PR position."[2]  Later, Mr. Smalls was fired.

3.      Although they are by no means the same thing, it may surprise many that this type of stereotyping, contempt-filled language is not reserved solely for

---

[1]      https://www.pbs.org/wgbh/frontline/article/youre-just-disposable-new-accounts-from-former-amazon-employees-raise-questions-about-working-conditions/ (last accessed May 17, 2021).

[2] See https://www.vice.com/en/article/5dm8bx/leaked-amazon-memo-details-plan-to-smear-fired-warehouse-organizer-hes-not-smart-or-articulate (last visited May 19, 2021).

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY MOTION TO STRIKE SECOND AMENDED CLASS ACTION COMPLAINT

Amazon's blue-collar workers.  In fact, sometimes the white male executives who dominate Amazon's top ranks let stereotyping and animus bubble to the surface when they have to deal with employees in the corporate workforce who speak up about improper practices, such as discrimination.  Amazon allows its managers, again seemingly in a misguided effort to protect the bottom line, to run amok and mistreat employees, particularly women and people of color, even when they arrive near the top of the Company's corporate ladder.

4.     These abusive managers are protected by Amazon's top leadership and Human Resources ("HR") organization, so long as they are part of the in-group and seen as serving the Company's bottom line.  What may surprise Amazon, however, is that such disregard for misconduct, in fact, harms the Company's bottom line and employee performance.

5.     Cindy Warner is a tremendously successful LGBTQ+ businesswoman who has had an illustrious career as an executive at many major institutions and tech companies for over 30 years before she was aggressively recruited to join Amazon in late 2019.

6.     Ms. Warner had to consider carefully whether or not to join Amazon, as she wanted to ensure that her next professional move could be to a place that she could stay for some time while writing what could be the last chapter in a storied career.

7.     Despite some reservations, however, she could not possibly know when she accepted her position with Amazon that the Company would allow her male managers and colleagues to reduce her to disgusting names such as a "**bitch**," an "**idiot**," and a "**nobody**."  These epithets were thrown at her not because she did not meet expectations, but rather occurred because she had ingratiated herself with her new team all too well, and was quickly delivering results that outshone her new white male coworkers in upper management.  Ms. Warner also made it her practice,

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

4

1  as a "fresh set of eyes" to question the practices of ProServe that kept female

2  employees and others from being recognized and advancing at the Company.

3      8.    Ms. Warner was subjected to blatant discrimination at Amazon dating

4  from even before she started work – having been hired at a job level, Level 8 position

5  ("L8"), that was lower than her experience supported.  She had been told that she

6  was being recruited for a Level 10 ("L10") position, which also comes with

7  compensation that is much higher.  This was not the last time Ms. Warner was to be

8  provided false information regarding her job role and how the Company would

9  handle her employment.

10     9.    Amazon's discrimination from the time of her hiring and throughout

11 Ms. Warner's employment has resulted in lost income of millions of dollars,

12 including with regard to how much the Company paid equally or less-qualified male

13 colleagues with similar job responsibilities.

14     10.   Rather than the innovative and forward-thinking environment that she

15 believed Amazon could be (*e.g.*, the General Motors of the 21st Century), Ms.

16 Warner quickly realized that the division of Amazon she joined (Professional

17 Services (ProServe) in Amazon Web Services (AWS)) was a prime example of a

18 boys' club where predominantly white male executives jealously guard their sphere

19 of influence.  In ProServe, as with many similar workplaces, this meant curtailing

20 the opportunities and paths for advancement of women and people of color, while

21 reserving plum positions for the white male friends and protégés of executives like

22 Todd Weatherby, Vice President of Professional Services Worldwide at AWS.

23     11.   Despite such obstacles, Ms. Warner, a business veteran, got right to

24 work.  Her drive to succeed at Amazon was infectious and her team, which was a

25 small fraction of the size of those she managed at previous employers, thrived under

26 her management.  Ms. Warner grew several of ProServe's most important client

27 relationships, such as Novartis and Cisco.

28

GIRARD BENGALI, APC
355 South Grand Ave., Suite 2450
Los Angeles, California 90071
(323) 302-8300

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY
MOTION TO STRIKE SECOND AMENDED CLASS ACTION COMPLAINT

12.     Rather than welcome a new colleague who was making tremendous positive contributions, Ms. Warner met constant resistance from her male colleagues who could not tolerate – and seemingly felt threatened by – an accomplished and effective woman like Ms. Warner.  Instead of building on Ms. Warner's ideas, they told her that she had "sharp elbows" and demanded that she "get out of the way." Despite starting at Amazon just as the COVID-19 pandemic took hold, she was able to build her team and create cohesion and a sense of shared direction, while also taking charge of the implementation of COVID-19 safety protocols for ProServe.

13.     Despite constant degradation from her male peers, during her tenure in ProServe at Amazon, Ms. Warner made innumerable valuable contributions from a business and organization perspective.  Her tenacity and dedication earned her significant praise in her Forte 2021 review including the following:

- "Cindy has the best business judgment I've seen in my career."

- "Cindy thinks big and demonstrates backbone when challenging us to think more long term about ProServe's partner program."

- "Cindy has incredible energy, brings a lot of positivity and is not afraid to speak her mind, especially when she sees something wrong.  She is a team player, and is a good listener.  She is unafraid to let go of her beliefs and learn."

14.     Male executives felt free to treat Ms. Warner, a gay woman in her late 50s, with open contempt, insults, and hostility.  This unprofessional, discriminatory, and unlawful conduct by Ms. Warner's male coworkers included, but was not limited to, one of the top-ranking managers at AWS, Dave Lavanty, calling her a "**bitch**," an "**idiot**," and a "**nobody**" in front of a member of Human Resources.  Ms. Warner, a highly experienced professional, was shocked and distraught that a coworker

6

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1  would show such hatred and apparently feel that he would be able to get away with

2  it. The particular epithets and insults used by Mr. Lavanty were obviously directed

3  specifically at Ms. Warner as a woman, as Mr. Lavanty has not dared use such

4  language against male colleagues in the manner that he did with Ms. Warner.

5        15.    Amazon was immediately aware of the discriminatory and derogatory

6  remarks that Mr. Lavanty directed at Ms. Warner, as a member of Human Resources,

7  Ed Salas, was meeting with them and personally witnessed the remarks.

8        16.    Rather than address and issue discipline for this unacceptable and

9  discriminatory conduct, Mr. Weatherby promoted Mr. Lavanty to the L10 level of

10  employment that the Company had used to lure Ms. Warner before they down-

11  leveled her position and compensation.

12        17.    This was particularly significant because Ms. Warner had been told by

13  Amazon that she could apply for an L10 position whenever she wished, but Mr.

14  Weatherby prohibited Ms. Warner from doing so, despite the fact that her

15  qualifications were far beyond those of Mr. Lavanty. Being denied the opportunity

16  to apply for these positions had a very large effect on her compensation and career

17  arc at Amazon, setting her trajectory back several years and costing her millions in

18  income.

19        18.    This pattern and *modus operandi* has occurred in ProServe repeatedly

20  with female employees' careers suffering in favor of white males who are part of the

21  inner circle. In this instance, though, Ms. Warner's seniority and superior results

22  and relationships made her a hard enough target for the usual discriminatory tactics

23  that the frustration and misogynistic disdain of one of the white male ProServe

24  executives finally bubbled to the surface with his exclamatory use of the label

25  "**bitch**" towards her.

