LAWRENCE M. PEARSON (NY SBN 3954591)
ALFREDO J. PELICCI (NY SBN 5775820)
(All admitted *pro hac vice*)
**WIGDOR LLP**
85 Fifth Avenue, Fifth Floor
New York, NY 10003
Tel.: (212) 257-6800
Fax: (212) 257-6845
lpearson@wigdorlaw.com
apelicci@wigdorlaw.com

OMAR H. BENGALI (CA SBN 276055)
**GIRARD BENGALI, APC**
355 S. Grand Street, Suite 2450
Los Angeles, CA 90071
Tel.: (323) 403-5687
Fax: (323) 302-8305
obengali@girardbengali.com

*Attorneys for Plaintiff Cindy Warner*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CINDY WARNER,<br><br>        Plaintiff,<br><br>  vs.<br><br>AMAZON.COM, INC., AMAZON WEB SERVICES, INC., and TODD WEATHERBY, in his individual and professional capacities,<br><br>        Defendants. | Case No. 5:21-cv-00866-JWH-KK<br>———<br>**SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................3

ADMINISTRATIVE PROCEDURES .................................................................10

JURISDICTION AND VENUE ...........................................................................11

PARTIES ...............................................................................................................11

FACTUAL ALLEGATIONS ...............................................................................12

I.      Ms. Warner's Career Before and Recruitment to Amazon, and Her Role
        and Accomplishments in One Year at Amazon ..........................................12

II.     Management Refuses to Provide Ms. Warner with Additional
        Responsibilities or Allow Her to Apply for a Promotion, Contrary to
        What She Had Been Promised by Amazon...................................................16

III.    Ms. Warner Is the Target of Abusive Treatment and Unmistakably Sexist
        Epithets in the Presence of Human Resources Personnel, Demonstrating
        the Gender Bias of Her Immediate Male Supervisors.................................23

IV.     The Disparate Treatment and Verbal Abuse of Ms. Warner by AWS's
        Management Is Only One of the Most Recent Examples of
        Discriminatory and Retaliatory Conduct Against Ms. Warner and Others
        that Have Been Overlooked by Amazon......................................................33

V.      Amazon Terminates Ms. Warner In an Act of Open Retaliation for
        Retaining Attorneys and Coming Forward with Legal Claims Against the
        Company.......................................................................................................48

VI.     Amazon Ignored ProServe Employees' Outcry Concerning the
        Retaliatory Termination of Ms. Warner and Rejected Ms. Warner's Good
        Faith Requests for Amazon to Reverse Course............................................52

FIRST CAUSE OF ACTION ...............................................................................58

SECOND CAUSE OF ACTION ..........................................................................60

WIGDOR LLP
85 FIFTH AVE, FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

THIRD CAUSE OF ACTION ...................................................................... 61

FOURTH CAUSE OF ACTION .................................................................. 62

FIFTH CAUSE OF ACTION ....................................................................... 62

SIXTH CAUSE OF ACTION ...................................................................... 64

SEVENTH CAUSE OF ACTION ............................................................... 64

EIGHTH CAUSE OF ACTION ................................................................... 65

NINTH CAUSE OF ACTION ...................................................................... 66

PRAYER FOR RELIEF ............................................................................... 67

JURY DEMAND .......................................................................................... 68

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

Plaintiff Cindy Warner ("Plaintiff" or "Ms. Warner"), by and through her undersigned counsel, Wigdor LLP, as and for the Second Amended Complaint in this action against Defendants Amazon.com, Inc. ("Amazon.com"), Amazon Web Services, Inc. ("AWS") (together, "Amazon" or the "Company"), and Todd Weatherby, in his individual and professional capacities, (collectively, "Defendants") hereby states and alleges as follows:

## PRELIMINARY STATEMENT

1.      In certain corners of Amazon's corporate organization, the white male executives who dominate Amazon's top ranks let stereotyping and animus bubble to the surface when they have to deal with employees (particularly women and other under-represented groups) who speak up about improper practices such as discrimination and harassment.  Amazon allows its managers, again seemingly in a misguided effort to protect the bottom line, to run amok and mistreat employees, particularly women and people of color, even when they manage to gain a position near the top of the Company's corporate ladder.

2.      These abusive managers are protected by Amazon's top leadership and Human Resources ("HR") organization, so long as they are part of the in-group and seen as serving the Company's bottom line.  Meanwhile, the employees who raise sincere, legitimate complaints regarding discrimination against or mistreatment of women in an organization, such as AWS's Professional Services (or "ProServe"), are often met with lip service, a sidelined career, or swift retaliation, including in the form of termination or a campaign to force them out of the Company.  What may surprise Amazon, however, is that such disregard for misconduct and employee complaints, in fact, harms the Company's bottom line and employee performance.

3.      Cindy Warner is a tremendously successful LGBTQ+ businesswoman who has had an illustrious career as an executive at many major institutions and tech

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1   companies for over 30 years before she was aggressively recruited to join Amazon

2   in late 2019.

3       4.      Ms. Warner had to consider carefully whether or not to join Amazon,

4   as she wanted to ensure that her next professional move could be to a place that she

5   could stay for some time while writing what could be the last chapter in a storied

6   career.

7       5.      Despite some reservations, however, she could not possibly know when

8   she accepted her position with Amazon that the Company would allow her male

9   managers and colleagues to reduce her to disgusting names such as a "**bitch**," an

10  "**idiot**," and a "**nobody**." These epithets were thrown at her not because she did not

11  meet expectations, but rather occurred because she had ingratiated herself with her

12  new team all too well, and was quickly delivering results that outshone her new

13  white male coworkers in upper management. Ms. Warner also made it her practice,

14  as a "fresh set of eyes" to question, challenge, and object to the practices of ProServe

15  that discriminatorily kept female employees and others from being recognized and

16  advancing at the Company. As a woman, Ms. Warner drew hostile and bitter

17  reactions that her male coworkers (such as Dave Lavanty, a white male) and manager

18  (Defendant Weatherby) did not direct at male peers and subordinates—with Mr.

19  Lavanty calling her a "bitch," and "idiot" and threatening her future at Amazon and

20  Mr. Weatherby letting this gender-related hostility and misconduct slide without so

21  much as a scolding, much less any discipline. Indeed, in a striking display of

22  contempt for Ms. Warner's complaint about Mr. Lavanty's use of an expressly

23  gender-related insult or slur, Weatherby increased Mr. Lavanty's Amazon "level"

24  just days later.

25      6.      Ms. Warner was subjected to blatant discrimination at Amazon dating

26  from even before she started work there – having been hired at a job level, Level 8

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

27

4

28  SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

position ("L8"), that was lower than her experience supported.  She had been told that she was being recruited for a Level 10 ("L10") position, which also comes with compensation that is much higher.  This was not the last time Ms. Warner was to be provided false information regarding her job role and how the Company would handle her employment.

7.     Amazon's discrimination from the time of her hiring and throughout Ms. Warner's employment has resulted in lost income of millions of dollars, including with regard to how much the Company paid equally or less-qualified male colleagues with similar job responsibilities.

8.     Rather than the innovative and forward-thinking environment that she believed Amazon could or would be (*e.g.*, the General Motors of the 21st Century), Ms. Warner quickly realized that the division of Amazon she joined, Professional Services or ProServe, in Amazon Web Services (AWS) was a prime example of a boys' club where predominantly white male executives jealously guard their sphere of influence.  In ProServe, as with many similar workplaces, this meant curtailing the opportunities and paths for advancement of women and people of color, while reserving plum positions for the white male friends and protégés of executives like Todd Weatherby, Vice President of Professional Services Worldwide at AWS.

9.     Despite such obstacles, Ms. Warner, a business veteran, got right to work.  Her drive to succeed at Amazon was infectious and her team, which was a small fraction of the size of those she managed at previous employers, thrived under her management.  Ms. Warner grew several of ProServe's most important client relationships, such as Novartis and Cisco.

10.     Rather than welcome a new colleague who was making tremendous positive contributions, Ms. Warner met constant resistance from her male colleagues who could not tolerate – and seemingly felt threatened by – an accomplished and

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

5

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

effective woman like Ms. Warner.  Instead of building on Ms. Warner's ideas, they told her that she supposedly had "sharp elbows" and demanded that she "get out of the way."  Despite starting at Amazon just as the COVID-19 pandemic took hold, she was able to build her team and create cohesion and a sense of shared direction, while also taking charge of the implementation of COVID-19 safety protocols for ProServe.

11.     Despite constant degradation from her male peers, during her tenure in ProServe at Amazon, Ms. Warner made innumerable valuable contributions from a business and organization perspective.  Her tenacity and dedication earned her significant praise in her Forte 2021 review including the following:

- "Cindy has the best business judgment I've seen in my career."

- "Cindy thinks big and demonstrates backbone when challenging us to think more long term about ProServe's partner program."

- "Cindy has incredible energy, brings a lot of positivity and is not afraid to speak her mind, especially when she sees something wrong.  She is a team player, and is a good listener.  She is unafraid to let go of her beliefs and learn."

12.     Male executives felt free to treat Ms. Warner, a gay woman in her late 50s, with open contempt, insults, and hostility.  This unprofessional, discriminatory, and unlawful conduct by Ms. Warner's male coworkers included, but was not limited to, one of the top-ranking managers at AWS, Dave Lavanty, calling her a "**bitch**," an "**idiot**," and a "**nobody**" in front of a member of Human Resources.  Ms. Warner, a highly experienced professional, was shocked and distraught that a coworker

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

6

1  would show such hatred, openly express animus against her as a woman (he had not

2  and would not plausibly call a male coworker a "bitch" in a work meeting in the

3  same manner) and apparently feel that he would be able to get away with it.  The

4  particular epithets and insults used by Mr. Lavanty were obviously directed

5  specifically at Ms. Warner as a woman, as Mr. Lavanty has not dared use such

6  language against male colleagues in the manner that he did with Ms. Warner.

7       13.    Amazon was immediately aware of the discriminatory and derogatory

8  remarks that Mr. Lavanty directed at Ms. Warner, as a member of Human Resources,

9  Ed Salas, was meeting with them and personally witnessed the remarks.  Amazon

10 and Ms. Warner also promptly informed Mr. Weatherby, the head of ProServe, about

11 this discriminatory and harassing misconduct by Mr. Lavanty.

12      14.    Rather than address and issue discipline for this unacceptable and

13 discriminatory conduct, Mr. Weatherby soon promoted Mr. Lavanty to the L10 level

14 of employment that the Company, the very level Defendants had used to lure Ms.

15 Warner before they down-leveled her position and compensation.

16      15.    This was particularly significant because Ms. Warner had been told by

17 Amazon that she could apply for an L10 position whenever she wished, but Mr.

18 Weatherby prohibited Ms. Warner from doing so, despite the fact that her

19 qualifications were far beyond those of Mr. Lavanty.  Being denied the opportunity

20 to apply for these positions had a very large effect on her compensation and career

21 arc at Amazon, setting her trajectory back several years and costing her millions in

22 income.

23      16.    This pattern and *modus operandi* has occurred in ProServe repeatedly

24 with female employees' careers suffering in favor of the white males who make up

25 ProServe's inner circle.  In this instance, though, Ms. Warner's seniority and

26 superior results and relationships made her a hard target for the usual discriminatory

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

7

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

tactics, and so the frustration and misogynistic disdain of one of the white male ProServe executives, Mr. Lavanty, finally bubbled to the surface with his exclamatory use of the label and epithet "**bitch**" towards her.

17. Amazon's management appears unconcerned with this rampant discrimination, as their own published data shows that women account for only approximately 20% of the employees at Amazon Level 8 and above – a figure that has changed relatively little over the past three years.[1]

18. On or around April 28, 2021, just three weeks after Amazon learned that Ms. Warner had retained legal counsel and informed the Company that she was pursuing legal claims of discrimination, Amazon abruptly and without explanation told Ms. Warner that her job in ProServe was over and that she had two months to find a new job at Amazon or her employment would end. Ms. Warner's direct manager, Defendant Weatherby, also was aware of her attorneys' letter and her claims of discrimination, as well as another protected complaint regarding equal pay for women in the group made that same month. Under Company policies and practices, both Mr. Weatherby and Amazon would have approved and implemented the adverse employment actions against Ms. Warner together. This was a blatantly retaliatory move against Ms. Warner that proved Defendants' animus and hostility against her. Mr. Weatherby and Mr. Lavanty, the white male managers of ProServe, could not tolerate leaving Ms. Warner in place once she made it clear that, if Amazon would not hold them accountable for their behavior, then she would do it.

19. Many coworkers and members of Ms. Warner's team expressed their shock and outrage regarding her sudden and unwarranted termination.

20. True to herself, Ms. Warner diligently applied for other positions for which she was qualified and a good match. However, Amazon's vindictive handling

---

[1] https://www.aboutamazon.com/news/workplace/our-workforce-data (last accessed May 17, 2021).