26        19.    Amazon's management appears unconcerned with this rampant

27  discrimination, as their own published data shows that women account for only

28

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

7

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1  approximately 20% of the employees at Amazon Level 8 and above – a figure that
2  has changed relatively little over the past three years.[3]

3       20.    On or around April 28, 2021, just two weeks after Amazon learned that
4  Ms. Warner had retained legal counsel and informed the Company that she was
5  pursuing legal claims of discrimination, Amazon abruptly and without explanation
6  told Ms. Warner that her job in ProServe was over and that she had two months to
7  find a new job at Amazon or her employment would end.  This was a blatantly
8  retaliatory move against Ms. Warner that proved Defendants' animus and hostility
9  against her.  Mr. Weatherby and Mr. Lavanty, the white male managers of ProServe,
10 could not tolerate leaving Ms. Warner in place once she made it clear that, if Amazon
11 would not hold them accountable for their behavior, she would.

12      21.    Many coworkers and members of Ms. Warner's team expressed their
13 shock and outrage regarding her sudden and unwarranted termination.

14      22.    True to herself, Ms. Warner has been diligently applying for other
15 positions for which she is qualified and a good match.  However, Amazon's
16 vindictive handling of the situation has made it very difficult for her to get good
17 responses, as her status on the Company's system shows her with no direct reports
18 (an obvious red flag at her level).

19      23.    In addition, the Company outright refused to recommend or help in any
20 way to find internal positions to her.  This reveals the Company's removal of Ms.
21 Warner from her role to be exactly what it is – a termination trying to masquerade
22 (poorly) as something else.  Never in her decades growing teams and building
23 organizations across a multitude of top companies has she experienced such
24 deplorable treatment, which also, not incidentally, goes against all business sense.

25
26
27 _____
   [3]     https://www.aboutamazon.com/news/workplace/our-workforce-data (last accessed May
       17, 2021).
28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY
MOTION TO STRIKE SECOND AMENDED CLASS ACTION COMPLAINT

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

24.    The openly discriminatory language and other conduct by Amazon's white male executives show that much of their worst behavior and abuse is targeted at female coworkers and subordinates.  It draws a clear connection between the dismal representation of women in the upper ranks of Amazon and systemic and conscious animus women and other underrepresented groups at Amazon.

25.    Amazon has long known about and tolerated conditions disadvantaging women and allowed its male-dominated management to engage in practices keeping women out of the Company's upper ranks.[4]  The insults, the open contempt, and the disregard towards a high-ranking and valuable female executive like Ms. Warner clearly illustrates the anti-female bias underlying these undeniable trends at the Company.  Many women (and men) in Professional Services have shared with Ms. Warner their own observations and experiences with discrimination and retaliation at Amazon.

26.    Amazon has an opportunity to sincerely examine its policies and practices and enact meaningful change, as Institutional Shareholder Services, a proxy firm, is recommending that Amazon investors vote in favor of an independent racial audit.  The vote is set for May 26, 2021 at the Company's annual shareholder meeting.  Amazon, however, is asking shareholders to reject the audit.  See https://www.seattletimes.com/business/amazon-investors-urged-by-proxy-firm-to-vote-in-favor-of-racial-audit/ (last accessed May 18, 2021).

27.    Ms. Warner now brings this action to redress the unlawful employment practices committed against her, including Defendants' discriminatory and retaliatory treatment of her due to her sex/gender in violation of the Equal Pay Act

---

[4] See,e.g.,https://www.realclearpolicy.com/articles/2018/10/09/report_amazon_falls_short_on_gender_equity_110846.html (last visited May 17, 2021).

1  of 1963, 29 U.S.C. § 206(d) *et seq.* ("EPA"), and the California Equal Pay Act,

2  California Labor Code § 1197.5 ("CEPA").[5]

3  ## ADMINISTRATIVE PROCEDURES

4  28.    Ms. Warner will file a charge with the U.S. Equal Employment

5  Opportunity Commission ("EEOC") alleging violations of Title VII, 42 U.S.C. §§

6  2000e *et seq.* ("Title VII").

7  29.    Pursuant to a work-sharing agreement between the EEOC and the

8  California Department of Fair Employment and Housing ("DFEH"), Ms. Warner's

9  charge will be cross-filed with the DFEH in order to satisfy prerequisites for brining

10  claims under California's Fair Employment and Housing Act, California

11  Government Code § 12940 ("FEHA").

12  30.    Upon the EEOC's completion of its investigation into Ms. Warner's

13  charge of discrimination and/or issuance of a Notice of Right to Sue, Ms. Warner

14  will seek leave to amend this Complaint to add Title VII and FEHA claims against

15  Amazon.

16  31.    Any and all other prerequisites to the filing of this suit have been met.

17  ## JURISDICTION AND VENUE

18  32.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§

19  1331 and 1343, as this action involves federal questions regarding the deprivation of

20  Plaintiff's rights under the EPA.  The Court has supplemental jurisdiction over

21  Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

22

23  [5]    This case, filed by Cindy Warner, is being filed simultaneously with the cases of other

24  female employees similarly subjected to unlawful discrimination, bias and retaliation at Amazon:
Diana Cuervo v. Amazon, et al. (U.S. District Court, Western District of Washington) (race,

25  ethnic background, national origin, and gender discrimination and retaliation); Tiffany Gordwin
v. Amazon, et al. (U.S. District Court, District of Arizona) (race, gender discrimination and

26  retaliation); Emily Sousa v. Amazon, et al. (U.S. District Court, District of Delaware) (race,
national origin, gender discrimination and retaliation); and Pearl Thomas v. Amazon, et al. (U.S.

27  District Court, Western District of Washington) (race, gender discrimination and retaliation).

28

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY
MOTION TO STRIKE SECOND AMENDED CLASS ACTION COMPLAINT

33.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

34.   Plaintiff Cindy Warner is a gay woman and a Global Leader, ProServe Advisory, Strategic Program Management and Partners at Amazon.com, Inc. and Amazon Web Services, Inc.  During the most relevant periods of her employment at Amazon, Plaintiff Warner resided in Riverside County, California.  At the time of her hire by Amazon, Ms. Warner also was residing in Michigan.  At all relevant times, Plaintiff Warner met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

35.   Defendant Amazon.com, Inc. is a Delaware-registered domestic corporation with operations in Irvine, California and throughout the country.  At all relevant times, Defendant Amazon.com, Inc. met the definition of "employer" and/or "covered employer" under all applicable statutes.

36.   Defendant Amazon Web Services, Inc. is a Delaware-registered domestic corporation with operations in Irvine, California and throughout the country.  At all relevant times, Defendant Amazon Web Services, Inc. has been a wholly owned subsidiary of Defendant Amazon.com, Inc. and met the definition of "employer" and/or "covered employer" under all applicable statutes.  Amazon.com, Inc. and AWS share facilities, administrative functions, and employee management functions and resources.

37.   Defendant Todd Weatherby is, upon information and belief, a resident of Seattle, Washington and is the Vice President of Professional Services Worldwide at Amazon Web Services, Inc., where he supervised Ms. Warner during her employment at the Company and controlled the terms and conditions of her employment (including her compensation and the ability to hire and fire).  At all

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

11

relevant times, Defendant Weatherby met the definitions of "employer" and/or "covered employer" under all applicable statutes.

### FACTUAL ALLEGATIONS

### I.   MS. WARNER'S CAREER BEFORE AND RECRUITMENT TO AMAZON, AND HER ROLE AND ACCOMPLISHMENTS IN ONE YEAR AT AMAZON

38.   Ms. Warner, who is a gay woman in her late 50s, was a Partner and Vice President for nearly ten years at Ernst & Young/Capgemini ("EY") as a Global Leader in Systems Applications and Products, Customer Relations Management before leading technology and cloud-based initiatives at several other world-class organizations, including Salesforce.com, PricewaterhouseCoopers ("PwC"), IBM, and NetApp.