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

8

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1   of the situation made it very difficult if not impossible for her to get good responses,

2   as her status on the Company's system showed her with no direct reports (an obvious

3   red flag at her level and indication of some irregularity regarding her status at the

4   Company).

5       21.     In addition, the Company outright refused to recommend or help in any

6   way to find internal positions for her.  This reveals the Company's removal of Ms.

7   Warner from her role to be exactly what it was – a termination trying to masquerade

8   (poorly) as something else.  Never in her decades of growing teams and building

9   organizations across a multitude of top companies had she experienced such

10  deplorable treatment, which also, not incidentally, goes against all business sense.

11      22.     The openly discriminatory language and other conduct by Amazon's

12  white male executives show that much of their worst behavior and abuse is targeted

13  at female coworkers and subordinates.  It draws a clear connection between the

14  dismal representation of women in the upper ranks of Amazon and systemic and

15  conscious animus and bias faced by women and other underrepresented groups at

16  Amazon.

17      23.     Amazon has long known about and tolerated conditions disadvantaging

18  women and allowed its male-dominated management to engage in practices keeping

19  women out of the Company's upper ranks.[2]  The insults, the open contempt, and the

20  disregard towards a high-ranking and valuable female executive like Ms. Warner

21  clearly illustrates the anti-female bias underlying these undeniable trends at the

22  Company.  Many women (and men) in Professional Services have shared with Ms.

23  Warner their own observations of and experiences with discrimination and

24  retaliation against women and other underrepresented groups at Amazon.

25

26  _____

    [2] See, e.g., https://www.realclearpolicy.com/articles/2018/10/09/report_amazon_falls_short_on_gen
27  der_equity_110846.html (last accessed May 17, 2021).

                                            9
28  ─────────────────────────────────────────────────────
    SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
                            DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

24.    Amazon had an opportunity to sincerely examine its policies and practices and enact meaningful change, as an employee petition circulated electronically among ProServe's workforce and was signed or "upvoted" by approximately 550 employees in June and July 2021.  The petition, which was spurred in part by the initial filing of Ms. Warner's instant lawsuit, noted "AWS employee experiences of sex and racial discrimination and retribution against whistleblowers [and] growing concern among ProServe employees about an underlying culture of systemic discrimination, harassment, bullying and bias against women and under-represented groups."  The employee petition made several suggestions and requests regarding a truly independent and transparent investigation as well as the establishment of an "employee council or advisory group," which were not followed by the Company.

25.    Ms. Warner now brings this action to redress the unlawful employment practices committed against her, including Defendants' discriminatory and retaliatory treatment of her due to her sex/gender and legally protected activity in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Equal Pay Act of 1963, 29 U.S.C. § 206(d) *et seq.* ("EPA"), California's Fair Employment and Housing Act, California Government Code § 12940 ("FEHA"), and the California Equal Pay Act, California Labor Code § 1197.5 ("CEPA").

**ADMINISTRATIVE PROCEDURES**

26.    On May 26, 2021, Ms. Warner filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII.

27.    Pursuant to a work-sharing agreement between the EEOC and the California Department of Fair Employment and Housing ("DFEH"), Ms. Warner's charge was cross-filed with the DFEH in order to satisfy prerequisites for bringing claims under the FEHA.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

10

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1  28.     On May 26, 2021, the DFEH issued Plaintiff a Right to Sue.  On June

2  3, 2021, the EEOC issued Plaintiff a Right to Sue.

3  29.     Any and all other prerequisites to the filing of this suit have been met.

4  ## JURISDICTION AND VENUE

5  30.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§

6  1331 and 1343, as this action involves federal questions regarding the deprivation of

7  Plaintiff's rights under the Title VII and the EPA.  The Court has supplemental

8  jurisdiction over Plaintiff's related claims arising under state law pursuant to 28

9  U.S.C. § 1367(a).

10  31.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as a

11  substantial part of the events or omissions giving rise to this action, including the

12  unlawful employment practices alleged herein, occurred in this district.

13  ## PARTIES

14  32.     Plaintiff Cindy Warner is a gay white woman and was a Global Leader,

15  ProServe Advisory, Strategic Program Management and Partners at Amazon.com,

16  Inc. and Amazon Web Services, Inc.  During the most relevant periods of her

17  employment at Amazon, Plaintiff Warner resided in Riverside County, California.

18  At the time of her hire by Amazon, Ms. Warner also was residing in Michigan.  At

19  all relevant times, Plaintiff Warner met the definition of an "employee" and/or

20  "eligible employee" under all applicable statutes.

21  33.     Defendant Amazon.com, Inc. is a Delaware-registered domestic

22  corporation with operations in Irvine, California and throughout the country.  At all

23  relevant times, Defendant Amazon.com, Inc. met the definition of "employer"

24  and/or "covered employer" under all applicable statutes.

25  34.     Defendant Amazon Web Services, Inc. is a Delaware-registered

26  domestic corporation with operations in Irvine, California and throughout the

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

27

11

28  SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

country.  At all relevant times, Defendant Amazon Web Services, Inc. has been a wholly owned subsidiary of Defendant Amazon.com, Inc. and met the definition of "employer" and/or "covered employer" under all applicable statutes.  Amazon.com, Inc. and AWS share facilities, administrative functions, and employee management functions and resources.

35.    Defendant Todd Weatherby is a white male and, upon information and belief, a resident of Seattle, Washington and was at all relevant times the Vice President of Professional Services Worldwide at Amazon Web Services, Inc., where he supervised Ms. Warner during her employment at the Company and controlled the terms and conditions of her employment (including her compensation and the ability to hire and fire).  At all relevant times, Defendant Weatherby met the definitions of "employer" and/or "covered employer" under all applicable statutes.

## FACTUAL ALLEGATIONS

## I.    MS. WARNER'S CAREER BEFORE AND RECRUITMENT TO AMAZON, AND HER ROLE AND ACCOMPLISHMENTS IN ONE YEAR AT AMAZON

36.    Ms. Warner, who is a gay woman in her late 50s, was a Partner and Vice President for nearly ten years at Ernst & Young/Capgemini ("EY") as a Global Leader in Systems Applications and Products, Customer Relations Management before leading technology and cloud-based initiatives at several other world-class organizations, including Salesforce.com, PricewaterhouseCoopers ("PwC"), IBM, and NetApp.

37.    At NetApp, Ms. Warner led an organization responsible for $2.4 billion in revenue, a budget of $700 million, approximately 3,000 full-time employees, and which provided service and support to that company's top 100 clients (including artificial intelligence solutions).  She has been credited with a wholesale

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

12

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1  transformation of the services and support organizations to facilitate that company's

2  transition to the cloud before being approached by Amazon in or around October

3  2019.

4  38.   Amazon aggressively recruited Ms. Warner to join its Professional

5  Services Group.   Ms. Warner previously had built professional services

6  organizations at Salesforce, PwC, and IBM.   Although she was recognized as

7  qualified for a Vice President, Level 10 ("L10") position, as confirmed in

8  conversations with both her recruiter and eventual boss, Todd Weatherby, she was

9  told that Amazon does not hire for L10 positions externally.

10  39.   Amazon and Mr. Weatherby succeeded in piquing Ms. Warner's

11  interest in the position with descriptions of her wide-ranging role and the discretion

12  and responsibility she would have.   She also interviewed with several other Amazon

13  representatives in Seattle in or around December 2019, at which the depth of Ms.

14  Warner's experience and professional achievements and qualifications were

15  thoroughly inquired into.

16  40.   Ms. Warner was told by Weatherby that she would be Mr. Weatherby's

17  replacement for succession planning purposes, as supposedly no other L10

18  employees were being groomed for that role.   Ms. Warner also was told that, in light

19  of her qualifications and readiness for an L10 role, she could apply for such a role

20  anywhere in the Company at any time once she joined Amazon, and that if and when

21  an L10 job became available in Professional Services, she also could apply for that

22  role.

23  41.   Soon, Ms. Warner received an offer from Amazon and was told that

24  although they loved her and she was a great fit, the Company does not hire for L10

25  positions much, if at all, from outside the organization, and therefore they could only

26

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

13

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

WIGDOR LLP
85 FIFTH AVE, FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1  offer her a Level 8 ("L8") position. Upon information and belief, the decision to

2  hire Ms. Warner as an L8 employee instead of L10 was made by Mr. Weatherby.

3      42. Ms. Warner had been considering a few other opportunities which she

4  had declined in anticipation of Amazon's offer, and though she was disappointed by

5  the significant pay cut she would take and narrower responsibilities she would have

6  as a result of the lower level, she believed the Company's assurances regarding her

7  ability to apply for an L10 position soon after she started. Amazon's representatives

8  promised Ms. Warner that she was eligible to apply for a promotion without any

9  time constraints.

10      43. Ms. Warner started work at Amazon as Global Leader, ProServe

11  Advisory, on or around February 17, 2020. Ms. Warner was paid the capped salary

12  of $160,000, as well as bonus and stock payments that brought her total annual

13  compensation to approximately $890,000.

14      44. Ms. Warner's role was leading Global Advisory Professional Services,

15  referred to as AWS's "tip of the spear," in which her team would work with

16  executive customers to show them how AWS could transform their organizations.

17  In this position, her ambit ultimately falls under Senior Leadership Team member

18  and Senior Vice President Matt Garman, who leads AWS Sales, Marketing and

19  Service.

20      45. In her role, Ms. Warner directly reported to Mr. Weatherby who, as

21  noted above, hired Ms. Warner for her role. In fact, Ms. Warner's offer letter was

22  signed by Mr. Weatherby. Mr. Weatherby had authority to dictate the scope and

23  nature of Ms. Warner's role. For example, approximately one week prior to Ms.

24  Warner starting, Mr. Weatherby informed Ms. Warner that he decided that her role

25  would include additional responsibilities pertaining to overseeing ProServe's partner

26  network. Upon information and belief, Mr. Weatherby was responsible for the

27

28

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

hiring and termination decisions for all ProServe employees at Ms. Warner's level, although such decisions also were reviewed and implemented by other Amazon personnel, such as those in Human Resources (HR). Mr. Weatherby determined the scope of the roles in ProServe at Ms. Warner's level, including assigning the ProServe leaders their specific projects and duties. Upon information and belief, Mr. Weatherby was the decision maker regarding compensation decisions for ProServe employees at Ms. Warner's level, including Ms. Warner.

46. In Global Advisory (which she was required to take over directly a few months into her tenure), Ms. Warner found that she had been handed an area that previously had four different leaders in four years. Ms. Warner was also tasked with building out the AWS Amazon Partner Network organization into Professional Services, an effort which had failed several times in the past. Ms. Warner also was given charge of Strategic Programs, another area in which several executives had failed to coalesce a strategy that brought the team along.

47. Upon starting at Amazon, in great contrast to her previous roles (including NetApp), Ms. Warner learned that the headcount of her team would be only approximately 50 employees, and that she had no budget or profit-and-loss responsibilities. Ms. Warner hit the ground running at Amazon and within her first month she established a COVID Business Continuity team in response to shutdowns and remote work arrangements affecting customers and Amazon itself. She was diving deeper to understand the Strategic Programs that were failing to achieve their objectives and restructured the Advisory Team to create greater clarity of their objectives and provide more value for Amazon's customers.

48. By October 2020, Ms. Warner had thoroughly gotten her arms around her various roles, making headway on the goals with her Advisory area growing, having made some excellent hires, and significantly growing the number of partners

15

in her area as well (including working with the CEO of Accenture). She was also making a significant impact as an Advisor to the Women@ProServe affinity group that was discussing instances of and addressing the gender bias and obstacles to advancement for women that were and are so pervasive within Professional Services.

## II. MANAGEMENT REFUSES TO PROVIDE MS. WARNER WITH ADDITIONAL RESPONSIBILITIES OR ALLOW HER TO APPLY FOR A PROMOTION, CONTRARY TO WHAT SHE HAD BEEN PROMISED BY AMAZON

49.     In light of her progress with her teams, in or around October 2020, Ms. Warner asked Mr. Weatherby for more responsibility, showed him the progress made in her group and explained that she easily could take on more, as the size of the team was comparable to what she was handling 20 years before or longer in the scheme of her career (which Mr. Weatherby would have known from the recruiting process).

50.     Yet, Mr. Weatherby turned her down flat. He refused to give her any more responsibility and simply declared, without any basis or explanation, that she had not proved capable of taking on more responsibility and that she somehow did not understand Amazon's culture (despite the clear headway she had made in previously floundering groups and initiatives). Mr. Weatherby further asserted (without any concrete basis) that Ms. Warner has "sharp elbows" and that she somehow does not listen well enough. It was immediately obvious that these were vague, intangible criticisms and rationalizations.