39.   At NetApp, Ms. Warner led an organization responsible for $2.4 billion in revenue, a budget of $700 million, approximately 3,000 full-time employees, and which provided service and support to that company's top 100 clients (including artificial intelligence solutions).   She has been credited with a wholesale transformation of the services and support organizations to facilitate that company's transition to the cloud before being approached by Amazon in or around October 2019.

40.   Amazon aggressively recruited Ms. Warner to join its Professional Services Group.   Ms. Warner previously had built professional services organizations at Salesforce, PwC, and IBM.   Although she was recognized as qualified for a Vice President, Level 10 ("L10") position, as confirmed in conversations with both her recruiter and eventual boss, Todd Weatherby, she was told that Amazon does not hire for L10 positions externally.

41.   Amazon and Mr. Weatherby succeeded in piquing Ms. Warner's interest in the position with descriptions of her wide-ranging role and the discretion

12

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1    and responsibility she would have.  She also interviewed with several other Amazon

2    representatives in Seattle in or around December 2019, at which the depth of Ms.

3    Warner's experience and professional achievements and qualifications were

4    thoroughly inquired into.

5         42.    Ms. Warner was told that she would be Mr. Weatherby's replacement

6    for succession planning purposes, as no other L10 employees were being groomed

7    for that role.  Ms. Warner also was told that, in light of her qualifications and

8    readiness for an L10 role, she could apply for such a role anywhere in the Company

9    at any time once she joined Amazon, and that if and when an L10 job became

10   available in Professional Services, she also could apply for that role.

11        43.    Soon, Ms. Warner received an offer from Amazon and was told that

12   although they loved her and she was a great fit, the Company does not hire for L10

13   positions much, if at all, from outside the organization, and therefore they could only

14   offer her a Level 8 ("L8") position.  Ms. Warner had been considering a few other

15   opportunities which she had declined in anticipation of Amazon's offer, and though

16   she was disappointed by the significant pay cut she would take and narrower

17   responsibilities she would have as a result of the lower level, she believed the

18   Company's assurances regarding her ability to apply for an L10 position soon after

19   she started.  Amazon's representatives promised Ms. Warner that she was eligible to

20   apply for a promotion without any time constraints.

21        44.    Ms. Warner started work at Amazon as Global Leader, ProServe

22   Advisory, on or around February 17, 2020.  Ms. Warner was paid the capped salary

23   of $160,000, as well as bonus and stock payments that brought her total annual

24   compensation to approximately $890,000.

25        45.    Ms. Warner's role was leading Global Advisory Professional Services,

26   referred to as AWS's "tip of the spear," in which her team would work with

27   executive customers to show them how AWS could transform their organizations.

28

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

13

In this position, her ambit ultimately falls under Senior Leadership Team member and Senior Vice President Matt Garman, who leads AWS Sales, Marketing and Service.

46.   In Global Advisory (which she was required to take over directly a few months into her tenure), Ms. Warner found that she had been handed an area that previously had four different leaders in four years. Ms. Warner was also tasked with building out the AWS Amazon Partner Network organization into Professional Services, an effort which had failed several times in the past.  Ms. Warner also was given charge of Strategic Programs, another area in which several executives had failed to coalesce a strategy that brought the team along.

47.   Upon starting at Amazon, in great contrast to her previous roles (including NetApp), Ms. Warner learned that the headcount of her team would be only approximately 50 employees, and that she had no budget or profit-and-loss responsibilities.  Ms. Warner hit the ground running at Amazon and within her first month she established a COVID Business Continuity team in response to shutdowns and remote work arrangements affecting customers and Amazon itself.  She was diving deeper to understand the Strategic Programs that were failing to achieve their objectives and restructured the Advisory Team to create greater clarity of their objectives and provide more value for Amazon's customers.

48.   By October 2020, Ms. Warner had thoroughly gotten her arms around her various roles, making headway on the goals with her Advisory area growing, having made some excellent hires, and significantly growing the number of partners in her area as well (including working with the CEO of Accenture).  She was also making a significant impact as an Advisor to the Women@ProServe affinity group that was addressing the gender bias and obstacles to advancement for women that are so pervasive within Professional Services.

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

14

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

## II.   MANAGEMENT REFUSES TO PROVIDE MS. WARNER WITH ADDITIONAL RESPONSIBILITIES OR ALLOW HER TO APPLY FOR A PROMOTION, CONTRARY TO WHAT SHE HAD BEEN PROMISED BY AMAZON

49.     In light of her progress with her teams, in or around October 2020, Ms. Warner asked Mr. Weatherby for more responsibility, showed him the progress made in her group and explained that she easily could take on more, as the size of the team was comparable to what she was handling 20 years ago or longer in the scheme of her career (which Mr. Weatherby would have known from the recruiting process).

50.     Yet, Mr. Weatherby turned her down flat.  He refused to give her any more responsibility and simply declared that she had not proved capable of taking on more responsibility and that she did not understand Amazon's culture.  Mr. Weatherby further asserted (without any concrete basis) that Ms. Warner has "sharp elbows" and that she somehow does not listen well enough.  It was immediately obvious that these were vague, intangible criticisms and rationalizations.

51.     During 2020, Ms. Warner had on occasion asked Mr. Weatherby, "have we considered" various things, which Mr. Weatherby took as her supposedly "being very critical," despite the fact that she was in fact being curious, having a bias for action, thinking outside the box, and identifying areas for improvement (as one would expect of any new, high-ranking executive).  Indeed, Ms. Warner, who has been a successful member of many teams, asked Mr. Weatherby in response to his brusque rejection of her requests whether she had presented herself inappropriately or offended others at any point and that she would want to know if that was the case.  Mr. Weatherby could not give any concrete examples at all beyond his visceral feelings towards Ms. Warner.

15

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1   52.   It was apparent that Mr. Weatherby was very uncomfortable with Ms.

2   Warner's presence in his organization due to her outspokenness regarding challenges

3   within Professional Services, her support of other employees, particularly women,

4   and her willingness to escalate such issues.  Indeed, Ms. Warner escalated issues on

5   several occasions and where appropriate communicated them in terms of seeming

6   discrimination against female employees in the group.  Others in ProServe had

7   recognized how helpful Ms. Warner could be based on her experience, integrity

8   without fear, understanding, and the contributions she already had made in her time

9   at the Company.   Colleagues have commented that Ms. Warner was more

10  Amazonian than other managers and was "a breath of fresh air," among other

11  compliments and endorsements of her approach and style.

12   53.   Indeed, Ms. Warner's Forte 2021 review comments from both peers

13  and her direct reports are effusive, with multiple peers noting how well her prior

14  executive experience fits with her role and the organization's goals, and her team

15  members praising her support and honesty.  Both peers and direct reports alike noted

16  Ms. Warner's passion and willingness to speak plainly, and how quickly she has

17  learned the organization's workings.

18   54.   Peer comments included: "Cindy has incredible energy, brings a lot of

19  positivity and is not afraid to speak her mind, especially when she sees something

20  wrong.  She is a team player, and is a good listener.  She is unafraid to let go of her

21  beliefs and learn;" "Cindy has the best business judgment I've seen in my career;"

22  "Cindy is able to manage diverse perspectives and opinions to draw practical

23  approaches and bring teams together by focusing on what's best for the customer.