51.     During 2020, Ms. Warner had on occasion asked Mr. Weatherby, "have we considered" various things, which Mr. Weatherby took as her supposedly "being very critical," despite the fact that she was in fact being curious, having a bias for

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

16

1   action, thinking outside the box, and identifying areas for improvement (as one
2   would expect of any new, high-ranking executive).  Indeed, Ms. Warner, who has
3   been a successful member of many teams, asked Mr. Weatherby in response to his
4   brusque rejection of her questions and requests whether she had presented herself
5   inappropriately or offended others at any point, and that she would want to know if
6   that was the case.  Mr. Weatherby could not give any concrete examples at all beyond
7   his visceral feelings towards Ms. Warner.

8       52.    It was apparent that Mr. Weatherby was very uncomfortable with Ms.
9   Warner's presence in his organization due to her outspokenness regarding challenges
10  within Professional Services, her support of other employees, particularly women,
11  and her willingness to escalate issues (including employee observations and
12  concerns regarding bias, particularly against women in ProServe).  Indeed, Ms.
13  Warner escalated such issues on several occasions during 2020 and 2021, and where
14  appropriate communicated them in terms of apparent discrimination against female
15  employees in the group.

16      53.    By way of example, in or around March 2021, Ms. Warner raised issues
17  with respect to pay disparities and provided four examples of specific female
18  ProServe employees who she believed were earning less than male employees
19  performing the same work and at the same level.  Ms. Warner was disturbed to learn
20  that there were also male employees at a lower level who were also receiving higher
21  compensation than the four female employees who she had identified, despite their
22  being in similar or lesser roles. Ms. Warner was able to identify the pay disparities
23  through the personal compensation statements of her employees that she reviewed
24  during the managerial compensation review process.

25      54.    Ms. Warner first raised the issue of the pay disparities for the four
26  female ProServe employees with the Human Resources employee who was

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

17

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

1  supporting ProServe, Ed Salas in March 2021.  Ms. Warner was going through the

2  compensation review process for her organization with Mr. Salas, whereby they both

3  reviewed the compensation of individual employees. While doing so, Ms. Warner

4  recognized the pay disparity and directly raised concerns that female employees

5  were being paid less than male employees in equal – and even lesser – roles.

6      55.    Mr. Salas acknowledged that Ms. Warner's observation appeared to be

7  accurate and that he would "look into it." After apparently looking into it, he

8  informed Ms. Warner that there wasn't anything that could be done at the time.

9      56.    After raising her concerns with Mr. Salas, Ms. Warner proceeded to

10  raise her concerns with Mr. Weatherby during team leadership meetings in early

11  April 2021.  Ms. Warner raised her concerns with Mr. Weatherby because she knew

12  he had the ability to address the pay disparities due to his access to additional funds

13  that could be used to balance compensation.  Ms. Warner specifically indicated to

14  Mr. Weatherby and Mr. Salas that she believed these four employees were being

15  paid less than several of their male colleagues because of their gender.

16      57.    Others in ProServe had recognized how helpful Ms. Warner could be

17  based on her experience, integrity without fear, understanding, and the contributions

18  she already had made in her time at the Company.  Colleagues have commented that

19  Ms. Warner was more Amazonian than other managers and was "a breath of fresh

20  air," among other compliments and endorsements of her approach and style.

21      58.    Indeed, Ms. Warner's Forte 2021 review comments from both peers

22  and her direct reports are effusive, with multiple peers noting how well her prior

23  executive experience fits with her role and the organization's goals, and her team

24  members praising her support and honesty.  Both peers and direct reports alike noted

25  Ms. Warner's passion and willingness to speak plainly, and how quickly she had

26  learned the organization's workings.

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

18

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

59.     Peer comments included: "Cindy has incredible energy, brings a lot of positivity and is not afraid to speak her mind, especially when she sees something wrong.  She is a team player, and is a good listener.  She is unafraid to let go of her beliefs and learn;" "Cindy has the best business judgment I've seen in my career;" "Cindy is able to manage diverse perspectives and opinions to draw practical approaches and bring teams together by focusing on what's best for the customer. Her ability to remove emotion from conversations and drive to fact[-]based decision making is a valuable asset for everyone she works with;" and "Cindy thinks big and demonstrates backbone when challenging us to think more long term about ProServe's partner program."

60.     In November 2020, when it was announced that Andy Bailey, a peer of Ms. Warner, was leaving, Mr. Weatherby was exploring what to do with Mr. Bailey's role (L8 Director, Global Verticals and Strategic Accounts) running strategic accounts and industry verticals, which came with a 600-employee team. Ms. Warner suggested to Mr. Weatherby that Mr. Bailey's group could be combined with hers (Bailey's group and Ms. Warner's team handle global accounts and industry verticals and have many synergies), which would save headcount.  In addition, it would have given Ms. Warner an opportunity to demonstrate that she could take on more remit and her capabilities (which already were well-established based on her track record and the L10 role Amazon already had recruited her for). Mr. Weatherby again told Ms. Warner without basis that she supposedly was neither capable nor competent to lead Mr. Bailey's team.

61.     In or around January 2021, Ms. Warner read a document showing that an L10 role in Professional Services was being hired from outside the Company. This turned out to be for Mr. Bailey's replacement.  Ms. Warner again asked to be considered for the role as Mr. Bailey's replacement at the L10 level, and whether

19

1    she could apply for the role.  Naturally, Ms. Warner thought back to discussions with
2    Amazon during her recruitment, when she was told that L10 roles were only rarely
3    filled from outside the Company, and that she could apply for such roles promptly
4    upon joining Amazon.

5         62.    Mr. Weatherby refused and said that he was not and would not consider
6    Ms. Warner or anyone else in her "L8 peer group" for an L10 position.  This later
7    turned out to be completely and knowingly false.

8         63.    The job description for Mr. Bailey's L10 role was soon distributed
9    externally, contrary to what Ms. Warner had been told by Mr. Weatherby during her
10   recruitment about Amazon's policy against hiring from outside to fill such roles.
11   The job was described as: "Vice President, Global Verticals and Strategic Accounts
12   to have industry shaping impact by leading a broad scope of strategic, multinational
13   customer accounts and consulting teams at AWS.  This executive will provide
14   leadership on the largest and most complex IT transformation projects across a
15   variety of industries, including Media and Entertainment, Health Care and Life
16   Sciences, Industrial…."

17        64.    Ms. Warner's previous experience (and even what she did at AWS for
18   the past year) was just about a perfect match for the description of the ideal candidate
19   for the role: "The ideal candidate must be able to lead global teams at scale.  They
20   must be a trusted advisor to CxOs with a successful track record of
21   selling/positioning consulting work to the largest global enterprises.  The successful
22   candidate will bring a high-level of gravitas, astute judgment, effective negotiation
23   and influencing expertise, and exceptional people leadership skills.  This leader will
24   have Digital/cloud transformation experience, as well as the ability to easily distill
25   and sell complex solutions and engagements that will have industry shaping impact."

26
27

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

20

28   SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
     DAMAGES

65.    Ms. Warner has many years of IT advisory experience and leadership of teams of a global scope, including work leading the design and implementation of tech solutions and cloud-based systems across lines of business and for C-suite contacts and Fortune 500 customers in a host of industries (such as Microsoft, GE, Ford, and others).

66.    Indeed, Amazon and its recruiter had recognized that Ms. Warner already was well-qualified for an L10 role at the Company.  Ms. Warner's work and excellent track record over more than 30 years, from EY to Salesforce to PwC to IBM, NetApp, and others all provided the precise background called for by Mr. Bailey's position.  This was the same experience noted by peers and direct reports as pivotal in Ms. Warner's success during her first year at AWS, as further reflected in her Forte feedback.

67.    Ms. Warner could see from the job description for the position that she was, if anything, overqualified for the L10 role being filled.  She raised the matter with Human Resources in order to make sure that they knew that she was not being allowed to apply for the job and had not received any concrete explanation as to why.

68.    Ms. Warner also talked again with Mr. Weatherby and showed him her resume/CV, explaining her experience in order to clear up any misunderstanding and show that she was, in fact, thoroughly qualified for the L10 job.  Ms. Warner pointed out that anyone applying from outside Amazon also would need to demonstrate their qualifications through past experience, and said she was not sure why she would not be considered on the same basis.  In fact, Ms. Warner had the advantage of already having been vetted by the Company for hire and accrued some high-level experience at Amazon, getting to know its organization and culture.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

21

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

69.     In response to these highly reasonable observations and requests, Mr. Weatherby curtly told Ms. Warner that he did not care, that he was not considering Ms. Warner or her "peers," and that he would not consider Ms. Warner until she supposedly showed that she was competent and could handle the job that she already was in, heading a team of 50 full-time employees.

70.     Human Resources escalated the matter to Lou Manfredo (head of Human Resources for AWS), who declared that it was up to Mr. Weatherby, that he could do as he pleased, and that if he did not want to consider Ms. Warner for the job, then he did not have to do so.  Of course, whether or not Mr. Weatherby had the authority and discretion to make such a decision did not mean that he lawfully could do so on a discriminatory basis.

71.     The next month, in or around February 2021, Andy Jassy, AWS CEO, emailed Mr. Weatherby about a customer company, Change Healthcare, whose CEO needed AWS's help.  Mr. Weatherby forwarded the message to Ms. Warner and Professional Services Director (at that time) Dave Lavanty.  Mr. Jassy appears to have had a "top to top" meeting with the customer's C-suite executives.

72.     Once Mr. Lavanty and Ms. Warner received the email, Ms. Warner shared that she and her team members had been working on the relationship with that same customer for six months, including with people in their C-suite, and that she and her direct reports would be happy to help.  However, Mr. Lavanty decided (clearly sensing an opportunity to swoop in and seize a chance to impress or get the attention of Mr. Jassy) that he and his people instead would take over responsibility for the entire customer relationship from Ms. Warner and her team.

73.     In fact, Mr. Lavanty stated via email to Doug Smith that, "You and I are going to work on this one together."  Ms. Warner had done nothing wrong and there was no business reason for this change.  Mr. Lavanty was merely moving in to

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

22

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1  assume what he must have believed was an opportunity to work on a relationship

2  that had the attention of Mr. Jassy.

3  **III.** **MS. WARNER IS THE TARGET OF ABUSIVE TREATMENT AND**

4  **UNMISTAKABLY SEXIST EPITHETS IN THE PRESENCE OF HUMAN**

5  **RESOURCES PERSONNEL, DEMONSTRATING THE GENDER BIAS OF**

6  **HER IMMEDIATE MALE SUPERVISORS**

7  74.    When Ms. Warner questioned whether the Change Healthcare

8  relationship should simply be handed over to Mr. Lavanty, he became furious.  Mr.

9  Weatherby also got involved, and when it appeared that he might also have doubts

10  about Mr. Lavanty's move, Mr. Lavanty became even angrier and made a false claim

11  about a deliverable that was due to the customer.  Much of these discussions were

12  documented in chats (some including Human Resources) over Amazon's internal

13  messaging platform, Chime.

14  75.    Ms. Warner proposed a call for Monday, February 15, 2021 in an

15  attempt to resolve the issue and ensure there was no negative customer impact in

16  connection with the deliverable, as Mr. Lavanty had falsely asserted.  Ms. Warner

17  got on the call with Mr. Lavanty and HR representative Ed Salas (who Ms. Warner

18  had asked to be on the line).

19  76.    On the call, Mr. Lavanty tore into Ms. Warner (who had been criticized

20  herself for supposed "sharp elbows") and began outright and repeatedly screaming,

21  "Do you know what you've done?  Do you know the mess you've created?  I can't

22  believe you've done this to me!  How dare you do this to me!" and other furious, out

23  of control statements.

24  77.    Mr. Salas suggested that Mr. Lavanty calm himself.

25  78.    Instead, Mr. Lavanty, who is a white male, doubled down on his

26  unacceptable and abusive conduct, yelling at Ms. Warner that, **"You are nobody!**

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

27

28

23

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

**You've done nothing in this organization!  I'm going to make damn sure you go nowhere in this organization!"**  Mr. Lavanty continued, "You and Amanda Rankin [one of Ms. Warner's female direct reports who had been working on the customer relationship] are **idiots**!  No one wants to work with either of you."

79.     Mr. Salas interjected by saying, "Dave.  Stop.  Stop now."

80.     Mr. Lavanty then made the nature of his ire very clear, saying: **"I'm not working with her, she's a bitch!"**

81.     Mr. Salas warned Mr. Lavanty again to stop and reminded him that that call was supposed to be about one topic only – the customer relationship.  Ms. Warner pointed out that the call was about only whether a deliverable was due to the customer and ensuring that they did not suffer any negative effects.  Mr. Lavanty then confirmed and admitted, peevishly, that his previous statements on trying to pin blame on or undermine Ms. Warner had been false, saying, "I don't know if there's a deliverable here.  Don't you ever question me."  Mr. Lavanty then disconnected from the call, seemingly hanging up on Ms. Warner and Mr. Salas.