24  Her ability to remove emotion from conversations and drive to fact[-]based decision

25  making is a valuable asset for everyone she works with;" and "Cindy thinks big and

26  demonstrates backbone when challenging us to think more long term about

27  ProServe's partner program."

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY
MOTION TO STRIKE SECOND AMENDED CLASS ACTION COMPLAINT

55.     In November 2020, when it was announced that Andy Bailey, a peer of Ms. Warner, was leaving, Mr. Weatherby was exploring what to do with Mr. Bailey's role (L8 Director, Global Verticals and Strategic Accounts) running strategic accounts and industry verticals, which came with a 600-employee team. Ms. Warner suggested to Mr. Weatherby that Mr. Bailey's group could be combined with hers (Bailey's group and Ms. Warner's team handle global accounts and industry verticals and have many synergies), which would save headcount.   In addition, it would have given Ms. Warner an opportunity to demonstrate that she could take on more remit and her capabilities (which already were well-established based on her track record and the L10 role Amazon already had recruited her for). Mr. Weatherby again told Ms. Warner that she was neither capable nor competent to lead Mr. Bailey's team.

56.     In or around January 2021, Ms. Warner read a document showing that an L10 role in Professional Services was being hired from outside the Company. This turned out to be for Mr. Bailey's replacement.  Ms. Warner again asked to be considered for the role as Mr. Bailey's replacement at the L10 level, and whether she could apply for the role.  Naturally, Ms. Warner thought back to discussions with Amazon during her recruitment, when she was told that L10 roles were only rarely filled from outside the Company, and that she could apply for such roles promptly upon joining Amazon.

57.     Mr. Weatherby refused and said that he was not and would not consider Ms. Warner or anyone else in her "L8 peer group" for an L10 position.  This turned out to be completely and knowingly false.

58.     The job description for Mr. Bailey's L10 role was soon distributed externally, contrary to what Ms. Warner had been told by Mr. Weatherby about Amazon's policy against hiring from outside to fill such roles.  The job was described as: "Vice President, Global Verticals and Strategic Accounts to have

17

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

industry shaping impact by leading a broad scope of strategic, multinational customer accounts and consulting teams at AWS.  This executive will provide leadership on the largest and most complex IT transformation projects across a variety of industries, including Media and Entertainment, Health Care and Life Sciences, Industrial…."

59.    Ms. Warner's previous experience (and even what she did at AWS for the past year) was just about a perfect match for the description of the ideal candidate for the role: "The ideal candidate must be able to lead global teams at scale.  They must be a trusted advisor to CxOs with a successful track record of selling/positioning consulting work to the largest global enterprises.  The successful candidate will bring a high-level of gravitas, astute judgment, effective negotiation and influencing expertise, and exceptional people leadership skills.  This leader will have Digital/cloud transformation experience, as well as the ability to easily distill and sell complex solutions and engagements that will have industry shaping impact."

60.    Ms. Warner has many years of IT advisory experience and leadership of teams of a global scope, including work leading the design and implementation of tech solutions and cloud-based systems across lines of business and for C-suite contacts and Fortune 500 customers in a host of industries (such as Microsoft, GE, Ford, and others).

61.    Indeed, Amazon and its recruiter had recognized that Ms. Warner already was well-qualified for an L10 role at the Company.  Ms. Warner's work and excellent track record over more than 30 years, from EY to Salesforce to PwC to IBM, NetApp, and others all provided the precise background called for by Mr. Bailey's position.  This was the same experience noted by peers and direct reports as pivotal in Ms. Warner's success during her first year at AWS, as further reflected in her Forte feedback.

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY MOTION TO STRIKE SECOND AMENDED CLASS ACTION COMPLAINT

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

62.    Ms. Warner could see from the job description for the position that she was, if anything, overqualified for the L10 role being filled.  She raised the matter with Human Resources in order to make sure that they knew that she was not being allowed to apply for the job and had not received any concrete explanation as to why.

63.    Ms. Warner also talked again with Mr. Weatherby and showed him her resume/CV, explaining her experience in order to clear up any misunderstanding and show that she was, in fact, thoroughly qualified for the L10 job.  Ms. Warner pointed out that anyone applying from outside Amazon also would need to demonstrate their qualifications through past experience, and said she was not sure why she would not be considered on the same basis.  In fact, Ms. Warner had the advantage of already having been vetted by the Company for hire and some high-level experience at Amazon, getting to know its organization and culture.

64.    In response to these highly reasonable observations and requests, Mr. Weatherby curtly told Ms. Warner that he did not care, that he was not considering Ms. Warner or her "peers," and that he would not consider Ms. Warner until she supposedly showed that she was competent and could handle the job that she already was in, heading a team of 50 full-time employees.

65.    Human Resources escalated the matter to Lou Manfredo (head of Human Resources for AWS), who declared that it was up to Mr. Weatherby, that he could do as he pleased, and that if he did not want to consider Ms. Warner for the job, then he did not have to do so.

66.    The next month, in or around February 2021, Andy Jassy, AWS CEO, emailed Mr. Weatherby about a customer company whose CEO needed AWS's help. Mr. Weatherby forwarded the message to Ms. Warner and Professional Services Director (at that time) Dave Lavanty.  Mr. Jassy appears to have had a "top to top" meeting with Amazon's C-suite customer executives.

19

67. Once Mr. Lavanty and Ms. Warner received the email, Ms. Warner shared that she and her team members had been working on the relationship with that same customer for six months, including with people in their C-suite, and that she and her direct reports would be happy to help. However, Mr. Lavanty decided that he and his people instead would take over responsibility for the entire customer relationship from Ms. Warner and her team.

68. In fact, Mr. Lavanty stated via email to Doug Smith that "You and I are going to work on this one together." Ms. Warner had done nothing wrong and there was no business reason for this change. Mr. Lavanty was merely moving in to assume what he must have believed was an opportunity to work on a relationship that had the attention of Mr. Jassy.

III. **MS. WARNER IS THE TARGET OF ABUSIVE TREATMENT AND UNMISTAKABLY SEXIST EPITHETS IN THE PRESENCE OF HUMAN RESOURCES PERSONNEL, DEMONSTRATING THE GENDER BIAS OF HER IMMEDIATE MALE SUPERVISORS**

69. When Ms. Warner questioned whether the Change Healthcare relationship should simply be handed over to Mr. Lavanty, he became furious. Mr. Weatherby also got involved, and when it appeared that he might also have doubts about Mr. Lavanty's move, Mr. Lavanty became even angrier and made a false claim about a deliverable that was due to the customer. Much of these discussions were documented in chats over Chime (including with Human Resources).

70. Ms. Warner proposed a call for Monday, February 15, 2021 in an attempt to resolve the issue and ensure there was no negative customer impact in connection with the deliverable, as Mr. Lavanty had falsely asserted. Ms. Warner got on the call with Mr. Lavanty and HR representative Ed Salas (who Ms. Warner had asked to be on the line).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY MOTION TO STRIKE SECOND AMENDED CLASS ACTION COMPLAINT

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

71.    On the call, Mr. Lavanty tore into Ms. Warner (who had been criticized herself for supposed "sharp elbows") and began outright and repeatedly screaming, "Do you know what you've done?  Do you know the mess you've created?  I can't believe you've done this to me!  How dare you do this to me!" and other furious, out of control statements.

72.    Mr. Salas suggested that Mr. Lavanty calm himself.

73.    Instead, Mr. Lavanty doubled down on his unacceptable and abusive conduct, yelling at Ms. Warner that, "You are nobody!  You've done nothing in this organization!  I'm going to make damn sure you go nowhere in this organization!" Mr. Lavanty continued, "You and Amanda Rankin [one of Ms. Warner's direct reports who had been working on the customer relationship] are idiots!  No one wants to work with either of you."