82.     Mr. Salas was shocked, and said, "I have never ever witnessed an assault on another employee like this in all my years in HR.  Cindy, I need to do something about this.  Yes, I'm taking issue with this."  Mr. Salas asked for Ms. Warner's permission to bring what occurred on the call to the attention of other HR and/or Employee Relations employees.  In response, Ms. Warner expressed her desire for him to do so and gave the go-ahead to escalate the issue of the disturbing, discriminatory incident.  Shortly after the call, Mr. Salas sent Ms. Warner a copy of the code of conduct in order to demonstrate that Mr. Lavanty's behavior was not only a violation of the code of conduct's prohibitions of harassment and discriminatory conduct, but also a terminable offense.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

24

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

83.     A member of Employee Relations called Ms. Warner later, and Mr. Salas also followed up with Ms. Warner later that week.

84.     Ms. Warner could hardly sleep for a week, with Mr. Lavanty's raging, abusive, sexist language and threat ringing in her ears for days afterwards and a new, very present fear of retaliation preoccupying her thoughts.  Mr. Lavanty had unmistakably and with tremendously hostility insulted her specifically as a woman (and threw in another female colleague at one point for good measure) and threatened her future at the Company.  Would the Company and Mr. Weatherby respond and do the right thing?

85.     Around two weeks later, Employee Relations contacted Ms. Warner (she had not heard at all from Mr. Weatherby or Mr. Garman) to tell her that the matter had been investigated and escalated all the way to Mr. Jassy.  However, despite the Employee Relations person's admitted disbelief at Mr. Lavanty's conduct and finding that the verbal assault was completely inappropriate, Ms. Warner was told that the ultimate decision on what to do (if anything) was left up to Mr. Weatherby.

86.     In these late February 2021 communications, it was expressly discussed with Ms. Warner (including in writing over the Company's internal messaging app, Chime) that Mr. Lavanty's conduct (and her complaint about his sexist tirade against her) pointed towards violations of the Company's policy against sexual and other unlawful harassment, as well as its policy against discrimination based upon legally protected characteristics.  Mr. Weatherby and Amazon were well aware of this complaint and opposition by Ms. Warner to and concerning Mr. Lavanty's harassing and discriminatory conduct directed at her gender, which was in violation of relevant anti-discrimination laws.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

87.     During the week of March 1, 2021, Ms. Warner was called by Toni Handler of HR and told that a meeting was being set up for the following Monday. Ms. Warner received an email from Mr. Lavanty that week to the effect that it seemed he was not at his best during their meeting, and that Ms. Warner misunderstood his intentions ("I realize how my words and/or tone may have been received as dismissive and/or disrespectful."), that he meant no disrespect and he was sorry if Ms. Warner took what he said negatively.

88.     Obviously, this evasive, disingenuous non-apology was insult being added to injury (how else for a woman to take being called a "bitch," apart from negatively?), and were it not so distasteful, it would be laughable how closely the formulation of Mr. Lavanty's email resembles so many other insincere, inchoate public "apologies" from powerful men whose sexist, discriminatory behavior has landed them in a position where they might face consequences.

89.     On or around Monday, March 8, 2021, Ms. Warner had a call with Mr. Weatherby, Ms. Handler, and Mr. Lavanty.  Mr. Weatherby turned the call into an opportunity to grill Ms. Warner about why she thought Mr. Lavanty was trying to take over the customer relationship (as though this was not already obvious and an openly declared goal of Lavanty—indeed, it was the reason for the meeting at issue).

90.     Ms. Warner forwarded Mr. Weatherby various Chime messages that clearly showed what Mr. Lavanty was doing, with Mr. Lavanty openly expressing his intentions to "take this over" and saying that Ms. Warner had to "turn over your work and get out of the way."

91.     Mr. Weatherby appeared determined to avoid the subject of Mr. Lavanty's outrageous, discriminatory attack on Ms. Warner altogether, and instead tried to turn the spotlight on Ms. Warner and suggest (absurdly and offensively) that she had somehow precipitated the barrage from Mr. Lavanty (as though his sexist

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

tirade could be excused in any plausible way). This gambit by Mr. Weatherby, too, demonstrated his clear retaliatory animus against Ms. Warner for opposing Mr. Lavanty's blatantly discriminatory, harassing conduct (which included a vow to make sure she went "nowhere" at Amazon).

92.     Ms. Warner finally said, "Are we going to talk about the assault?  I thought that was the nature of this phone call."

93.     Extraordinarily, Mr. Weatherby (the head of an organization employing several thousand employees) said nothing in response.

94.     Through both her providing information and a witness statement in connection with the investigation of Mr. Lavanty's conduct, as well as her own statements to Amazon's Human Resources and Employee Relations people and Mr. Weatherby objecting to that conduct, Ms. Warner engaged in both opposition to and lodged complaints regarding Mr. Lavanty's discriminatory, harassment conduct. In doing so, Ms. Warner directly indicated that she believed she was being subjected to harassment, discrimination, and retaliation.

95.     Ms. Handler said that she also thought a discussion of Mr. Lavanty's conduct was the purpose of the call. Ms. Warner made it clear that Mr. Lavanty's email was not an apology and that she did not misunderstand anything, whether it was his tone, words, threats, etc. She got all of it, and it was not acceptable.

96.     Again, Mr. Weatherby, their mutual supervisor, did not say a word.

97.     Ms. Warner said that she would do her best to forge ahead because they are peers, but that her trust in Mr. Lavanty had been diminished. The call ended without Mr. Weatherby admonishing Mr. Lavanty in any way whatsoever, nor offering any comment on the sexist behavior.

27

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

98.     Just three days later, on or around March 11, 2021, Mr. Weatherby circulated a short announcement that Mr. Lavanty had been promoted to Vice President.

99.     It is well-known at Amazon that Mr. Lavanty has been the subject of various harassment, discrimination, and other complaints at the Company.  Notably, as indicated by data concerning the numbers of Employee Relations complaints made by employees on the teams of each specific ProServe leader, Mr. Lavanty's team yielded a highly disproportionate number of employee complaints.  For the period of January 2021 through April 2021 alone, Mr. Lavanty's team was the subject of eighteen (18) complaints.  The median amount among ProServe leaders was two (2) complaints, and the average (mostly increased by Mr. Lavanty's high number) was four (4).  During this limited period, employees under Mr. Lavanty filed five (5) complaints regarding "management behavior," five (5) complaints regarding "discrimination," three (3) complaints regarding "misconduct," one (1) complaint regarding "retaliation," and two (2) complaints regarding "harassment."

100.    Upon information belief, the above-mentioned complaint numbers only account for complaints that were not subjectively deemed by Amazon as "lacking merit" and, as a result, exclude a significant number of complaints (companies tend to find most complaints by employees "lack merit," particularly when they implicate potential legal liability).  In addition, there almost certainly are many employees with such concerns or complaints who did not raise them to HR or others at the Company.  Jeff Bezos himself has noted, "[W]hen the anecdotes and the data disagree, the anecdotes are usually right.  There's something wrong with the way you are measuring it."[3]  This logic applies here, where Amazon's cherry-picked data concerning employee complaints (which already reveals frequent complaints about

---

[3]     See https://www.inc.com/business-insider/amazon-founder-ceo-jeff-bezos-customer-emails-forward-managers-fix-issues.html (last accessed August 6, 2021).

28

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

discrimination, retaliation, and harassment in ProServe) is contradicted by the large numbers of employees who have come forward to share their experiences of discrimination, retaliation, harassment, and intimidation in ProServe.   Despite Amazon's attempt to cover up the true number of employees making complaints of discrimination, retaliation, and harassment in ProServe, it is undeniable that the data paints a terrible picture of how employees are treated within Mr. Lavanty's team.

101.   Mr. Weatherby is reputed to have run interference for Mr. Lavanty on several complaints, and it appears that Mr. Lavanty's open eruption of gender-related animus towards Ms. Warner is one of many examples of such shielding from discipline.   Rather than face the slightest of consequences, Mr. Lavanty was handsomely rewarded despite his abysmal, even hateful, conduct that violated the Company's Code of Conduct and amounted to terminable offenses.   In doing this and outright refusing to discuss Ms. Warner's legally protected opposition to Mr. Lavanty's conduct, Mr. Weatherby excused and intentionally assisted Mr. Lavanty in carrying out his discriminatory conduct, and shielded Mr. Lavanty from the consequences of his actions.

102.   Not only was Mr. Lavanty spared from any discipline or consequences, but he by all appearances he was rewarded for it (or despite his shameful, discriminatory and harassing behavior).   Mr. Weatherby had falsely told Ms. Warner that neither she nor any of her other peers would be considered for the L10 position to which Mr. Lavanty was elevated.   Therefore, Mr. Weatherby cleared the way for Mr. Lavanty on that score as well, eliminating any other candidates for the open L10 position.

103.   Ms. Warner's record and experience demonstrate that she was undoubtably far more qualified than Mr. Lavanty (including in the area of Professional Services).   For example, Ms. Warner achieved Senior Vice President

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

29

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

status at several large public companies and has a track record of managing bigger teams with significantly larger budgets and revenues than Mr. Lavanty.

104.   Amazon's decision to deprive Ms. Warner of opportunities for promotion into the L10 role was particularly egregious because Ms. Warner was already performing functions that amounted to a L10 role.

105.   By way of example only, among other responsibilities that were consistent with an L10 role (in addition the various groups and initiatives already noted above, which combined to more than a typical L8 role), Ms. Warner often was used as a surrogate for Mr. Weatherby in meetings with some of Amazon's most senior leaders and business partners, such as Mr. Jassy or Accenture CEO Julie Sweet.

106.   As a result of Amazon's decision to promote Mr. Lavanty to an L10 role, Mr. Lavanty began to receive greater compensation while little to no changes were made to his job duties and responsibilities.  Therefore, Mr. Lavanty was provided greater compensation than Ms. Warner for performing substantially similar work.

107.   In association with his elevation to the L10 role, Mr. Lavanty did not receive any additional substantive responsibilities or greater authority that distinguished the role he was performing from the role that he was already performing or the role Ms. Warner was performing. Further highlighting that Mr. Lavanty's role had not changed in association with being awarded the "L10" designation, Mr. Lavanty was not supervising any additional employees or overseeing any new projects or responsibilities. Therefore, Mr. Lavanty was provided with greater compensation while he remained performing a role that was equal to Ms. Warner's role in every substantive respect.

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

108.   Therefore, Mr. Lavanty's role was still comparable to Ms. Warner's, even in the wake of his elevation to L10.  In fact, Mr. Lavanty's job duties and responsibilities remained similar to Ms. Warner's and if anything covered a smaller scope of work and involved lower-value client relationships than Ms. Warner's role. For example, Mr. Lavanty and Ms. Warner both were responsible for managing ProServe's most important client relationships.  In doing so, Mr. Lavanty and Ms. Warner both provided the strategy and oversaw the execution of their clients' migration to Amazon's cloud-based infrastructure, which included, among other things, overseeing the training of clients' employees as well as assessing and providing guidance related to governance and risk management.

109.   For example, on at least three occasions, Ms. Warner's team was assigned clients that were previously handled by Mr. Lavanty's team due to Ms. Warner's team being better able to address the clients' needs.

110.   Beyond handling all of the same responsibilities with equally high-level clients as Mr. Lavanty's team, Ms. Warner and her team were responsible for additional duties that Mr. Lavanty did not cover, such as collaborating with the AWS partner network so they could jointly deliver on the execution of projects as well as managing the "People and Change" practice.

111.   Amazon therefore required Ms. Warner to perform work that was consistent with an L10 role, while denying her the same compensation and title/level that they provided to her equally or less-experienced male colleagues at the Company who were officially designated as L10 employees (and compensated as much as $1 million or more annually than what Ms. Warner was being paid).  In Mr. Lavanty's case, his new L10 designation did not come with any discernible increase in ambit or responsibility (for instance, he had the same authority over the same group of employees as before, with no change), while clearly giving his direct

WIGDOR LLP
85 FIFTH AVE, FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1  supervisor, Mr. Weatherby, the ability to justify higher compensation to a favored

2  male subordinate.

3      112.  Later, on March 11, 2021, Ms. Warner had a one-on-one meeting with

4  Mr. Weatherby.  Mr. Weatherby asked Ms. Warner how she thought the Monday

5  meeting with Mr. Lavanty had gone.  Ms. Warner honestly answered that she thought

6  it had been awful, in part because Mr. Weatherby had said nothing about Mr.

7  Lavanty's conduct.  She also let Mr. Weatherby know that others in the group also

8  were shocked by Mr. Lavanty's promotion, particularly because they knew Mr.

9  Lavanty had been the subject of several complaints and investigations by Employee

10 Relations.    Again, Ms. Warner was objecting to and opposing reported

11 discriminatory conduct in ProServe to her direct manager, Mr. Weatherby.