74.    Mr. Salas interjected by saying, "Dave.  Stop.  Stop now."

75.    Mr. Lavanty then made the nature of his ire very clear, saying: "I'm not working with her, she's a bitch!"

76.    Mr. Salas warned Mr. Lavanty again to stop and reminded him that that call was supposed to be about one topic only – the customer relationship.  Ms. Warner pointed out that the call was about only whether a deliverable was due to the customer and ensuring that they did not suffer any negative effects.  Mr. Lavanty then confirmed that his previous statements on the subject had been false, saying, "I don't know if there's a deliverable here.  Don't you ever question me."  Mr. Lavanty then disconnected from the call, seemingly hanging up on Ms. Warner and Mr. Salas.

77.    Mr. Salas was shocked, and said, "I have never ever witnessed an assault on another employee like this in all my years in HR.  Cindy, I need to do something about this.  Yes, I'm taking issue with this."  Mr. Salas asked for Ms. Warner's permission to bring what occurred on the call to the attention of other HR and/or Employee Relations employees.  In response, Ms. Warner expressed her

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

21

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

desire for him to do so and gave the go-ahead to escalate the issue of the disturbing, discriminatory incident.  Shortly after the call, Mr. Salas sent Ms. Warner a copy of the code of conduct in order to demonstrate that Mr. Lavanty's behavior was not only a violation of the code of conduct, but also a terminable offense.

78.     A member of Employee Relations called Ms. Warner later, and Mr. Salas also followed up with Ms. Warner later that week.

79.     Ms. Warner could hardly sleep for a week, with Mr. Lavanty's raging, abusive language ringing in her ears for days afterwards and a new, very present fear of retaliation preoccupying her thoughts.

80.     Around two weeks later, Employee Relations contacted Ms. Warner (she had not heard at all from Mr. Weatherby or Mr. Garman) to tell her that the matter had been investigated and escalated all the way to Mr. Jassy.  However, despite the Employee Relations person's admitted disbelief at Mr. Lavanty's conduct and finding that the verbal assault was completely inappropriate, Ms. Warner was told that the ultimate decision on what to do (if anything) was left up to Mr. Weatherby.

81.     During the week of March 1, 2021, Ms. Warner was called by Toni Handler of HR and told that a meeting was being set up for the following Monday. Ms. Warner received an email from Mr. Lavanty that week to the effect that it seemed he was not at his best during their meeting, that Ms. Warner misunderstood his intentions ("I realize how my words and/or tone may have been received as dismissive and/or disrespectful."), that he meant no disrespect and he was sorry if Ms. Warner took what he said negatively.

82.     Obviously, this evasive non-apology was insult being added to injury, and were it not so distasteful, it would be laughable how closely the formulation of Mr. Lavanty's email resembles so many other insincere, inchoate public "apologies"

22

1  from powerful men whose sexist, discriminatory behavior has landed them in a
2  position where they might face consequences.

3      83.    On or around Monday, March 8, 2021, Ms. Warner had a call with Mr.
4  Weatherby, Ms. Handler, and Mr. Lavanty.  Mr. Weatherby turned the call into an
5  opportunity to grill Ms. Warner about why she thought Mr. Lavanty was trying to
6  take over the customer relationship (as though this was not already obvious and a
7  declared goal of Lavanty).

8      84.    Ms. Warner forwarded Mr. Weatherby various Chime messages that
9  clearly showed what Mr. Lavanty was doing, with Mr. Lavanty openly expressing
10  his intentions to "take this over" and saying that Ms. Warner had to "turn over your
11  work and get out of the way."

12      85.    Mr. Weatherby appeared determined to avoid the subject of Mr.
13  Lavanty's outrageous, discriminatory attack on Ms. Warner altogether, and instead
14  tried to turn the spotlight on Ms. Warner and suggest (absurdly and offensively) that
15  she had somehow precipitated the barrage from Mr. Lavanty.  This gambit, too,
16  demonstrated clear retaliatory animus against Ms. Warner.

17      86.    Ms. Warner finally said, "Are we going to talk about the assault?  I
18  thought that was the nature of this phone call."

19      87.    Mr. Weatherby said nothing in response.

20      88.    Ms. Handler said that she also thought a discussion of Mr. Lavanty's
21  conduct was the purpose of the call.  Ms. Warner made it clear that Mr. Lavanty's
22  email was not an apology and that she did not misunderstand anything, whether it
23  was his tone, words, threats, etc.  She got all of it, and it was not acceptable.

24      89.    Again, Mr. Weatherby, their mutual supervisor, did not say a word.

25      90.    Ms. Warner said that she would do her best to forge ahead because they
26  are peers, but that her trust in Mr. Lavanty had been diminished.  The call ended

27
28

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

23

1  without Mr. Weatherby admonishing Mr. Lavanty in any way whatsoever, nor

2  offering any comment on the sexist behavior.

3  91.   Just three days later, on or around March 11, 2021, Mr. Weatherby

4  circulated a terse announcement that Mr. Lavanty had been promoted to Vice

5  President.

6  92.   It is well-known at Amazon that Mr. Lavanty has been the subject of

7  various harassment, discrimination, and other complaints at the Company.  Mr.

8  Weatherby is reputed to have run interference for Mr. Lavanty on several of these

9  complaints, and it appears that Mr. Lavanty's open eruption of animus towards Ms.

10  Warner is only the latest example of such shielding from discipline.  On the contrary,

11  Mr. Lavanty was handsomely rewarded despite his abysmal, even hateful, conduct

12  that violated the Company's Code of Conduct and amounted to terminable offenses.

13  93.   Not only was Mr. Lavanty spared from any discipline or consequences,

14  but Mr. Weatherby had falsely told Ms. Warner that neither she nor any of her other

15  peers would be considered for the L10 position to which Mr. Lavanty was elevated.

16  Therefore, Mr. Weatherby cleared the way for Mr. Lavanty on that score as well,

17  eliminating any other candidates for the open L10 position.

18  94.   Ms. Warner's record and experience demonstrate that she was

19  undoubtably far more qualified than Mr. Lavanty (including in the area of

20  Professional Services).  For example, Ms. Warner achieved Senior Vice President

21  status at several large public companies and has a track record of managing bigger

22  teams with significantly larger budgets and revenues than Mr, Lavanty.

23  95.   Amazon's decision to deprive Ms. Warner of opportunities for

24  promotion into the L10 role was particularly egregious because Ms. Warner was

25  already performing functions that amounted to a L10 role.

26  96.   By way of example only, among other responsibilities that were

27  consistent with an L10 role, Ms. Warner often was used as a surrogate for Mr.

28

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

24

Weatherby in meetings with some of Amazon's most senior leaders and business partners, such as Mr. Jassy or Accenture CEO Julie Sweet.

97.    Amazon therefore required Ms. Warner to perform work that was consistent with an L10 role, while denying her the same compensation and title/level that they provided to her equally or less-experienced male colleagues at the Company who were officially designated as L10 employees (and compensated as much as $1 million or more annually than what Ms. Warner was being paid).

98.    Later, on March 11, 2021, Ms. Warner had a one-on-one meeting with Mr. Weatherby.  Mr. Weatherby asked Ms. Warner how she though the Monday meeting with Mr. Lavanty had gone.  Ms. Warner honestly answered that she thought it had been awful, in part because Mr. Weatherby had said nothing about Mr. Lavanty's conduct.  She also let Mr. Weatherby know that others in the group also were shocked by Mr. Lavanty's promotion, particularly because they knew Mr. Lavanty had been the subject of several complaints and investigations by Employee Relations.