12     113.  Mr. Weatherby let Ms. Warner know that Mr. Lavanty's promotion had

13 been approved the same day as his outburst, Monday, March 8, 2021, which meant

14 that he had been promoted despite his openly sexist and abusive conduct towards

15 Ms. Warner, which should have proven his unsuitability for a highly senior role, as

16 it was very recent and unquestionably violated Amazon's Code of Conduct

17 prohibiting gender-related discriminatory and harassing conduct (along with his

18 other alleged harassing and discriminatory conduct towards other employees).

19     114.  Indeed, Mr. Weatherby openly conveyed his retaliatory animus towards

20 Ms. Warner for her legally protected opposition to and complaint about Mr.

21 Lavanty's sexist tirade by bitterly stopping their conversation at one point to

22 sarcastically note that he realized that he should not use the word "nobody" around

23 Ms. Warner because she might get offended or complain about him.  This icy

24 statement by Mr. Weatherby foreshadowed the blatant, swift retaliation against Ms.

25 Warner that was just weeks away from being decided upon and carried out by Mr.

26 Weatherby and Amazon.

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

32

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

115.   Unbelievably, this promotion made Mr. Lavanty, a man who has called Ms. Warner a "nobody," "of no interest," an "idiot," and a "bitch," technically her superior and in a better position to potentially make good on his threat to make sure she went "nowhere" at Amazon through increased influence and access if only by dint of his new "level" and clear shielding by Mr. Weatherby.  This was a particularly clear and present danger given Mr. Weatherby's apparent endorsement of how Mr. Lavanty had acted, as well as his expressed disdain and even anger towards Ms. Warner for making a protected complaint about Mr. Lavanty's misconduct.

116.   Mr. Weatherby apparently believed that it was an acceptable state of affairs in the Professional Services group, to promote a male executive promptly after he saw fit to attack a senior female Director-level employee with a gender-related slur and insult her intelligence (and, notably, that of another female colleague).  This conduct by Messrs. Weatherby and Lavanty demonstrates gender-related and retaliatory animus (on the basis of known legally protected activity in the form of her opposition and complaint) against Ms. Warner.

**IV.   THE DISPARATE TREATMENT AND VERBAL ABUSE OF MS. WARNER BY AWS'S MANAGEMENT IS ONLY ONE OF THE MOST RECENT EXAMPLES OF DISCRIMINATORY AND RETALIATORY CONDUCT AGAINST MS. WARNER AND OTHERS THAT HAVE BEEN OVERLOOKED BY AMAZON**

117.   Among Ms. Warner's coworkers in ProServe (including most of the group's female employees), the promotion of Mr. Lavanty was in fact, and was viewed as, a reward to someone who was close with and had been loyal to Mr. Weatherby and a ratification of a "white boys' club" in which white men enjoyed a leg up and dominated the upper ranks, and in which social cohesion and conformity (fostered by the demographic homogeneity of hiring and promoting largely white

33

men with whom leadership was comfortable) was prized over new ideas and even results.

118.   Indeed, Mr. Lavanty was given a new L10 rank and increased compensation despite what Ms. Warner has been told are consistent performance shortcomings on the part of Mr. Lavanty, and despite his blatantly sexist and discriminatory conduct and wild display of inappropriate rage and vow of retribution against Ms. Warner just weeks before.  In granting this promotion, Mr. Weatherby was displaying his own profound disregard for termination-worthy discriminatory/harassing misconduct targeting one of the group's few senior female employees and discriminatory and retaliatory animus against Ms. Warner herself.

119.   Colleagues again discussed, as they had before, the fact that many women in the group who had spoken up about Mr. Lavanty and other issues were often moved, demoted, transferred to another matter, or felt forced to leave the Company altogether because their position was no longer tenable as their prospects had evaporated.  This pattern of retaliation would soon repeat itself with Ms. Warner.

120.   The members of the Women@ProServe group were so disturbed by Mr. Lavanty's elevation that they discussed writing an account of their experiences with gender discrimination to be read at a future Professional Services meeting.  High-ranking female colleagues felt so hopeless and marginalized under Mr. Weatherby's management that they have cried while discussing their experiences with Ms. Warner.

121.   The Women@ProServe group, in light of the deference given to Mr. Weatherby by Employee Relations and HR, was unsure how to successfully get Amazon to finally address the protection he has given to men who treat female colleagues with open contempt, as well as the fact that even the most qualified and/or accomplished women in the group get few resources and small roles with little

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

34

authority or influence (such as Ms. Warner herself and a female peer with only a modest team).

122. For Ms. Warner, the warning signs that women are treated with disregard and are at a sizable disadvantage in Professional Services surfaced early in her tenure. On or around March 12, 2020, less than a month after she started, Mr. Weatherby and Ms. Warner exchanged Chime messages after a Women@ProServe monthly call. Mr. Weatherby messaged Ms. Warner about a female employee who had talked about being upset that a male employee had taken credit for her work and published it in his own name. Mr. Weatherby did not understand why the employee was so bothered by this. Ms. Warner observed that there were concerns in the group about the treatment of women and that this was the kind of issue that frequently comes up regarding how women are treated and taken advantage of in an organization.

123. On or around April 7, 2020, Mr. Weatherby asked Ms. Warner to "intervene" in the Women@ProServe Chime room because there had been a number of escalations out of the discussions in its chat room. He singled out one specific female employee as making supposedly unfounded assertions about men taking credit for or otherwise downplaying women's contributions or excluding them from opportunities to provide input. Mr. Weatherby was irritated by this and said that the employee's observations and feelings were not accurate or constructive.

124. Ms. Warner later learned that Mr. Weatherby had installed a male "ally" in the Women@ProServe chat who was taking screenshots (of the attendees and comments) and providing an account of the female employees' discussions of discrimination, retaliation, and inequity directly to Mr. Weatherby. This was not at all so that Mr. Weatherby could address concerns, but rather so he could identify supposed malcontents or purportedly disloyal or troublesome female employees.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

35

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1  Ultimately, this male employee was rewarded with a promotion for his service to

2  Mr. Weatherby in helping to squelch complaints and dissent about the widespread

3  gender inequity in ProServe.  This pattern aligns with Mr. Weatherby's practice of

4  rewarding male colleagues who quash (or attempt to quash through bullying or other

5  means) any attempts to call attention to the discrimination occurring in ProServe.

6      125.  Mr. Weatherby ultimately asked Ms. Warner to reach out to and

7  immediately start working with the President of Women@ProServe, to change the

8  direction of the conversation and make things more positive.  He also named other

9  women who he believed were speaking out of turn by commenting on areas in which

10  they did not work and went so far as to label one person's observations as "toxic."

11  In doing so, Mr. Weatherby held female employees of ProServe to a different

12  standard with respect to the candor that they were allowed to speak with regarding

13  the dynamics within the ProServe organization, particularly with regard to gender-

14  related discrimination and inequities.

15      126.  Ms. Warner objected to Mr. Weatherby's attempts to silence the

16  employees of Women@ProServe, said that she refused to shut down the discussions

17  or bat down such complaints, and indicated that she believed that their consistent

18  and frequent complaints regarding favorable treatment of male employees were

19  supported by her own observations.  This was an early example of protected activity

20  by Ms. Warner reporting concerns regarding gender discrimination to Mr.

21  Weatherby.

22      127.  Mr. Weatherby appeared panicked that the women were having these

23  discussions in a public, open forum, and urgently wanted it to end.  In particular, he

24  said that the assertion that men were taking credit for the work of female employees

25  and suppressing their visibility and leadership "is the part I'm most concerned

26  about."  Mr. Weatherby did not want the concerns addressed – he wanted the

27

28

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

discussion of such concerns to be cut off.   Demonstrating Mr. Weatherby's awareness that the complaints were related to issues of discrimination, Weatherby specifically noted to Ms. Warner that he was concerned about the complaints of Women@ProServe advancing perceptions that Mr. Weatherby's organization had widespread issues pertaining to gender equity.

128.   Later in April 2020, Mr. Weatherby blocked the rehire of a former Amazon employee, Mike Owens, who had been vocal about issues in Professional Services, including the bullying, discriminatory conduct of male employee Pravin Raj (whose discriminatory and harassing conduct has been complained of by several other employees as well).   Despite the fact that the hiring loop for Mr. Owens was "inclined" to hire (including Ms. Warner, the hiring manager, who had worked with Mr. Owens at two other companies), Mr. Weatherby refused to allow him to be rehired, offering only a vague criticism of his resume.

129.   To Ms. Warner, it appeared that it was Mr. Owens's willingness to speak up that Mr. Weatherby did not like.   Ms. Warner escalated the issue regarding Mr. Weatherby's blocking of the hire, as it was against policy, but nothing was done. As an indication of how solid and well-suited a candidate he was, Mr. Owens was hired by a different part of Amazon around six months later.

130.   On or around June 2, 2020, within three months of her being on the job, Ms. Warner ferreted out an Advisory employee who had been at the Company for well over a year (March 2019) but was working full-time as a partner for a consulting firm while also "working" at Amazon full-time.   This employee was previously assigned to report to Mr. Weatherby and then was assigned to report to Ms. Warner. The employee, a white male, was chronically absent from meetings, did not follow up on assignments from Mr. Weatherby, and was described by Mr. Weatherby to Ms. Warner as merely "disconnected."   This person also had been rated as meeting

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

37

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

expectations by Mr. Weatherby.  Mr. Weatherby had to admit that, "I'm feeling pretty stupid for that happening under my nose."

131.   Yet, when female employees (including senior women such as Ms. Warner or another female peer) miss a meeting or call for any reason, Mr. Weatherby rails against and berates them, while this white male employee skated by barely working and being chronically absent for well over a year (and who knows how much longer it would have been if Ms. Warner had not zeroed in on him), for a good while under Mr. Weatherby's direct supervision.

132.   The absentee employee was soon terminated after Ms. Warner discovered and revealed his conduct, and Ms. Warner took over his group, which had gone through several unsuccessful managers in recent years, including Pravin Raj.

133.   By way of example only, regarding common manifestations of disparate gender-based attitudes and treatment in ProServe, on or around June 15, 2020, Mr. Weatherby scolded Ms. Warner over Chime for not having read a paper in its entirety before a call even though she had only received it late the night before and thought it would be reviewed on the call (he called it a "fuzzy discussion"). Days later, on or around June 17, 2020, Mr. Weatherby told Ms. Warner via Chime that, "I like your tone today!  You are asking questions, showing curiosity and not making statements or judgments.  Keep it up."

134.   Clearly, Mr. Weatherby wanted Ms. Warner to be submissive and unassertive, which, based upon his protection of Mr. Lavanty and lack of such feedback to male members of the ProServe leadership team, is not what he expects from his male direct reports.  Mr. Weatherby also requires Ms. Warner to get his approval on any significant decisions and action, whereas her male peers go about

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

38

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1  their business without oversight (as illustrated by the incident with the absentee

2  employee and many others).

3      135.  By way of another example, Mr. Weatherby leveled the weak criticism

4  that Ms. Warner was not "demonstrating frugality" because she sent out holiday care

5  packages to employees as a teambuilding effort, while many of her male peers were

6  doing similar things.  This rang particularly hollow during 2020, a year when the

7  Company avoided so many of the usual expenses associated with having employees

8  in the office.

9      136.  In contrast, during Leadership Meetings with the same ProServe

10  executives, when Ms. Warner's male colleagues discussed utilizing their budget for

11  similar team-building expenditures, they were praised by Mr. Weatherby.  This

12  included Mr. Lavanty and other male colleagues who spent significantly higher sums

13  of money – into the six figures – on expenditures to support the morale of their teams,

14  including hiring persons in new positions to carry out support functions.  As a result

15  of the contrasting reactions, it was clear to Ms. Warner that she was not permitted to

16  utilize the team's budget to support her team in the same manner that her male

17  colleagues were permitted to do.

18      137.  In late August 2020, Ms. Warner directly raised to one of the HR

19  professionals responsible for ProServe that a male executive exhibited extreme bias

20  in how he treated his subordinates, breaking rules for those who he liked (i.e., his

21  white male subordinates) or ignoring conventions altogether, whereas employees

22  who he did not favor (a group predominantly composed of women and persons of

23  color) were held to strict standards of performance and conformance to Amazon

24  policy.

25      138.  A further example of this type of disparate treatment (which echoed

26  concerns of other female ProServe employees, too) occurred in or around October

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

39

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

2020, after Ms. Warner took the opportunity to visit with several employees (in a properly socially distant manner) while she was on the road traveling from her Michigan home to spend several months at her California home. She blogged about the trip and visits to her team members, and the effort she made to meet them even amid the pandemic was a hit with her reports and she got great feedback that it created a feeling of connection and caring. When Ms. Warner mentioned these meetings during a Leadership Team meeting, Mr. Weatherby panned the idea and said that he was not sure what sort of "obsession" this demonstrated, and he found it odd. Ms. Warner said to the group that she believed it demonstrated employee obsession (a phrase used by Amazon's top leadership) and that she felt that the Company's leadership principles should account for that as well.