99.    Mr. Weatherby let Ms. Warner know that Mr. Lavanty's promotion had been approved the same day as his outburst, Monday, March 8, 2021, which meant that he had been promoted despite his openly sexist and abusive conduct towards Ms. Warner, which should have proven his unsuitability for a highly senior role, as it was very recent and unquestionably violated Amazon's Code of Conduct (along with his other alleged harassing and discriminatory conduct).

100.    Unbelievably, this promotion made Mr. Lavanty, a man who has called Ms. Warner a "nobody," "of no interest," an "idiot," and a "bitch," her superior.  Mr. Weatherby apparently believed that this is an acceptable state of affairs in the Professional Services group.

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

25

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

## IV.   THE DISPARATE TREATMENT AND VERBAL ABUSE OF MS. WARNER BY AWS'S MANAGEMENT IS ONLY ONE OF THE MOST RECENT EXAMPLES OF DISCRIMINATORY AND RETALIATORY CONDUCT AGAINST MS. WARNER AND OTHERS THAT HAVE BEEN OVERLOOKED BY AMAZON

101.   Among Ms. Warner's peers, the promotion of Mr. Lavanty was viewed as a reward to someone who was close with and had been loyal to Mr. Weatherby and a ratification of a "white boys' club" in which social cohesion was prized over new ideas and even results (it happened despite what Ms. Warner has been told are consistent performance shortcomings on the part of Mr. Lavanty).

102.   Colleagues again discussed, as they had before, the fact that many women in the group who had spoken up about Mr. Lavanty and other issues were often moved, demoted, transferred to another matter, or felt forced to leave the Company altogether because their position was no longer tenable as their prospects had evaporated.

103.   The members of the Women@ProServe group were so disturbed by Mr. Lavanty's elevation that they discussed writing an account of their experiences with gender discrimination to be read at a future Professional Services meeting.  High-ranking female colleagues feel so hopeless and marginalized under Mr. Weatherby's management that they have cried while discussing their experiences with Ms. Warner.

104.   The Women@ProServe group, in light of the deference given to Mr. Weatherby by Employee Relations and HR, is unsure how to successfully get Amazon to finally address the protection he has given to men who treat female colleagues with open contempt, as well as the fact that even the most qualified and/or accomplished women in the group get few resources and small roles with little

26

1   authority or influence (such as Ms. Warner herself and a female peer with only a

2   modest team).

3       105.   For Ms. Warner, the warning signs that women are treated with

4   disregard and are at a sizable disadvantage in Professional Services surfaced early

5   in her tenure.  On or around March 12, 2020, less than a month after she started, Mr.

6   Weatherby and Ms. Warner exchanged Chime messages after a Women@ProServe

7   monthly call.  Mr. Weatherby messaged Ms. Warner about a female employee who

8   had talked about being upset that a male employee had taken credit for her work and

9   published it in his own name.  Mr. Weatherby did not understand why the employee

10   was so bothered by this.  Ms. Warner observed that there were concerns in the group

11   about the treatment of women and that this was the kind of issue that frequently

12   comes up regarding how women are treated and taken advantage of in an

13   organization.

14       106.   On or around April 7, 2020, Mr. Weatherby asked Ms. Warner to

15   "intervene" in the Women@ProServe Chime room because there had been a number

16   of escalations out of the discussions in its chat room.  He singled out one specific

17   female employee as making supposedly unfounded assertions about men taking

18   credit for or otherwise downplaying women's contributions or excluding them from

19   opportunities to provide input.  Mr. Weatherby was irritated by this and said that the

20   employee's observations and feelings were not accurate or constructive.

21       107.   He asked Ms. Warner to reach out to and immediately start working

22   with the President of Women@ProServe, to change the direction of the conversation

23   and make things more positive.  He also named other women who he believed were

24   speaking out of turn by commenting on areas in which they did not work and went

25   so far as to label one person's observations as "toxic."

26       108.   Mr. Weatherby appeared panicked that the women were having these

27   discussions in a public, open forum, and urgently wanted it to end.  In particular, he

28

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

said that the assertion that men were taking credit for the work of female employees and suppressing their visibility and leadership "is the part I'm most concerned about."   Mr. Weatherby did not want the concerns addressed – he wanted the discussion of such concerns to be cut off.

109.   Later in April 2020, Mr. Weatherby blocked the rehire of a former Amazon employee, Mike Owens, who had been vocal about issues in Professional Services, including the bullying, discriminatory conduct of male employee Pravin Raj (whose discriminatory and harassing conduct has been complained of by several other employees as well).   Despite the fact that the hiring loop for Mr. Owens was "inclined" (including Ms. Warner, the hiring manager, who had worked with Mr. Owens at two other companies), Mr. Weatherby refused to allow him to be rehired, offering only a vague criticism of his resume.

110.   To Ms. Warner, it appeared that it was Mr. Owens's willingness to speak up that Mr. Weatherby did not like.   Ms. Warner escalated the issue regarding the blocking of the hire as it was against policy, but nothing was done.   As an indication of how solid a candidate he was, Mr. Owens was hired by a different part of Amazon around six months later.

111.   On or around June 2, 2020, within three months of her being on the job, Ms. Warner ferreted out an Advisory employee who had been at the Company for well over a year (March 2019) but was working full-time as a partner for a consulting firm while also "working" at Amazon full-time.   This employee was previously assigned to report to Mr. Weatherby and then was assigned to report to Ms. Warner. The employee, a white male, was chronically absent from meetings, did not follow up on assignments from Mr. Weatherby, and was described by Mr. Weatherby to Ms. Warner as merely "disconnected."   This person also had been rated as meeting expectations by Mr. Weatherby.   Mr. Weatherby had to admit that, "I'm feeling pretty stupid for that happening under my nose."

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

28

112.   Yet, when female employees (including senior women such as Ms. Warner or another female peer) miss a meeting or call for any reason, Mr. Weatherby rails against and berates them, while this white male employee skated by barely working and being chronically absent for well over a year (and who knows how much longer it would have been if Ms. Warner had not zeroed in on him).

113.   The absentee employee was soon terminated, and Ms. Warner took over his group, which had gone through several unsuccessful managers in recent years, including Pravin Raj.

114.   By way of example only, regarding common manifestations of disparate gender-based attitudes and treatment in ProServe, on or around June 15, 2020, Mr. Weatherby scolded Ms. Warner over Chime for not having read a paper in its entirety before a call even though she had received it late the night before and thought it would be reviewed on the call (he called it a "fuzzy discussion").  Days later, on or around June 17, 2020, Mr. Weatherby told Ms. Warner via Chime that, "I like your tone today!  You are asking questions, showing curiosity and not making statements or judgments.  Keep it up."

115.   Clearly, Mr. Weatherby wanted Ms. Warner to be submissive and unassertive, which, based upon his protection of Mr. Lavanty, is not what he expects from his male direct reports.  Mr. Weatherby also requires Ms. Warner to get his approval on any significant decisions and action, whereas her male peers go about their business without oversight (as illustrated by the incident with the absentee employee and many others).

116.   By way of another example, Mr. Weatherby leveled the weak criticism that Ms. Warner was not "demonstrating frugality" because she sent out holiday care packages to employees as a teambuilding effort, while many of her male peers were doing similar things.  This rang particularly hollow during 2020, a year that the

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY
MOTION TO STRIKE SECOND AMENDED CLASS ACTION COMPLAINT

1   Company avoided so many of the usual expense associated with having employees

2   in the office.