139. Just one month later, Mr. Lavanty suggested a 15th leadership principle within Professional Services called "Employee Obsession," and said he had someone on his team write a short narrative introducing the idea. Mr. Weatherby was enthusiastic and "inclined" about this and told Mr. Lavanty to form a team around the idea, which later was implemented. A clearer illustration of the professional concerns of the women in Professional Services with regard to their contributions being coopted and then credit and opportunity instead going to a white male colleague could hardly be presented.

140. Also on June 17, 2020, Mr. Weatherby sent Ms. Warner a Chime message asking her for help due to female employees having left the group Women@ProServe and saying that "leadership isn't doing enough." Mr. Weatherby complained that another female employee had stopped listening circles from being scheduled and he blamed that employee for some women not wanting to be part of Women@ProServe (which would further dent the appearance that his group was making efforts or taking any effective steps in the area of diversity, equity, and

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

inclusion). Mr. Weatherby raised the idea of disbanding the Women@ProServe group altogether. Ms. Warner collaboratively and supportively pointed out that bumps in the road were to be expected and should not dissuade one from further efforts to achieve equity or take away from progress that is made.

141. Ms. Warner advised Mr. Weatherby not to leap to the conclusion that the group's efforts were for naught or counterproductive. Mr. Weatherby responded, "Ok, I'll not leap. But I am on the ledge and need you to pull me back!" In this same exchange, Mr. Weatherby made it clear that his primary concern was that his perceived progress on inclusion and diversity at AWS would be tainted.

142. In August 2020, a few months later, Mr. Lavanty and another AWS executive, Pravin Raj, apparently were the unnamed subjects of a LinkedIn blog post by a former employee, who published and signed the posting with his full name. The post discussed the use of homophobic language and other abusive, harassing, and discriminatory conduct.

143. Ms. Warner learned that Mr. Lavanty had allegedly used homophobic language and that the post was referring to that incident. The post attracted much attention among employees and management at AWS and, in late August 2020, a Diversity & Inclusion ("D&I") leader raised the blog post at a meeting in order to discuss with Professional Services employees how it made them feel and what portions of the post were true.

144. Mr. Weatherby and Mr. Lavanty became furious at this, with Mr. Lavanty yelling at the Black female D&I leader, "How dare you bring this up, that guy is a piece of shit—in front of Leadership Team!" In response, the D&I person evenly and calmly stated that the employees in the group should have an honest conversation about the post. Mr. Lavanty proceeded to express homophobic views by discounting the opinion of the gay male employee who authored the post due to

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

the "choices he had made in his life." Those present, including Ms. Warner, understood clearly that Mr. Lavanty was commenting negatively on that person's LGBTQ+ status and his (in Mr. Lavanty's view) non-gender-conforming (i.e., heterosexual) sexual preferences. Through context and tone, Mr. Lavanty was clearly stating that the gay male employee's sexual orientation was an undesirable, blameworthy lifestyle "choice" and therefore called his credibility, judgment, and perception of reality into question.

145. Ms. Warner was shocked and offended by Mr. Lavanty's discriminatory remarks (in an open meeting with a D&I person present, no less), and by the fact that, again, Mr. Lavanty's volatile, hateful behavior was permitted to go unchecked. Notably, after this blow-up and demonstration of retaliatory animus, the D&I employee soon turned in her resignation and moved to an entirely different group.

146. Despite all of this, Ms. Warner was undaunted in raising with Mr. Weatherby how her status as a woman seemed to affect perceptions of her work (and that of other women in Professional Services). In doing so, Ms. Warner was directly noting the disparate treatment to which she and other women in ProServe were being subjected. Mr. Weatherby and other members of the Leadership Team are generally very complimentary of the work of other white males, but when someone such as the Black female D&I employee raises a different perspective, they are quick to pile on and even attempt to humiliate and intimidate the person.

147. In multiple routine one-on-one meetings with Mr. Weatherby, Ms. Warner has defended her work product and pointed out examples of work by male colleagues that was lackluster (especially by comparison). She has pointed out to Mr. Weatherby that, because she is a woman, she can expect and will get a public flogging and humiliating treatment, whereas "one of the boys" will get praise. In

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

response to these observations, which she has made more than once, Mr. Weatherby generally merely shrugs and declines to respond.  This provides another example of Mr. Weatherby's indifference and disdain for his subordinates' concerns and complaints regarding potential gender-based discrimination and inequity in his organization.

148.   Ms. Warner has personally observed and learned from her own personal experience that Mr. Weatherby tends to criticize women for conduct that goes unremarked when male managers do the same and much worse.  Although Mr. Weatherby has chided Ms. Warner for having "sharp elbows," a line parroted and hurled at her by Mr. Lavanty, there is ample evidence that aggression and totally unprofessional displays of volcanic anger by men are ignored or seen as par for the course.  Other men in the group also appear to have taken their cues from the top male managers (Mr. Weatherby and others on the Leadership team, including Mr. Lavanty) in their bullying behavior, deriding an employee as a "minor league player" and ridiculing praise for employees who are not part of the in-group (particularly those who are not white males).

149.   When Ms. Warner pointed out the inappropriate nature of such conduct, Mr. Weatherby called out Ms. Warner in their next one-on-one meeting, saying, "You were wrong to do that."  On such occasions and others, Mr. Weatherby would resort to the vague refrain and excuse that, "You need to learn the culture here."  Needless to say, the "culture" at Amazon should not include ridicule, abuse, disregard for employees' feelings of marginalization, and displays of retaliatory animus when people raise legitimate concerns.  Nor should the "culture" include barely (if at all) disguised retaliatory animus towards anyone who raises issues regarding unequal treatment or bias (conscious or not), which Mr. Weatherby

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

43

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1   displayed regularly towards Ms. Warner when she raised not just bullying but

2   disparate treatment of female employees.

3      150.   Unfortunately, Mr. Weatherby recently again showed his displeasure

4   with Ms. Warner regarding her speaking up about improper, discriminatory conduct.

5   During the same one-on-one meeting, in early March 2021, when Mr. Weatherby

6   had asked about the call with Mr. Lavanty, he was reviewing Ms. Warner's goals for

7   this year.

8      151.   At one point, Mr. Weatherby said, "It would be great if you can create

9   definition around our Go to Market, because nobody really understands…."  He

10  suddenly stopped and then sarcastically said, "Oh, I better not use that word."  Ms.

11  Warner genuinely asked which word he meant.  Mr. Weatherby then sourly said, "I

12  better not use the word 'nobody.'  You might take it the wrong way."

13     152.   This was a pointed, caustic reference to Ms. Warner's objection to Mr.

14  Lavanty calling her a "nobody."  Needless to say, this was unmistakable evidence of

15  lingering anger towards Ms. Warner for her legally protected complaint about Mr.

16  Lavanty regarding his discriminatory, harassing conduct.  Immediately, and almost

17  certainly as intended, Mr. Weatherby's hostile statement caused great anxiety and

18  apprehension of retaliation in Ms. Warner.  Mr. Weatherby clearly held it against

19  Ms. Warner that she was willing to stand up against unacceptable, discriminatory

20  conduct when committed by one of Mr. Weatherby's white male lieutenants, even

21  when the conduct was obviously sexist and outrageous and was directed against her

22  personally.  The full extent of Defendants' retaliatory animus and the reckless

23  measures they were willing to take to punish and attempt to silence Ms. Warner

24  would soon become clear.

25

26

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

1     153.  In or around April 2021, Mr. Weatherby repeated his practice of

2 permitting his male reports to marginalize and/or abuse female members of

3 ProServe, this time with Ms. Warner.

4     154.  Ms. Warner spent months working on a project called "Strategic

5 Program Leaders."  In connection with the project, Ms. Warner developed job

6 descriptions for positions she would be hiring in order to implement the program.

7 During numerous discussions about the project, Ms. Warner's male colleagues (Mr.

8 Bailey, Mr. Lavanty, and Mr. Raj) would demean and belittle Ms. Warner's ideas

9 and plan for advancing under-represented groups in ProServe.

10     155.  The blatantly demeaning treatment of Ms. Warner was so open and

11 striking that two other colleagues commented on it, with one questioning why these

12 male employees were treating Ms. Warner in this inappropriate way, while another

13 remarked that he would "get the popcorn" for the next meeting because every time

14 these male employees took the opportunity to treat Ms. Warner with blatant

15 contempt and hostility (which they did not do among each other).

16     156.  This treatment and the embarrassment of such public humiliation left

17 Ms. Warner feeling demeaned and belittled, and it unquestionably undermined her

18 authority in ProServe.

19     157.  Ultimately, Mr. Weatherby gave Ms. Warner's male colleagues the go-

20 ahead to take over the Strategic Program Leaders project, without so much as

21 informing Ms. Warner, much less consulting her on the move.  Adding insult to

22 injury, Ms. Warner's male colleagues utilized the very job descriptions and plans

23 that they openly tore apart in the previous team meetings, showing that their abusive

24 conduct had nothing to do with the substance of Ms. Warner's work product, but

25 rather was simply motivated by hostility to a senior woman among their ranks.

26

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

158.    Another woman in ProServe experienced very similar patterns of gender discrimination and retaliation throughout 2020 when dealing with Mr. Weatherby and one of his white male subordinates in the wake of complaints about gender-related bias and disparate treatment of women in ProServe as compared to the men.

159.    After her supervisor had pushed two female employees off the team in ProServe, this employee realized that her supervisor was engaging in a pattern of targeting female employees for performance management and removal from the team.   In August 2020, when she soon realized that this supervisor was about to engage in a similar pattern with two other female employees on the team, the female employee confronted her supervisor with her concerns that he was targeting female employees and chasing them off the team.

160.    Immediately after this employee confronted her supervisor about his seemingly targeted and discriminatory pattern of pushing female employees off of his team and/or out of Amazon altogether, the supervisor began to retaliate against the female employee by micromanaging her and attempting to fabricate performance deficiencies.

161.    This employee ultimately filed a complaint with Human Resources in August 2020.

162.    Looking for additional assistance and fearing further retaliation, this employee sought to speak to a high-level female in ProServe leadership.  Ms. Warner was the only women in such a post at the time.  As such, this employee reached out to Ms. Warner and scheduled a meeting with her for August 28, 2020.

163.    Prior to the female employee's scheduled meeting with Ms. Warner, the employee met with Mr. Weatherby to discuss the complaint of discrimination

46

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

that she filed. During their discussion, Mr. Weatherby appeared to acknowledge that complaints about systemic gender bias were occurring throughout ProServe.

164.   The employee told Mr. Weatherby that she intended to speak with Ms. Warner about the employee's concerns regarding gender bias against and disadvantages for women in ProServe.  This employee also intended to discuss transferring to Ms. Warner's team with Ms. Warner so she could escape the retaliation on her current team, hoping that a team run by a female leader like Ms. Warner would provide a better environment.  In response, Mr. Weatherby directed her to cancel the meeting with Ms. Warner.  The employee complied with Mr. Weatherby's demand.

165.   In October 2020, this employee was pushed out of ProServe by the manager she complained about. Despite being on a different team, this female employee later was subjected to further discrimination and retaliation that included a decreased compensation award.  This female employee confirmed with her subsequent manager that the decreased compensation was based upon feedback of the supervisor who she filed protected complaints about.

166.   On April 19 2021, this employee relayed her complaints about the continued retaliation to Ms. Handler, the HR Representative who was supporting Mr. Weatherby and his organization. Rather than address this employee's concerns, Mr. Weatherby or any other leaders in his organization did nothing about the clear retaliation against the female employee.

167.   Mr. Weatherby's retaliatory impulses were further confirmed by his conduct and statements to Ms. Warner regarding the Women@ProServe group, which he viewed with suspicion and paranoia whenever it served as a forum for female employees to discuss gender-related bias or inequity in ProServe.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

47

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

168. From October 2020 until August 2021, another high-level employee in ProServe – who at points reported directly to Mr. Lavanty and then Mr. Raj – made several complaints about pay disparities with respect to female employees in ProServe.

169. This employee recognized that several female employees had been downleveled and/or were receiving less compensation than their male colleagues. After raising his concerns with HR and in open discussions forums throughout the time period of October 2020 through August 2021, Amazon terminated this employee's employment.

## V. AMAZON TERMINATES MS. WARNER IN AN ACT OF OPEN RETALIATION FOR RETAINING ATTORNEYS AND COMING FORWARD WITH LEGAL CLAIMS AGAINST THE COMPANY

170. On or around April 7, 2021, Amazon received a letter from Ms. Warner's counsel informing the Company that she was now represented by attorneys and which detailed her allegations of discrimination and retaliation against the Defendants. In this letter, Amazon was specifically informed that Ms. Warner alleged that Amazon's conduct constituted violations of both Title VII and the EPA.