3        117.   A further example of this type of disparate treatment (which echoed

4   concerns of other female ProServe employees, too) occurred in or around October

5   2020, after Ms. Warner took the opportunity to visit with several employees (in a

6   properly socially distant manner) while she was on the road traveling from her

7   Michigan home to spend several months at her California home.  She blogged about

8   the trip and visits to her team members, and the effort to meet them even amid the

9   pandemic was a hit with her reports and she got great feedback that it created a

10  feeling of connection and caring.  When Ms. Warner mentioned these meetings

11  during a Leadership Team meeting, Mr. Weatherby panned the idea and said that he

12  was not sure what sort of "obsession" this demonstrated, and he found it odd.  Ms.

13  Warner said to the group that she believed it demonstrated employee obsession and

14  that she felt that the Company's leadership principles should account for that as well.

15       118.   Tellingly, just one month later, Mr. Lavanty suggested a 15th leadership

16  principle within Professional Services called "Employee Obsession," and said he

17  had someone on his team write a short narrative introducing the idea.  Mr. Weatherby

18  was enthusiastic and "inclined" about this and told Mr. Lavanty to form a team

19  around the idea, which has gone ahead.  A clearer illustration of the professional

20  concerns of the women in Professional Services could hardly be presented.

21       119.   Also on June 17, 2020, Mr. Weatherby sent Ms. Warner a Chime

22  message asking her for help due to female employees having left the group

23  Women@ProServe and saying that "leadership isn't doing enough."  Mr. Weatherby

24  complained that another female employee had stopped listening circles from being

25  scheduled and he blamed her for some women not wanting to be part of

26  Women@ProServe.  Ms. Warner pointed out that bumps in the road were to be

27

28

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY
MOTION TO STRIKE SECOND AMENDED CLASS ACTION COMPLAINT

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

expected and should not dissuade one from further efforts to achieve equity or take away from progress that is made.

120.   Ms. Warner advised Mr. Weatherby not to leap to the conclusion that the group's efforts were for naught or counterproductive.  Mr. Weatherby responded, "Ok, I'll not leap.  But I am on the ledge and need you to pull me back!"  In this same exchange, Mr. Weatherby made it clear that his primary concern was that his perceived progress on inclusion and diversity at AWS would be tainted.

121.   In August 2020, a few months later, Mr. Lavanty and another AWS executive, Pravin Raj, apparently were the unnamed subjects of a LinkedIn blog post by a former employee.  The post discussed the use of homophobic language and other abusive, harassing, and discriminatory conduct.

122.   Ms. Warner learned that Mr. Lavanty had allegedly used homophobic language and that the post was referring to that incident.  The post attracted attention at AWS and, in late August 2020, a Diversity & Inclusion ("D&I") leader raised the blog post at a meeting in order to discuss with Professional Services employees how it made them feel and what portions of the post were true.

123.   Mr. Weatherby and Mr. Lavanty became furious at this, with Mr. Lavanty yelling at the Black female D&I leader, "How dare you bring this up, that guy is a piece of shit—in front of Leadership Team!"  In response, the D&I person evenly stated that the employees in the group should have an honest conversation about the post.  Mr. Lavanty proceeded to express homophobic views by discounting the opinion of the gay male employee who authored the post due to the "choices he had made in his life."  Ms. Warner was shocked and offended by Mr. Lavanty's discriminatory remarks, and by the fact that, once again, Mr. Lavanty's volatile, hateful behavior was permitted to go unchecked.  Notably, after this blow-up and demonstration of retaliatory animus, the D&I employee soon turned in her resignation and moved to an entirely different group.

31

124.   Despite all of this, Ms. Warner was undaunted in raising with Mr. Weatherby how her status as a woman seemed to affect perceptions of her work (and that of other women in Professional Services).  Mr. Weatherby and other members of the Leadership Team are generally very complimentary of the work of other white males, but when someone such as the Black female D&I employee raises a different perspective, they are quick to pile on and even attempt to humiliate and intimidate the person.

125.   In multiple one-on-one meetings, Ms. Warner has defended her work product and pointed out examples of work by male colleagues that was lackluster (especially by comparison).  She has pointed out that, because she is a woman, she can expect and will get a public flogging and humiliating treatment, whereas "one of the boys" will get praise.  In response to these observations, which she has made more than once, Mr. Weatherby generally merely shrugs and declines to respond.

126.   Ms. Warner has learned from personal experience that Mr. Weatherby tends to criticize women for conduct that goes unremarked when male managers do the same and much worse.  Although he has chided Ms. Warner for having "sharp elbows," a line parroted by Mr. Lavanty, there is ample evidence that aggression and totally unprofessional displays of volcanic anger by men are ignored or seen as par for the course.  Other men in the group also appear to have taken their cues from the top male managers in their bullying behavior, deriding an employee as a "minor league player" and ridiculing praise for employees who are not part of the in-group.

127.   When Ms. Warner pointed out the inappropriate nature of such conduct, Mr. Weatherby called out Ms. Warner in their next one-on-one meeting, saying, "You were wrong to do that."  On such occasions and others, Mr. Weatherby would resort to the vague refrain and excuse that, "You need to learn the culture here."  Needless to say, the "culture" at Amazon should not include ridicule, abuse,

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY
MOTION TO STRIKE SECOND AMENDED CLASS ACTION COMPLAINT

1    disregard for employees' feelings of marginalization, and displays of retaliatory

2    animus when people raise legitimate concerns.

3         128.   Unfortunately, Mr. Weatherby recently again showed his displeasure

4    with Ms. Warner regarding her speaking up about improper, discriminatory conduct.

5    During the same one-on-one meeting, in early March 2021, when Mr. Weatherby

6    had asked about the call with Mr. Lavanty, he was reviewing Ms. Warner's goals for

7    this year.

8         129.   At one point, Mr. Weatherby said, "It would be great if you can create

9    definition around our Go to Market, because nobody really understands…."  He

10   stopped and then sarcastically said, "Oh, I better not use that word."  Ms. Warner

11   genuinely asked what word he meant.  Mr. Weatherby then sourly said, "I better not

12   use the word 'nobody.'  You might take it the wrong way."

13        130.   This was a pointed reference to Ms. Warner's objection to Mr. Lavanty

14   calling her a "nobody."  Needless to say, this unmistakable evidence of lingering

15   anger towards Ms. Warner for her legally protected complaint about Mr. Lavanty

16   regarding his discriminatory, harassing conduct has caused great anxiety and

17   apprehension of retaliation.  Mr. Weatherby clearly held Ms. Warner's willingness

18   to stand up against unacceptable, discriminatory conduct against her.  The full extent

19   of Defendants' retaliatory animus and reckless measures they were willing to take

20   to punish Ms. Warner would soon become clear.

21   **V.   AMAZON TERMINATES MS. WARNER, IN AN ACT OF OPEN**

22   **      RETALIATION FOR RETAINING ATTORNEYS AND COMING**

23   **      FORWARD WITH LEGAL CLAIMS AGAINST THE COMPANY**

24        131.   On or around April 7, 2021, Amazon received a letter from Ms.

25   Warner's counsel informing the Company that she was now represented by attorneys

26   and which detailed her allegations of discrimination and retaliation against the

27   Defendants.

28

33

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY
MOTION TO STRIKE SECOND AMENDED CLASS ACTION COMPLAINT

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

132.   Unbelievably, just three weeks later, on or around April 28, 2021, Ms. Warner was notified that she was being terminated from her position in ProServe at Amazon.  Ms. Warner also was told she had to find a new job outside of Professional Services within two months or she would be out of the company entirely.  Therefore, Ms. Warner was essentially terminated with two months' notice, and had to find a new job (which, if she could manage it, incidentally could be at Amazon).  Notably, it had taken five months for Ms. Warner to enter her job at Amazon even when she was being actively and personally recruited—Amazon knows that two months is a completely inadequate period in which to find a new position.