171. A member of HR responsible for ProServe at this the time, confirmed to Ms. Warner that Mr. Weatherby was informed of and was fully aware of the April 7, 2021 letter from Ms. Warner's attorneys and its contents, which alleged discriminatory conduct by him and other male executives against Ms. Warner and other women in ProServe. The HR representative's confirmation that Mr. Weatherby was aware was based upon the HR representative's direct knowledge.

172. On April 14, 2021, Ms. Warner also informed both Mr. Weatherby and Toni Handler of HR in writing via email or Chime that her unhappiness with her

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

48

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1   time in ProServe was connected to "systemic bias, racism and discrimination that I

2   have witnessed in ProServe."

3       173.   Unbelievably, just three weeks after receiving her attorneys' letter

4   outlining her legal claims of discrimination (and two weeks after other legally

5   protected complaints by Ms. Warner regarding pay equity for and discriminatory

6   treatment of women in ProServe), on or around April 28, 2021, Ms. Warner was

7   notified that she was being terminated from her position in ProServe at Amazon.

8       174.   The approval of Mr. Weatherby and other Amazon officials was

9   necessary to terminate Ms. Warner, a Level 8 Director employee, per Company

10   policy and practice. This was confirmed by the above-mentioned HR representative,

11   and is consistent with other terminations witnessed and participated in by Ms.

12   Warner.

13      175.   Ms. Warner's termination was blatant retaliation by Mr. Weatherby and

14   Amazon itself for her engaging in legally protected activity in both objecting to

15   discrimination against women and herself and retaining counsel to pursue legal

16   claims.  The removal of her from her position and termination came just weeks after

17   she retained counsel, a couple of months after she spoke out against the

18   discrimination and abuse she endured on account of her gender by Mr. Lavanty, and

19   just days after she attended her last Women@ProServe meeting.

20      176.   Indeed, Ms. Warner had noted to a male colleague on or around April

21   14, 2021 that the Women@ProServe group might as well disband if the ProServe

22   Leadership Team (led by Mr. Weatherby) insisted on having someone sit in on those

23   meetings to "monitor" them and ensure that nothing too controversial or difficult

24   was discussed—which obviously defeated the entire purpose of such a forum for

25   women in ProServe.  This also provided yet another example of the animus of Mr.

26

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

49

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

1  Weatherby towards women in his department, who he apparently viewed as disloyal

2  subversives if they expressed negative views about their treatment in ProServe.

3       177.   In a strange and futile attempt at disguising a blatantly retaliatory

4  termination, Amazon HR representatives told Ms. Warner that she had to find a new

5  job outside of Professional Services within two months or she would be out of the

6  Company entirely.   Therefore, Ms. Warner was essentially terminated with two

7  months' notice, and had to find a new job.   Notably, it had taken five months for Ms.

8  Warner to enter her job at Amazon even when she was being actively and personally

9  recruited—Amazon knows that two months is a completely inadequate period in

10  which to find a new position, particularly a high-level job like the one held by Ms.

11  Warner.

12       178.   No alternative positions were offered by Amazon, nor was Ms. Warner

13  offered any assistance in finding a new position.   Indeed, the sudden and abrupt

14  removal of Ms. Warner from her job caused a tremendous stir in ProServe and

15  beyond, which greatly damaged her reputation and ability to find a new position.

16       179.   Subsequently, Amazon transferred all of Ms. Warner's responsibilities

17  to at least two of her peers, and reportedly up to three separate L8 employees are

18  now being employed to run what Ms. Warner previously oversaw, underlining the

19  higher-level scope of Ms. Warner's former remit and areas of responsibility.   Many

20  of Ms. Warner's coworkers and subordinates contacted Ms. Warner to express their

21  shock and dismay regarding her abrupt termination, as well as to offer words of

22  thanks and compliments.   Indeed, some of these employees later led an effort to

23  circulate an electronic petition in June and July 2021 in an attempt to address the

24  concerns of women in ProServe regarding what they saw as a clear pattern of gender-

25  based discrimination and retaliation against those who spoke up, as discussed further

26  below.

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

50

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

180.   Additionally, the fact that the Company's system now reflected that Ms. Warner (an L8 employee at the time) had no direct reports clearly communicated to hiring managers that there were unspecified issues surrounding Ms. Warner's status at the Company, and that they should stay away.  This was unlawful retaliation by Amazon and any employees and officials who directed, approved and/or carried out this action against Ms. Warner.

181.   Indeed, Ms. Warner contacted several Amazon managers about jobs that she was qualified and well-suited for, but after friendly, promising initial conversations, they did not get back to her (likely after looking into the background of the situation and/or inquiring with management in ProServe).

182.   Ms. Warner applied for at least six roles at Amazon after being stripped of her duties and direct reports.  Ms. Warner had all of the necessary qualifications for the roles she applied to, and in fact, was arguably over-qualified for most of the roles.  Yet, with respect to four of the applications, Ms. Warner was never contacted regarding her candidacy.[4]

183.   With respect to one of the roles she applied for (Director, Global System Integrator Sales), Ms. Warner spoke with the hiring manager – an employee with whom she had a good working relationship – who, after telling Ms. Warner that she was a good fit for the role, proceeded to stop engaging with Ms. Warner and completely ignored her follow-up messages.  This sharp change can only be explained by the hiring manager noticing the oddities in Ms. Warner's profile in the system, including that Ms. Warner had no direct reports assigned to her and/or his learning of Ms. Warner's complaints.

_____

[4]     Ms. Warner was never contacted regarding her application for the following roles that she applied for on the specified dates: HR Director (L8) on May 18, 2021; Head of Corporate Sourcing (L8) on May 18, 2021; Director, Office of Information Security (L8) on June 2, 2021; and Director of Last Mile, Pre-Station Planning (L8) on June 3, 2021.

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE, FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

184.   With respect to only one of the six roles that Ms. Warner applied to did Ms. Warner receive an explanation for why she was not going to be considered for the role.

## VII.   AMAZON IGNORED PROSERVE EMPLOYEES' OUTCRY CONCERNING THE RETALIATORY TERMINATION OF MS. WARNER AND REJECTED MS. WARNER'S GOOD FAITH REQUESTS FOR AMAZON TO REVERSE COURSE

185.   In every instance where Ms. Warner communicated with Amazon regarding her concerns, she never indicated that it was her intent to leave Amazon. As a result, Amazon's reaction to her complaints – whereby they pushed her out of the Company – was not in any way provoked by representations made by Ms. Warner regarding a desire to resign from her role at Amazon.  Ms. Warner never expressed a desire to be involuntarily removed from her position or to leave her position without any replacement or transition to another role.  In addition, before she was removed from her job, Ms. Warner, through counsel, informed Amazon that she in fact would like to stay in ProServe and aid in addressing the problems in the department.

186.   On June 22, 2021, in an additional good faith attempt at preventing Amazon from continuing down a path of retaliation and offering to participate in improving employment practices in ProServe, Ms. Warner emailed a letter to Jeff Bezos and Andy Jassy.  Ms. Warner requested that her correspondence be distributed to other members of Amazon's Board of Directors.

187.   In her letter, Ms. Warner indicated that she was writing to Amazon's Board as "a proud AWS executive and experienced business leader who wants to help rectify an increasingly alarming situation within Professional Services."

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

52

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1      188.   Hoping that Amazon's Board would respond or intervene, Ms. Warner

2  detailed Amazon's ongoing efforts to push her out of the Company in response to

3  the allegations included in her April 7, 2021 letter, as well as an explanation

4  regarding this federal lawsuit:

> I had to seek legal representation and sent a letter to Amazon
> asking for help and offering to be part of the solution. Three
> weeks later, I was removed from my role in ProServe and told
> that I had two months to find a new job, or my employment
> would end.

189.   Ms. Warner used the opportunity to, once again, stress that she wanted
to stay at Amazon and work with the Company to address her concerns:

> On June 28, despite my best efforts to find a new post, it is very
> likely that my employment with Amazon will involuntarily end
> next week as I hit that two-month mark. I still hold out hope that
> I will get a chance to help turn around the situation in ProServe,
> retain many of the outstanding team members I know work there,
> and resume achieving great results for AWS.

190.   In closing, Ms. Warner reiterated in her letter to Mr. Bezos and Mr.
Jassy that she welcomed the opportunity to sit down with any of the Board members
to discuss how they could "work together" to find a solution to the concerns she
raised and which were echoed by many other employees in ProServe.

191.   Despite the conciliatory message of her letter, Ms. Warner received no
response from anyone at Amazon.

192.   During this time, ProServe employees who were outraged by Amazon's
imminent discriminatory and retaliatory termination of Ms. Warner organized an
effort to collectively express their objections to ProServe's "culture of systemic

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

53

discrimination, harassment, bullying and bias against women and under-represented groups."[5]

193.   The efforts of these employees culminated in a petition that was supported by more than five-hundred and fifty (550) ProServe employees (as of July 23, 2021) calling for Amazon to change its unfair practices of addressing discrimination claims that were "set up to protect the company and the status quo, rather than the employees filing the complaints."

194.   The petition specifically cited Ms. Warner, highlighting that the organizing efforts of these employees were, at least in part, inspired by Amazon's discriminatory and retaliatory termination of her and the Company's failure to investigate discrimination complaints.

195.   Notably, this petition was active prior to Ms. Warner's official end date at Amazon, and therefore Amazon (once again) was aware of and provided with an opportunity to examine its unlawful treatment of Ms. Warner and reverse course on pushing her out of the Company.

196.   Amazon was not swayed by the appeal of several hundred ProServe employees to the Company that it re-examine the retaliation and discrimination in ProServe, as Amazon refused to even delay Ms. Warner's termination and properly conduct an investigation into Ms. Warner's complaints that included an interview of Ms. Warner herself.   Shockingly, Ms. Warner was never interviewed by Amazon regarding the allegations she raised in the April 7, 2021 letter sent by her counsel, nor was there any serious attempt by the Company before that to obtain an account from her about what happened on the call with Mr. Lavanty and in ProServe

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

---

[5]   A recent article in the Washington Post details the efforts of these employees. See https://www.washingtonpost.com/technology/2021/07/23/amazon-gender-discrimination-investigation/ (last accessed August 6, 2021).

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

generally.  This evidences a desire by Amazon to avoid creating a record of such alleged unlawful conduct and any detailed employee complaints.

197.  Amazon also failed to provide an open forum for the hundreds of ProServe employees to voice their concerns regarding the unlawful discriminatory conduct that was and is regularly occurring in ProServe.

198.  Despite presiding over the ProServe organization, Mr. Weatherby was largely absent from all public discussions pertaining to the complaints of widespread discrimination and retaliation that were raised by ProServe employees in their widely circulated petition.

199.  Upon information and belief, after Ms. Warner's lawsuit was filed in May 2021, Mr. Weatherby canceled most (if not all) public appearances, including a Women@ProServe meeting, the department's "all-hands" meetings, and an "Ask Todd Anything" event scheduled for early June 2021 in which employees would have had an opportunity to ask Mr. Weatherby questions in an open forum.

200.  Instead, Amazon replaced the "Ask Todd Anything" event with a virtual event run by HR (renamed "Ask the Leaders Anything") on a platform not typically used by Amazon for similar events.  Upon information and belief, during this event, employees were muted, unable to turn on their video cameras, and unable to contribute to a group chat or directly message each other.  Instead, HR representatives provided answers to pre-screened questions, and to the extent that they addressed questions and concerns submitted by participants (which only the event organizers could see), they rephrased the employees' questions in a manner that enabled them to avoid addressing issues that they wanted to ignore or did not want to address publicly.[6]

---

[6]    Amazon's rephrasing of employees' questions was confirmed by employees in offline discussions in which they told each other the actual questions they were submitting and which had been altered by the Company representatives.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

201.   Additionally, Amazon engaged in a deliberate effort to silence employees who sought to speak out against Amazon's unlawful treatment of Ms. Warner.   Upon information and belief, Amazon specifically notified several ProServe employees not to put anything in writing pertaining to Ms. Warner's case or they would face termination and that they should stop communicating with Ms. Warner.   This further demonstrates Defendants' retaliatory policies, practices and animus towards Ms. Warner and others who raise and discuss concerns regarding discrimination and other unlawful treatment of employees.

202.   Despite the outcry of ProServe employees and numerous attempts by Ms. Warner to persuade Amazon to reverse course, Amazon proceeded with its plan to end Ms. Warner's employment.

203.   As intended by Amazon and for the reasons discussed above, Ms. Warner was unable to secure a new role at Amazon within the 60-day period that Amazon had dictated to her.

204.   On June 30, 2021, Ms. Handler emailed Ms. Warner to inform her that her employment with Amazon would end effective that day, and that the separation was on an involuntary basis.   Ms. Handler's communication inaccurately noted that Ms. Warner's termination was a result of her supposed "unwillingness" to work within the ProServe organization.   This was patently false and clearly contradicted by multiple communications by Ms. Warner (including her letter to Amazon's Board of Directors just the week before and representations made by her counsel).   Ms. Handler's representations therefore were knowingly false and intended to aid and abet Amazon's discriminatory conduct.[7]

---

[7]   After satisfying all necessary procedural prerequisites, Ms. Warner amended this Complaint to include additional claims, including, but not limited to, aiding and abetting discrimination under FEHA.