133.   No alternative positions were offered by Amazon, nor was Ms. Warner offered any assistance in finding a new position.  Indeed, the sudden and abrupt removal of Ms. Warner from her job caused a tremendous stir in ProServe and beyond, which has greatly damaged her reputation and ability to find a new position.  For example, the fact that the Company's system now reflects that Ms. Warner, an L8 employee (at least for now), has no direct reports clearly communicates to hiring managers that there is an issue surrounding her and that they should stay away.

134.   Indeed, Ms. Warner has contacted several Amazon managers about jobs that she was qualified and well-suited for, but after friendly, promising initial conversations, they do not get back to her (after likely looking into the background of the situation with people in ProServe).

135.   Ms. Warner's termination was blatant retaliation for engaging in legally protected activity in both objecting to discrimination against women and herself and retaining counsel to pursue legal claims.  The termination came shortly after she spoke out against the discrimination she endured on account of her gender, and just days after she attended her last Women@ProServe meeting.

136.   Subsequently, Amazon transferred all of Ms. Warner's responsibilities to two of her peers.  Many of Ms. Warner's coworkers and subordinates contacted

34

1  Ms. Warner to express their shock and dismay regarding her abrupt termination, as

2  well as to offer words of thanks and compliments.

3      137.   Amazon and managers such as Mr. Weatherby and Mr. Lavanty very

4  clearly believe they are untouchable and can terminate employees for retaliatory

5  reasons with impunity.  In doing so, Amazon shows that it will not be bothered or

6  inconvenienced for even a brief time by retaining a "squeaky wheel" employee in

7  order to comply with its legal obligations under the country's anti-discrimination

8  laws.  It is Ms. Warner's hope that, through this blatant retaliation against her,

9  Amazon's dangerous sense of invincibility may finally be put to the test and

10  shattered.

### FIRST CAUSE OF ACTION
### (Violations of the Equal Pay Act)
### *Against All Defendants*

11

12

13      138.   Plaintiff hereby repeats, reiterates and re-alleges each and every

14  allegation as contained in each of the preceding paragraphs, as though fully set forth

15  herein.

16      139.   During Plaintiff's employment, Defendants required Plaintiff to

17  perform the same or substantially the same job position as male employees, requiring

18  equal skill, effort and responsibility under similar working conditions, and paid

19  Plaintiff a rate of pay, including but not limited to salary and securities awards or

20  grants, less than such male employees.

21      140.   Defendants engaged in patterns, practices, and/or policies of

22  employment which discriminated against Plaintiff on the basis of her gender by

23  paying Plaintiff a lesser rate of pay, including but not limited to salary and securities

24  awards or grants, than that paid to male employees performing the same or

25  substantially similar job duties which require equal skill, effort and responsibility,

26  and under the same working conditions.

27

28

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

35

1    141.   As a direct and proximate result of Defendants' unlawful discriminatory

2    conduct in violation of the EPA, Plaintiff has suffered, and continues to suffer, harm

3    for which she is entitled to an award of monetary damages, liquidated damages,

4    interest, and other relief.

5    142.   Defendants' conduct was willful, and it knew that its actions constituted

6    unlawful violation of the EPA and/or showed reckless disregard for Plaintiff's

7    statutorily protected rights.

## SECOND CAUSE OF ACTION
**(Retaliation in Violation of the Equal Pay Act)**
***Against All Defendants***

10   143.   Plaintiff hereby repeats, reiterates and re-alleges each and every

11   allegation as contained in each of the preceding paragraphs, as though fully set forth

12   herein.

13   144.   By the actions described above, among others, Defendants retaliated

14   against Plaintiff for complaining about unequal pay on the basis of sex by altering

15   her working conditions and terminating her employment.

16   145.   As a direct and proximate result of Defendants' unlawful retaliatory

17   conduct in violation of the EPA, Plaintiff has suffered, and continues to suffer, harm

18   for which she is entitled to an award of monetary damages, interest, liquidated

19   damages, and other relief.

20   146.   Defendants' conduct was willful, and it knew that its actions constituted

21   unlawful violation of the EPA and/or showed reckless disregard for Plaintiff's

22   statutorily protected rights.

23   / / /

24   / / /

25   / / /

26   / / /

27

28

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

36

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

### THIRD CAUSE OF ACTION
#### (Violations of California Equal Pay Act)
#### *Against All Defendants*

147.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

148.   During Plaintiff's employment, Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort and responsibility under similar working conditions, and paid Plaintiff a rate of pay, including but not limited to salary and securities awards or grants, less than such male employees.

149.   Defendants engaged in patterns, practices, and/or policies of employment which discriminated against Plaintiff on the basis of her gender by paying Plaintiff a lesser rate of pay, including but not limited to salary and securities awards or grants, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort and responsibility, and under the same working conditions.

150.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of CEPA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages, liquidated damages, interest, and other relief.

151.   Defendants' conduct was willful and it knew that its actions constituted unlawful violation of the CEPA and/or showed reckless disregard for Plaintiff's statutorily protected rights.

/ / /

/ / /

/ / /

37

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of California Equal Pay Act)**
***Against All Defendants***

152. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

153. By the actions described above, among others, Defendants retaliated against Plaintiff for complaining about unequal pay on the basis of sex by altering her working conditions and terminating her employment.

154. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the CEPA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages, liquidated damages, interest, and other relief.

155. Defendants' conduct was willful, and it knew that its actions constituted unlawful violation of the CEPA and/or showed reckless disregard for Plaintiff's statutorily protected rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of California.

B. An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

C. An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1  compensatory damages, including, but not limited to, compensation for Plaintiff's

2  emotional distress;

3      D.    An award of liquidated damages equal to the amount of Plaintiff's past

4  and future lost wages;

5      E.    An award of punitive damages in an amount to be determined at trial;

6      F.    Prejudgment interest on all amounts due;

7      G.    Post-judgment interest as may be allowed by law;

8      H.    An award of Plaintiff's reasonable attorneys' fees and costs; and

9      I.    Such other and further relief as the Court may deem just and proper.

10  / / /

11  / / /

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY
MOTION TO STRIKE SECOND AMENDED CLASS ACTION COMPLAINT

1

## JURY DEMAND

2       Plaintiff hereby demands a trial by jury on all issues of fact and damages stated

3   herein.

4

5   Dated: May 19, 2021                    Respectfully submitted,

6                                          **WIGDOR LLP**

7                                          Lawrence M. Pearson

8                                          Jeanne M. Christensen
                                           Alfredo J. Pelicci

9                                          Anthony G. Bizien
                                           (motions for admission *pro hac vice*

10                                         forthcoming)

11

12                                         85 Fifth Avenue, Fifth Floor
                                           New York, NY 10003

13                                         Telephone: (212) 257-6800
                                           Facsimile: (212) 257-6845

14                                         lpearson@wigdorlaw.com

15                                         jchristensen@wigdorlaw.com

16                                         apelicci@wigdorlaw.com
                                           abizien@wigdorlaw.com

17

18                                         **GIRARD BENGALI, APC**

19

20                                         By: _____
                                                  Omar H. Bengali

21

22                                         355 S. Grand Street, Suite 2450
                                           Los Angeles, CA 90071

23                                         Telephone: (323) 403-5687

24                                         Facsimile: (323) 302-8305
                                           obengali@girardbengali.com

25

26                                         *Attorneys for Plaintiff Cindy Warner*

27

28

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY
MOTION TO STRIKE SECOND AMENDED CLASS ACTION COMPLAINT