56

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1    205.   In response to Ms. Handler's email, Ms. Warner indicated that she did
2  not desire to leave ProServe, but that she instead desired to no longer be subjected
3  to discrimination, retaliation, and harassment in ProServe.  Referring to discussions
4  that occurred before she retained counsel, Ms. Warner wrote:

> To be clear, I never indicated "your (my) unwillingness to work within the ProServe organization", nor was I not doing my job within ProServe.  What I clearly communicated in writing to yourself and Todd is that I was not desirous of working in an environment so rife with harassment, discrimination and bias.  As such, I was clear I would begin to look for another role in Amazon.  I was further clear this could take 6 months since an executive position is a bit harder to find.  Additionally, I made it clear that I would keep both yourself and Todd apprised of my progress in finding a new position until such time as I had secured one.  I further indicated that I would ensure there was a smooth transition so that I would not leave any sort of mess.
>
> At the time that you terminated my role, on April 28, I was fully engaged in doing my job.  We were planning for OP1 and had many other great projects in flight across the business that I managed.
>
> In the event that I was not doing my job in ProServe, it is my understanding that I would have been subject to a performance improvement process that would have concluded in a Pivot point to either stay doing my job, or exit the company.  That is the process I was trained and told I must use for all employees that were not performing their roles either in part or in total.  It is curious why if I was not doing my job, this process was not afforded to me?

24    206.   Upon information and belief, Ms. Handler never addressed Ms.
25  Warner's response.
26    207.   The final involuntary termination of Ms. Warner's employment came
27  and was carried out just over a month after she filed her initial federal complaint

57

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1   with this Court alleging violations of and claims under the EPA and CEPA for equal

2   pay discrimination.

3       208.   Amazon and managers such as Mr. Weatherby, Mr. Lavanty, and Ms.

4   Handler very clearly believe they are untouchable and can terminate employees for

5   discriminatory and retaliatory reasons with impunity.  In doing so, Amazon shows

6   that it will not be bothered or inconvenienced for even a brief time by retaining a

7   "squeaky wheel" employee in order to comply with its legal obligations under the

8   country's anti-discrimination laws.  It is Ms. Warner's hope that, through this blatant

9   retaliation against her, Amazon's dangerous sense of invincibility may finally be put

10  to the test and shattered.

11      209.   Although Ms. Warner is disheartened and devasted by Amazon's

12  actions, she remains dedicated to her lifelong commitment to fighting for an

13  equitable workplace for all.  In one last attempt to appeal to the leaders of Amazon,

14  Ms. Warner published an open letter to Amazon CEO Andy Jassy and CEO of

15  Amazon Web Services Adam Selipsky on July 23, 2021.[8]  In her letter, she

16  congratulated Mr. Jassy and Mr. Selipsky on their new roles and urged them to

17  address the persistent discrimination and retaliation that plagues ProServe.

18

19                        **FIRST CAUSE OF ACTION**
    **(Sex/Gender Discrimination under Title VII of the Civil Rights Act of 1964)**
20          ***Against Amazon.com, Inc. and Amazon Web Services, Inc.***

21      210.   Plaintiff hereby repeats, reiterates, and realleges each and every

22  allegation in the preceding paragraphs, as though set forth fully within.

23      211.   Defendants Amazon.com, Inc. and Amazon Web Services, Inc. have

24  discriminated against Plaintiff on the basis of her sex/gender (female/woman) in

25  violation of Title VII by subjecting her to disparate treatment and discriminatory

26

27  [8]   See https://medium.com/@cindylwarner1/amazon-fired-me-for-reporting-gender-bias-
    now-others-are-speaking-out-e1ca420c3692 (last accessed August 6, 2021).

28  SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
    DAMAGES

WIGDOR LLP
85 FIFTH AVE, FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

denial of advantageous terms and conditions of employment available to male employees, including, but not limited to, subjecting her to disparate working conditions, denying her terms and conditions of employment equal to that of her coworkers who do not belong to the same protected categories, as well as, but not limited to, by paying her less than her comparable and/or similarly situated colleagues in sufficiently similar and/or equivalent positions, failing to hire and/or promote her to an appropriate job level, denying her the ability to apply and/or be considered for the same job positions as male colleagues, and denying her the opportunity to work in an employment setting free of unlawful discrimination.

212. These actions are in direct violation of Title VII of the Civil Rights Act of 1964, as amended.

213. Additionally, the termination of Plaintiff's employment by Defendants constitutes discrimination based on sex/gender and violated Title VII.

214. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

215. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

216. Defendants' unlawful discriminatory and wrongful conduct constitutes a willful and wanton violation of Title VII, was outrageous and malicious, was intended to injure Plaintiff, and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

WIGDOR LLP
85 FIFTH AVE, FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title VII)
#### *Against Amazon.com, Inc. and Amazon Web Services, Inc.*

217. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

218. By the actions described above, among others, Defendants retaliated against Plaintiff for complaining about unequal treatment of herself and others on the basis of sex/gender by altering her working conditions and terminating her employment.

219. As a direct and proximate result of the unlawful retaliatory conduct committed by Defendants in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

220. As a direct and proximate result of the unlawful retaliatory conduct committed by Defendants in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

221. Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

### THIRD CAUSE OF ACTION
**(Violations of the Equal Pay Act)**
***Against All Defendants***

222.   Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

223.   During Plaintiff's employment, Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions, and paid Plaintiff a rate of pay, including, but not limited to, salary and securities awards or grants, less than such male employees.

224.   Defendants engaged in patterns, practices, and/or policies of employment which discriminated against Plaintiff on the basis of her gender by paying Plaintiff a lesser rate of pay, including, but not limited to, salary and securities awards or grants, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions.

225.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the EPA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages, liquidated damages, interest, and other relief.

226.   Defendants' conduct was willful, and they knew that their actions constituted unlawful violation of the EPA and/or showed reckless disregard for Plaintiff's statutorily protected rights.

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1

2

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the Equal Pay Act)
### *Against All Defendants*

3   227.   Plaintiff hereby repeats, reiterates, and re-alleges each and every

4   allegation as contained in each of the preceding paragraphs, as though fully set forth

5   herein.

6   228.   By the actions described above, among others, Defendants retaliated

7   against Plaintiff for complaining about unequal pay on the basis of sex by altering

8   her working conditions and terminating her employment.

9   229.   As a direct and proximate result of Defendants' unlawful retaliatory

10   conduct in violation of the EPA, Plaintiff has suffered, and continues to suffer, harm

11   for which she is entitled to an award of monetary damages, interest, liquidated

12   damages, and other relief.

13   230.   Defendants' conduct was willful, and they knew that their actions

14   constituted unlawful violation of the EPA and/or showed reckless disregard for

15   Plaintiff's statutorily protected rights.

## FIFTH CAUSE OF ACTION
### (Discrimination in Violation of FEHA)
### *Against Amazon.com, Inc. and Amazon Web Services, Inc.*

16

17

18   231.   Plaintiff hereby repeats, reiterates, and re-alleges each and every

19   allegation in each of the preceding paragraphs, as though fully set forth herein.

20   232.   At all times herein mentioned, California's Fair Employment and

21   Housing Act ("FEHA"), Cal. Government Code § 12940 *et seq.*, was in full force

22   and effect and fully binding upon the relevant Defendants.  Plaintiff was a member

23   of a group protected by the statute, in particular § 12940(a), prohibiting

24   discrimination in employment based on sex/gender.

25   233.   Defendants Amazon.com, Inc. and Amazon Web Services, Inc. have

26   discriminated against Plaintiff on the basis of her sex/gender (female/woman) in

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

62

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

violation of FEHA by subjecting her to disparate treatment and discriminatory denial of advantageous terms and conditions of employment available to male employees, including, but not limited to, subjecting her to disparate working conditions, denying her terms and conditions of employment equal to that of her coworkers who do not belong to the same protected categories, as well as, but not limited to, by paying her less than her comparable and/or similarly situated colleagues in sufficiently similar and/or equivalent positions, failing to hire and/or promote her to an appropriate job level, denying her the ability to apply and/or be considered for the same job positions as male colleagues, and denying her the opportunity to work in an employment setting free of unlawful discrimination.

234.   Additionally, the termination of Plaintiff's employment by Defendants constitutes discrimination based on sex/gender and violated FEHA.

235.   As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings, equity, and other employment benefits and has incurred other economic losses.

236.   As a further direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered emotional distress, humiliation, shame, and embarrassment all to the Plaintiff's damage in an amount to be proven at time of trial.

237.   Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights or safety of Plaintiff and others.  Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

### SIXTH CAUSE OF ACTION
### (Retaliation in Violation of FEHA)
### *Against Amazon.com, Inc. and Amazon Web Services, Inc.*

238.   Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

239.   At all times herein mentioned, California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §§ 12900, *et seq.*, was in full force and effect and was fully binding upon Defendants.  Specifically, § 12940(h) makes it an unlawful employment practice for an employer to discriminate against any person because the person has opposed any practices forbidden under this part.  As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer losses in earnings, equity and other employment benefits and has incurred other economic losses.

240.   As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered substantial emotional distress, humiliation, shame, and embarrassment, all to the Plaintiff's harm and damage in an amount to be proven at the time of trial.

241.   Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others.  Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

### SEVENTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of FEHA)
### *Against Defendant Weatherby*

242.   Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

64

243.   At all times herein mentioned, California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §§ 12900, *et seq.*, was in full force and effect and was fully binding upon the relevant Defendants.  Specifically, § 12940(i) makes it unlawful for any person "to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so."

244.    Defendant Weatherby aided and abetted the discriminatory conduct of Mr. Lavanty and Defendants Amazon.com, Inc. and Amazon Web Services, Inc.

245.   As a direct and proximate result of Defendant Weatherby's unlawful discriminatory conduct in violation of FEHA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages, liquidated damages, interest, and other relief.

246.   Defendant Weatherby's conduct was willful and he knew that his actions constituted unlawful violation of the FEHA and/or showed reckless disregard for Plaintiff's statutorily protected rights.

**EIGHTH CAUSE OF ACTION**
**(Violations of California Equal Pay Act)**
***Against All Defendants***

247.   Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

248.   During Plaintiff's employment, Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions, and paid Plaintiff a rate of pay, including, but not limited to, salary and securities awards or grants, less than such male employees.

249.   Defendants engaged in patterns, practices, and/or policies of employment which discriminated against Plaintiff on the basis of her gender by

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

65

paying Plaintiff a lesser rate of pay, including, but not limited to, salary and securities awards or grants, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions.

250.  As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of CEPA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages, liquidated damages, interest, and other relief.

251.  Defendants' conduct was willful, and they knew that their actions constituted unlawful violation of the CEPA and/or showed reckless disregard for Plaintiff's statutorily protected rights.

## NINTH CAUSE OF ACTION
### (Retaliation in Violation of California Equal Pay Act)
#### *Against All Defendants*

252.  Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

253.  By the actions described above, among others, Defendants retaliated against Plaintiff for complaining about unequal pay on the basis of sex by altering her working conditions and terminating her employment.

254.  As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the CEPA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages, liquidated damages, interest, and other relief.

255.  Defendants' conduct was willful, and they knew that their actions constituted unlawful violation of the CEPA and/or showed reckless disregard for Plaintiff's statutorily protected rights.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of California.

B.      An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

C.      An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

D.      An award of liquidated damages equal to the amount of Plaintiff's past and future lost wages;

E.      An award of punitive damages in an amount to be determined at trial;

F.      Prejudgment interest on all amounts due;

G.      Post-judgment interest as may be allowed by law;

H.      An award of Plaintiff's reasonable attorneys' fees and costs; and

I.      Such other and further relief as the Court may deem just and proper.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

67

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: July 29, 2022                                Respectfully submitted,

                                                    **WIGDOR LLP**


By: _____
                                                    Lawrence M. Pearson
                                                    Alfredo J. Pelicci
                                                    (Admitted *pro hac vice*)

                                                    85 Fifth Avenue, Fifth Floor
                                                    New York, NY 10003
                                                    Telephone: (212) 257-6800
                                                    Facsimile: (212) 257-6845
                                                    lpearson@wigdorlaw.com
                                                    apelicci@wigdorlaw.com

                                                    **GIRARD BENGALI, APC**

                                                    Omar H. Bengali

                                                    355 S. Grand Street, Suite 2450
                                                    Los Angeles, CA 90071
                                                    Telephone: (323) 403-5687
                                                    Facsimile: (323) 302-8305
                                                    obengali@girardbengali.com

                                                    *Attorneys for Plaintiff Cindy Warner*

SECOND AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES