LAWRENCE M. PEARSON (NY SBN 3954591)

(Admitted *pro hac vice*)
**WIGDOR LLP**
85 Fifth Avenue, Fifth Floor
New York, NY 10003
Tel.: (212) 257-6800
Fax: (212) 257-6845
lpearson@wigdorlaw.com


OMAR H. BENGALI (CA SBN 276055)
**GIRARD BENGALI, APC**
355 S. Grand Street, Suite 2450
Los Angeles, CA 90071
Tel.: (323) 403-5687
Fax: (323) 302-8305
obengali@girardbengali.com

*Attorneys for Plaintiff Cindy Warner*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CINDY WARNER,<br><br>              Plaintiff,<br><br>       vs.<br><br>AMAZON.COM, INC., AMAZON WEB SERVICES, INC., and TODD WEATHERBY, in his individual and professional capacities,<br><br>              Defendants. | Case No. 5:21-cv-00866-JWH-KK<br>———<br>**THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

WIGDOR LLP
85 FIFTH AVE, FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................3

ADMINISTRATIVE PROCEDURES ....................................................18

JURISDICTION AND VENUE .............................................................19

PARTIES ...............................................................................................19

FACTUAL ALLEGATIONS ..................................................................20

I.   Ms. Warner's Career Before and Recruitment to Amazon, and Her Role and Accomplishments in One Year at Amazon ............................................20

II.  Management Refuses to Provide Ms. Warner with Additional Responsibilities or Allow Her to Apply or Consider Her for a Promotion, in Contrast to How Male Peers Were Treated................................................25

III. Ms. Warner Is the Target of Discriminatory Treatment and Unmistakably Sexist Epithets in the Presence of Human Resources Personnel, Which Conduct Was Rewarded by Her Manager, Demonstrating the Gender Bias and Retaliatory Animus of Management ................................................35

IV.  The Disparate Treatment and Verbal Abuse of Ms. Warner Was Part of Widespread Discriminatory and Retaliatory Conduct Against Women in the Professional Services (ProServe) Group that Was Ignored and Abetted by Amazon and Mr. Weatherby ........................................................49

V.   Amazon and Mr. Weatherby Terminate Ms. Warner In an Act of Open Retaliation for Her Recent Protected Complaints and Coming Forward with Legal Claims of Gender Discrimination Against Defendants .............67

VI.  Amazon Ignored ProServe Employees' Outcry Concerning Systemic Gender Discrimination in ProServe and the Retaliatory Termination of Ms. Warner, and Rejected Ms. Warner's Good Faith Requests for Amazon to Reverse Course on Its Retaliation ................................................77

FIRST CAUSE OF ACTION ..................................................................84

1

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6900

SECOND CAUSE OF ACTION .................................................................85

THIRD CAUSE OF ACTION .....................................................................86

FOURTH CAUSE OF ACTION ..................................................................87

FIFTH CAUSE OF ACTION .......................................................................88

SIXTH CAUSE OF ACTION .......................................................................89

SEVENTH CAUSE OF ACTION .................................................................90

EIGHTH CAUSE OF ACTION ....................................................................91

NINTH CAUSE OF ACTION .......................................................................92

PRAYER FOR RELIEF ...............................................................................92

JURY DEMAND ...........................................................................................94

2

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

Plaintiff Cindy Warner ("Plaintiff" or "Ms. Warner"), by and through her undersigned counsel, Wigdor LLP, as and for the Third Amended Complaint in this action against Defendants Amazon.com, Inc. ("Amazon.com"), Amazon Web Services, Inc. ("AWS") (together, "Amazon" or the "Company"), and Todd Weatherby, in his individual and professional capacities, (collectively, "Defendants") hereby states and alleges as follows:

## PRELIMINARY STATEMENT

1.    In certain corners of Amazon's corporate organization, abusive managers who engage in a widely recognized pattern of conduct mistreating and blocking the advancement of women (while favoring and excusing the misconduct of their male peers), are protected by Amazon's top leadership and Human Resources ("HR") organization, so long as they are part of the male-dominated management in-group.  Meanwhile, employees who raise sincere, legitimate complaints regarding discrimination against or mistreatment of women, such as in AWS's Professional Services (or "ProServe"), are often met with lip service, a sidelined career, and/or swift retaliation, including in the form of termination or a campaign to force them out of the Company.  Even when hundreds of ProServe employees joined a petition calling upon the Company to take action on discrimination and inequity in the organization, Amazon reacted with a moribund, token investigation that did not take statements from all employees with firsthand accounts to share, and the report was not distributed to employees.

2.    Cindy Warner is a LGBTQ+ businesswoman who has had a successful career as an executive at many major institutions and tech companies for over 30 years before she was aggressively recruited to join Amazon in late 2019, at which she started work in February 2020.

3

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

3.     Ms. Warner had to consider carefully whether or not to join Amazon, as she wanted to ensure that her next professional move could be to a place that she could stay for some time while writing what could be the last chapter in her career.

4.     Despite some reservations, however, she could not possibly know when she accepted her position with Amazon that the Company would allow her male managers and colleagues to refuse to consider her for roles well within her qualifications and decades of experience on the same basis as male candidates, and hurl insulting and outright sexist names at her such as "**bitch**," "**idiot**," and "**nobody**," without any consequences.  These epithets were leveled at Ms. Warner not because of anything she did wrong, but rather because she was a woman who had ingratiated herself with clients and her new team all too well, and threatened to outshine her white male coworkers in upper management.  Ms. Warner also made it her practice during 2020 and into 2021, as a "fresh set of eyes" to question, challenge, and object to the practices of ProServe that discriminatorily kept female employees and others from being recognized and advancing at the Company.  As a woman, Ms. Warner drew hostile and bitter reactions for her ideas and suggestions (related to the business or remedying inequities) that her male coworkers (such as Dave Lavanty, a white male) and manager (Defendant Weatherby) did not direct at male peers and subordinates—with Mr. Lavanty calling her a "bitch" and "idiot" and threatening her future at Amazon in mid-February 2021 in a meeting also attended by an HR representative.  Mr. Weatherby seemingly approved of and freely allowed this gender-related hostility and misconduct slide without so much as a scolding, much less any discipline of Mr. Lavanty.  Indeed, in a striking display of contempt for Ms. Warner's complaint to HR about Mr. Lavanty's use of a specifically gender-related insult or slur, Mr. Weatherby increased Mr. Lavanty's Amazon "level" barely

WIGDOR LLP
85 FIFTH AVE, FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

4

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1    three weeks after the incident and just days after meeting with Ms. Warner and Mr.
2    Lavanty about it.

3         5.     Ms. Warner was subjected to blatant discrimination at Amazon dating
4    from even before she started work there—having been hired at a job level (Level 8
5    Director "L8")) that was lower than her experience supported.  She had been told
6    that she was being recruited for a Level 10 ("L10") Vice President position, which
7    was in line with her experience and job level at prior companies, and also comes
8    with compensation that is much higher.  However, Mr. Weatherby claimed before
9    she took the job that Amazon did not hire for L10 positions externally.  This later
10   proved to be false in February 2021, when Mr. Weatherby hired a man from outside
11   Amazon for an L10 position that Ms. Warner had asked him to be considered for.
12   Unfortunately, working in ProServe in Amazon would come to be characterized by
13   discriminatory and retaliatory hostility by Mr. Weatherby towards Ms. Warner, and
14   false representations regarding her job and how the Company would handle her
15   employment.

16        6.     Amazon's discrimination and retaliation from the time of her hiring
17   until the end of Ms. Warner's employment has resulted in lost income of millions of
18   dollars, including with regard to how much the Company paid equally- or less-
19   qualified male colleagues with similar job responsibilities.

20        7.     Rather than the innovative and forward-thinking environment that she
21   believed Amazon could or would have (e.g., the General Motors of the 21st
22   Century), Ms. Warner quickly realized that the division of Amazon she joined,
23   Professional Services or "ProServe" in Amazon Web Services (AWS), was a prime
24   example of a boys' club where an almost uniformly male leadership team jealously
25   guards their sphere of influence.  In ProServe, as with many similar workplaces, this
26   meant curtailing the opportunities and paths for advancement of women and people
27
28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

5

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1  of color, while reserving plum positions for the white men favored by the male-

2  dominated leadership team led by Todd Weatherby, Vice President of Professional

3  Services Worldwide at AWS.

4      8.    Despite such obstacles, Ms. Warner, a business veteran, got right to

5  work.  Her drive to succeed at Amazon was infectious and her team, which was a

6  small fraction of the size of those she managed at previous employers, thrived under

7  her management.  Ms. Warner grew several of ProServe's most important client

8  relationships, such as Novartis and Cisco.

9      9.    Rather than welcome a new colleague who was making tremendous

10  positive contributions, Ms. Warner met constant resistance from her male colleagues

11  who could not tolerate—and seemingly felt threatened by—an accomplished and

12  effective gay woman like Ms. Warner.  Instead of building on Ms. Warner's ideas,

13  Weatherby and Lavanty criticized her at least once each for supposedly having

14  "sharp elbows" (although Weatherby would use that same term as a compliment

15  and/or excuse for discriminatory behavior when referring to male executives) and

16  demanded that she "get out of the way."  Despite starting at Amazon just as the

17  COVID-19 pandemic took hold in early 2020, she was able to build her team and

18  create cohesion and a sense of shared direction, while also taking charge of the

19  implementation of COVID-19 safety protocols for ProServe.

20     10.    In the face of withering undermining by and contempt from her

21  manager Weatherby and her male peers, during her tenure in ProServe at Amazon,

22  Ms. Warner made innumerable valuable contributions from a business and

23  organization perspective.  Her tenacity and dedication earned her significant praise

24  from colleagues in her Forte 2021 review, including the following:

25      • "Cindy has the best business judgment I've seen in my
26        career."

27

28

6

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

- "Cindy thinks big and demonstrates backbone when challenging us to think more long term about ProServe's partner program."

- "Cindy has incredible energy, brings a lot of positivity and is not afraid to speak her mind, especially when she sees something wrong.  She is a team player, and is a good listener.  She is unafraid to let go of her beliefs and learn."

Indeed, even Defendant Weatherby, Ms. Warner's direct manager, was compelled to give her an "Achieves" (i.e., meets expectations) rating in 2021 regarding her performance, which is not freely given at the Company.

11.     Male executives felt free to treat Ms. Warner, a gay woman in her late 50s, with open contempt, insults, and hostility.  This unprofessional, discriminatory, and unlawful conduct by Ms. Warner's male coworkers included, but was not limited to, one of the top-ranking managers at AWS, Dave Lavanty, calling her a "**bitch**," an "**idiot**," and a "**nobody**" in front of a member of Human Resources.  Ms. Warner, a highly experienced professional, was shocked and distraught that a coworker would show such hatred, and openly express animus against her as a woman (he had not and would not plausibly call a male coworker a "bitch" in a work meeting in the same manner) and apparently feel that he would get away with it.  The particular epithets and insults used by Mr. Lavanty were obviously directed specifically at Ms. Warner as a woman, and Mr. Lavanty had not dared use such language against male colleagues in the manner that he did with Ms. Warner.

12.     Amazon was immediately aware of the discriminatory and derogatory remarks that Mr. Lavanty directed at Ms. Warner, as a member of Human Resources, Ed Salas, was meeting with them and personally witnessed the remarks.  Ms. Warner promptly told HR that she wanted to pursue a complaint, and also informed Mr.

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1  Weatherby, the head of ProServe, about her HR complaint and this discriminatory
2  and harassing misconduct by Mr. Lavanty.

3      13.    Indeed, in a meeting between Ms. Warner, Mr. Weatherby, and an HR
4  representative in early March 2021, Mr. Weatherby refused to discuss Mr. Lavanty's
5  misconduct.  Instead, he outrageously seemed to seek a way to blame Ms. Warner
6  for being called a "bitch," repeatedly asking what she may have done to provoke Mr.
7  Lavanty.    Rather than address and issue discipline for this unacceptable and
8  discriminatory conduct, Mr. Weatherby soon promoted Mr. Lavanty to the L10 level
9  of employment at the Company, the very level Defendants had used to lure Ms.
10 Warner before they down-leveled her position and compensation.

11     14.    Mr. Lavanty's elevation to L10 was particularly significant, because
12 Ms. Warner had been told by Amazon that she could apply for an L10 position
13 whenever she wished.  Yet, on at least two occasions in 2021, Mr. Weatherby had
14 refused to allow her to do so, or even, in November 2020, to take on more
15 responsibility as an L8 employee.

16     15.    In February 2021, Mr. Weatherby announced that he would be
17 replacing Andy Bailey, a departing L8 executive and a peer of Ms. Warner in a
18 similar role.  Mr. Weatherby told the ProServe leadership team that the role would
19 be filled as an L10 role, although the duties and scope would remain the same.  Ms.
20 Warner got the job posting and saw that her experience more than met the
21 requirements for the role.  Ms. Warner went to Mr. Weatherby and told him that she
22 wanted to apply and be considered for the role.  Mr. Weatherby, as Ms. Warner's
23 direct manager and per Amazon policy, controlled whether or not Ms. Warner would
24 be permitted to apply for a different position, and also was the decisionmaker
25 regarding who would be hired for that L10 position in ProServe.  Mr. Weatherby
26 refused to allow her to apply formally, saying that he would not consider her as a

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

8
THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1   candidate for the position, and that she supposedly was not "Amazonian" enough

2   yet.  At first, Mr. Weatherby simply said that Ms. Warner had not been at Amazon

3   long enough to apply for an L10 job, but he abandoned this false reasoning when

4   Ms. Warner pointed out the obvious—that she was considered for an L10 level when

5   she was applying externally, and that external hires were being considered for the

6   job who had no experience at Amazon at all (not to mention that Amazon and he had

7   told her she could apply for L10 roles at any time).

8       16.    Ms. Warner spoke with Toni Handler of HR about Mr. Weatherby's

9   refusal to allow her to apply for an L10 role, and she told Ms. Warner that Mr.

10  Weatherby's rationale for not allowing her to apply or be considered formally with

11  other candidates made no sense.  Ms. Handler talked with her boss Lou Manfredo

12  (and/or Ian Wilson) and their direction was that Ms. Warner should go back to Mr.

13  Weatherby and tell him that she was qualified and eligible to apply and be considered

14  for the job.  Ms. Warner followed their instructions, and Mr. Weatherby again told

15  Ms. Warner that he refused to consider her, rejecting her application for that job

16  (despite HR's conclusion that there was no reason she should not be considered).

17      17.    Soon after these events transpired, a male external candidate was hired

18  for the job who was without any professional services experience (in contrast to Ms.

19  Warner's approximately 25-year career in professional services).  Not only did the

20  male hire not have professional services experience, but Ms. Warner already was

21  familiar and had a year of working at Amazon itself.  The male hire was a General

22  Manager at IBM covering an Industry (Industrial Markets, Chemicals/Petroleum) in

23  a sales role, did not have a services-related role at all until about 18 months before

24  (when he was in an IBM consulting role identifying service companies to buy), and

25  was never in a professional services role in 13 years at IBM.

26

27

28

9

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

18.     Despite not allowing Ms. Warner to apply for the newly upgraded L10 position in February 2021, Mr. Weatherby suddenly elevated Mr. Lavanty from L8 to L10 in March 2021, without any change in Mr. Lavanty's role (just as the Andy Bailey role was unchanged but upgraded, which allows for higher compensation). Weatherby's elevation of Lavanty came just a couple of days after Weatherby had bitterly mocked Ms. Warner for an HR complaint she had made regarding Lavanty calling her a "nobody" amid a furious, sexist tirade.  The announcement email from Weatherby regarding Lavanty's elevation to L10 did not include any mention of a new role or duties, which would be customary, and indeed his role and responsibilities did not change through the end of Ms. Warner's employment three months later or, upon information and belief, to the date of this Third Amended Complaint.  In contrast with Ms. Warner's 25 years in the area, Mr. Lavanty had about 10 years of professional services experience.

19.     Being denied the opportunity to apply formally or be considered for L10 positions or elevation put Ms. Warner at a tremendous disadvantage and had a very large effect on her compensation and career arc at Amazon, setting her trajectory back several years and costing her millions of dollars in income.

20.     This pattern and *modus operandi* have occurred in ProServe repeatedly with female employees' careers suffering in favor of the men who make up ProServe's inner circle.  A female ProServe employee, AR, complained of retaliation in 2020 after she raised gender-based discrimination concerns regarding her being passed over for promotion.  Members of HR discussed Ms. R's situation with Ms. Warner, as well as a general history and pattern of discrimination against and blockage of advancement for women during Weatherby's tenure atop ProServe.  In electronic message discussions, AR noted that as "someone who co-leads the Women@ LT (as opposed to coming from me alone, that by and large, women do

10

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1   not want to be in or stay in ProServe.  It's not a one or two outlier type thing, it's a

2   recurrent theme.  It's important to be aware of it, and to not only consider programs

3   and initiatives and big ticket items, but also the day in and day out stuff that sends a

4   message of inclusion/exclusion."

5       21.     AR was an L6 (Manager) employee who was recognized as doing her

6   job at an L7 level, yet was passed over for promotion at least twice over multiple

7   years.  She was labeled a malcontent and toxic by Weatherby in connection with

8   discrimination concerns she repeatedly raised on behalf of women in ProServe, often

9   stemming from Women@ProServe employee resource group ("ERG") meetings,

10  and was gratuitously called an "idiot" by Lavanty amid a tirade he was directing at

11  Ms. Warner.  A male HR employee acknowledged to Ms. Warner that AR had paid

12  a serious price for trying to advance equity for women in ProServe, and as a result

13  of her complaints and appeals on behalf of herself and others, her reputation and

14  career at Amazon were negatively affected.  Among other things, AR raised the issue

15  and pervasive occurrence in ProServe of men taking responsibility for good work

16  product by women, whereby woman would do or take the lead on a project, after

17  which a male colleague would take the credit for delivering on the project on a team

18  call with their manager, and also pointed out different standards for promotion for

19  men as opposed to women (women needed a significantly larger body of work for

20  promotion than men).

21      22.     Men in ProServe were often promoted, for instance from L7 to L8,

22  despite not having the "complete file;" that is, without every qualification or piece

23  of documentary support expected of candidates and certainly demanded of female

24  candidates.  For male candidates, Mr. Weatherby would often write promotion

25  candidates' references himself, whereas women such as Amanda Rankin were not

26  being promoted even to L7 despite having superior credentials and various

27

28

11

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

independent references.  ProServe's promotion process was widely acknowledged within the organization as well as in HR to be biased and tilted against women.

23.     HR employees and women in ProServe also have discussed with Ms. Warner outright harassing and discriminatory remarks towards and toxic treatment of women, which Ms. Warner has experienced firsthand.  Women would commonly be referred to and criticized as too brusque, sharp or critical, and even called a "bitch" and be berated by male colleagues, particularly where they attempted to be assertive in standing up to bullying behavior, such as resisting having a client or assignment taken away from them.  Sexual harassment also was reputed to be common at ProServe's annual reinvent conference, where drunken evenings regularly led to misconduct by Professional Services personnel.

24.     Employees in the ProServe and AWS HR organization have reported to Ms. Warner that HR investigations were generally ineffective in addressing employee complaints and concerns, that HR processes were not designed to punish policy violations, and that there was a pattern and practice of executive leaders looking the other way regarding misconduct by male managers who were considered productive from a business perspective.  Mr. Weatherby was seen by HR personnel as acting to shield men, particularly his direct reports, from accusations of discrimination and related consequences, including Pravin Raj.  Indeed, one HR manager from within ProServe observed that managers in the organization would use various means to retaliate against employees who made complaints, such as stalling their promotion, assigning them to failing projects or withholding work, bullying them regularly, or coordinating with others to make working conditions intolerable.  This was observed regarding women who raised complaints to HR, Legal or management about bullying, harassment or discrimination, as they

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

generally were then treated less favorably than before, and almost uniformly left the Company or organization one way or another.

25.    Ms. Warner observed this pattern of discrimination and harassment herself as well, and many women came to her with examples of bullying by male coworkers and men receiving credit for female employees' ideas and work, exclusion from meetings and key discussions, and as a result missing out on career-related rewards. Ms. Warner was vocal and forthright, though professional, in leadership meetings and with Weatherby about the need to address women's concerns regarding discriminatory mistreatment and inequity in ProServe, and so several months into her tenure she too became a target for similar discriminatory and retaliatory treatment, including being ruled out for consideration for L10 roles by Mr. Weatherby.

26.    When, in early 2021, Ms. Warner objected to her male peer David Lavanty's efforts to wrest a desirable client relationship away from her, even against the best interests of the Company, the frustration and misogynistic disdain of Mr. Lavanty finally burst into the open, with him angrily calling her a "**bitch**" (as well as an "idiot" and a "nobody," for good measure) in front of an HR executive. Weatherby declined to take any action whatsoever against Lavanty, despite Lavanty's apparent, unavoidable admission that his actions were wrong. Instead, Weatherby elevated him to L10 just weeks after this incident of clear misconduct, despite HR officials' admissions that Lavanty's behavior clearly violated Amazon's Code of Conduct and was a terminable offense.

27.    Amazon's wider management also appears unconcerned with this rampant discrimination, as their own published data shows that women account for only approximately 20% of the employees at Amazon Level 8 and above—a figure

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

13

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1    that changed relatively little over the three years before and coinciding with Ms.

2    Warner's employment and the proportion of women at such a level in ProServe.[1]

3       28.    On or around April 28, 2021, Ms. Warner was terminated by the

4    Defendants. This came just three weeks after Amazon and Weatherby (who was

5    informed of the letter before the termination by HR and/or Legal) learned that Ms.

6    Warner had retained legal counsel through an April 7, 2021 letter to the Company

7    reporting discrimination against herself and other women in ProServe. The letter

8    further stated that she was pursuing legal claims of gender discrimination (including

9    for refusal to even consider her for L10 positions, in contrast to comparable men).

10    Instead of engaging in dialogue with Ms. Warner or seeking information from her

11    regarding these claims, Amazon abruptly and without explanation told Ms. Warner

12    that her job in ProServe was over and that she had two months to find a new job at

13    Amazon or her employment would end. Ms. Warner's direct manager, Defendant

14    Weatherby, was aware of her attorneys' letter and her claims of discrimination

15    before April 28, 2021, as well as another protected complaint by Ms. Warner directly

16    to Mr. Weatherby regarding equal pay for women in the group made that same month

17    (in addition to her recent complaints about Lavanty's sexist tantrum and other

18    discrimination concerns raised in leadership conversations, as detailed below). In

19    various meetings following Mr. Lavanty's "bitch" tirade against Ms. Warner in

20    March 2021, Ms. Warner made specific protected complaints to Mr. Weatherby and

21    HR personnel regarding Lavanty's conduct, her exclusion from participating in the

22    full application process for the L10 position, as well as multiple complaints on behalf

23    of women in ProServe regarding equal pay and other subjects. Some of these

24    complaints were made and memorialized or corroborated in writing as last as mid-

25    April 2021, as detailed below, and all concerned conduct and practices that would

---

[1]      https://www.aboutamazon.com/news/workplace/our-workforce-data (last accessed May 17, 2021).

WIGDOR LLP
85 FIFTH AVE, FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

14

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

1  reasonably be viewed as violations of Title VII and other applicable laws against

2  gender discrimination.

3       29.    Under Company policies and practices, Mr. Weatherby was required,

4  at a minimum, to approve her termination, and both he and Amazon would have

5  approved and implemented the adverse employment actions against Ms. Warner

6  together.  This was a blatantly retaliatory move against Ms. Warner that proved

7  Defendants' animus and hostility against her.  Ms. Warner was terminated not only

8  on the heels of legally protected complaints and in the absence of any proffered

9  intervening cause, but she was told by one of the HR representatives in the

10  termination meeting (only after Ms. Warner asked) that she was losing her job

11  because of her "unhappiness" in ProServe.  This was nonsensical and transparently

12  false.  Ms. Warner had pointed out to Mr. Weatherby and the Company the

13  discrimination women faced in ProServe, including herself, and told Weatherby that

14  as a result she was considering positions at Amazon outside ProServe, she had no

15  imminent plans to leave (and certainly not on an involuntary basis).  In addition, Mr.

16  Weatherby had shown his retaliatory animus towards Ms. Warner personally in a

17  recent angry, sarcastic remark to Ms. Warner about needing to be careful not to use

18  the word "nobody" around her, expressing his displeasure about her having filed a

19  complaint regarding Mr. Lavanty's sexist tirade.  Weatherby had also, in a meeting

20  with Ms. Warner and HR, tried to blame Ms. Warner for somehow provoking

21  Lavanty to call her vile names.  These acts by Defendants further demonstrate

22  Defendants' retaliatory animus against Ms. Warner for her legally protected activity

23  and complaints.  Mr. Weatherby and his right hand Mr. Lavanty, and the other male

24  managers of ProServe, could not tolerate leaving Ms. Warner in place once she made

25  it clear that, if Amazon would not hold them accountable for their behavior, then she

26  would do it.

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

15

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

30.     Many coworkers and members of Ms. Warner's team expressed their shock and outrage regarding her sudden and unwarranted termination, which damaged her reputation inside and outside Amazon.

31.     A ProServe HR employee has expressed the conclusion, based upon communications with HR and management personnel at the Company and observation of how other employees who made complaints of serious misconduct were handled, that Ms. Warner's removal from her job in ProServe was a reaction to her complaints of discrimination, and was also carried out to prevent her from gathering materials to further support her claims or further complaints.

32.     Furthermore, Ms. Warner's ouster was carried out by the Defendants in a manner far more harsh and abrupt than any other termination at her L8 Director level that had been observed over years by a ProServe HR employee.

33.     True to herself, Ms. Warner diligently applied for other positions at Amazon for which she was qualified and a good match, and even expressed a willingness to still help improve the workplace for women and employees generally in ProServe.  However, Amazon's vindictive handling of the situation made it very difficult if not impossible for her to close the deal on a new job within the Company even when she received initial and even enthusiastic interest, as her status on the Company's system had been changed to show her with no direct reports (an obvious red flag at her L8 level, indicating some irregularity regarding her status at the Company).

34.     In addition, the Company outright refused to recommend or help in any way to find internal positions for her.  This reveals the Company's removal of Ms. Warner from her role to be exactly what it was—a punitive termination trying to masquerade (poorly) as something else, as opposed to an attempt to coax an "unhappy" employee into a different area.  Never in her decades of growing teams

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

16

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1   and building organizations across a multitude of top companies had she experienced

2   such deplorable treatment, which also, not incidentally, goes against all business

3   sense.

4      35.   The openly discriminatory language and other conduct by Amazon's

5   white male executives in ProServe, including failure to advance qualified women

6   and allow the taking of their work by bullying male coworkers, show that much of

7   their worst behavior and abuse is targeted at female coworkers and subordinates.  It

8   draws a clear connection between the dismal representation of women in the upper

9   ranks of Amazon (including ProServe, which before Ms. Warner had perhaps one

10  other women in its leadership ranks) and systemic and conscious animus and bias

11  faced by women and other underrepresented groups at Amazon.

12     36.   Amazon has long known about and tolerated conditions disadvantaging

13  women and allowed its male-dominated management to engage in practices keeping

14  women out of the Company's upper ranks.[2]  The insults, the open contempt, and the

15  disregard towards a high-ranking and valuable female executive like Ms. Warner

16  exemplifies the anti-female bias underlying these undeniable trends at the Company.

17  Many women (and men) in Professional Services have shared with Ms. Warner their

18  own observations of and experiences with discrimination and retaliation against

19  women and other underrepresented groups at Amazon.  Ms. Warner and others have

20  observed these practices in ProServe as well, including failure to promote or hire

21  qualified women despite elevating lesser-qualified men, bullying, stealing of ideas

22  and assignments, firing despite good or comparable performance to male peers, and

23  other disparate treatment and retaliation that forced women out of ProServe at high

24  rates.

25  _____

26  [2]    See

27  https://www.realclearpolicy.com/articles/2018/10/09/report_amazon_falls_short_on_gender_equity_110846.html (last accessed May 17, 2021).

17

28  THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1   37.   Amazon had an opportunity to sincerely examine its policies and

2   practices and enact meaningful change, as an employee petition circulated

3   electronically among ProServe's workforce and was signed or "upvoted" by at least

4   550 employees and perhaps many more in June and July 2021.  The petition, which

5   was spurred in part by the initial filing of Ms. Warner's instant lawsuit, pleaded with

6   Amazon to address and investigate "AWS employee experiences of sex and racial

7   discrimination and retribution against whistleblowers [and] growing concern among

8   ProServe employees about an underlying culture of systemic discrimination,

9   harassment, bullying and bias against women and under-represented groups."  The

10  employee petition made several suggestions and requests regarding a truly

11  independent and transparent investigation, as well as the establishment of an

12  "employee council or advisory group," which were not followed by the Company.

13  38.   Eventually, Mr. Weatherby exited the Company in January 2023,

14  though he was permitted to do so after a year in a comfortable job after stepping

15  down as the head of ProServe.

16  39.   Ms. Warner now brings this action to redress the unlawful employment

17  practices committed against her, including Defendants' discriminatory and

18  retaliatory treatment of her due to her sex/gender and legally protected activity in

19  violation of Title VII, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Equal Pay Act of

20  1963, 29 U.S.C. § 206(d) *et seq.* ("EPA"), California's Fair Employment and

21  Housing Act, California Government Code § 12940 ("FEHA"), and the California

22  Equal Pay Act, California Labor Code § 1197.5 ("CEPA").

23  **ADMINISTRATIVE PROCEDURES**

24  40.   On May 26, 2021, Ms. Warner filed a charge with the U.S. Equal

25  Employment Opportunity Commission ("EEOC") alleging violations of Title VII.

26

27

28

18

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

1
2
3
4

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

41.     Pursuant to a work-sharing agreement between the EEOC and the California Department of Fair Employment and Housing ("DFEH"), Ms. Warner's charge was cross-filed with the DFEH in order to satisfy prerequisites for bringing claims under the FEHA.

42.     On May 26, 2021, the DFEH issued Plaintiff a Right to Sue.  On June 3, 2021, the EEOC issued Plaintiff a Right to Sue.

43.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

44.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the Title VII and the EPA.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

45.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

46.     Plaintiff Cindy Warner is a gay white woman and was a Global Leader, ProServe Advisory, Strategic Program Management and Partners at Amazon.com, Inc. and Amazon Web Services, Inc.  During the most relevant periods of her employment at Amazon, Plaintiff Warner resided in Riverside County, California.  At the time of her hire by Amazon, Ms. Warner also was residing in Michigan.  At all relevant times, Plaintiff Warner met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

47.     Defendant Amazon.com, Inc. is a Delaware-registered domestic corporation with operations in Irvine, California and throughout the country.  At all

19

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1   relevant times, Defendant Amazon.com, Inc. met the definition of "employer"

2   and/or "covered employer" under all applicable statutes.

3       48.    Defendant Amazon Web Services, Inc. is a Delaware-registered

4   domestic corporation with operations in Irvine, California and throughout the

5   country.  At all relevant times, Defendant Amazon Web Services, Inc. has been a

6   wholly owned subsidiary of Defendant Amazon.com, Inc. and met the definition of

7   "employer" and/or "covered employer" under all applicable statutes.  Amazon.com,

8   Inc. and AWS share facilities, administrative functions, and employee management

9   functions and resources.

10       49.    Defendant Todd Weatherby is a white male and, upon information and

11   belief, a resident of Seattle, Washington and was at all relevant times the Vice

12   President of Professional Services Worldwide at Amazon Web Services, Inc., where

13   he supervised Ms. Warner during her employment at the Company and controlled

14   the terms and conditions of her employment (including her compensation and the

15   ability to hire and fire).  Based upon Ms. Warner's involvement and observation of

16   other employees' terminations, as well as information from members of HR, Mr.

17   Weatherby's approval was necessary to terminate employees in ProServe, including

18   Ms. Warner.  At all relevant times, Defendant Weatherby met the definitions of

19   "employer" and/or "covered employer" under all applicable statutes.

20   **FACTUAL ALLEGATIONS**

21   **I.    MS. WARNER'S CAREER BEFORE AND RECRUITMENT TO**

22   **AMAZON, AND HER ROLE AND ACCOMPLISHMENTS IN ONE YEAR**

23   **AT AMAZON**

24       50.    Ms. Warner, who is a gay woman in her late 50s, was a Partner and

25   Vice President for nearly ten years at Ernst & Young/Capgemini ("EY") as a Global

26   Leader in Systems Applications and Products, Customer Relations Management

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

27

20

28   THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

before leading technology and cloud-based initiatives at several other world-class organizations, including Salesforce.com, PricewaterhouseCoopers ("PwC"), IBM, and NetApp.

51.     At NetApp, Ms. Warner led an organization responsible for $2.4 billion in revenue, a budget of $700 million, approximately 3,000 full-time employees, and which provided service and support to that company's top 100 clients (including artificial intelligence solutions).     She has been credited with a wholesale transformation of the services and support organizations to facilitate that company's transition to the cloud before being approached by Amazon in or around October 2019.

52.     Amazon aggressively recruited Ms. Warner to join its Professional Services Group.     Ms. Warner previously had built professional services organizations at Salesforce, PwC, and IBM.     Although she was recognized as qualified for a Vice President, Level 10 ("L10") position, as confirmed in conversations with both her recruiter and eventual boss, Todd Weatherby, she was told by Mr. Weatherby (falsely, as it later turned out) that Amazon does not hire for L10 positions externally.

53.     Amazon and Mr. Weatherby succeeded in piquing Ms. Warner's interest in the position with descriptions of her wide-ranging role and the discretion and responsibility she would have.     She also interviewed with several other Amazon representatives in Seattle in or around December 2019, at which the depth of Ms. Warner's experience and professional achievements and qualifications were thoroughly inquired into.

54.     Ms. Warner was told by Mr. Weatherby that she would be his replacement for succession planning purposes, as supposedly no other L10 employees were being groomed for that role.     Ms. Warner also was told that, in light

21

of her qualifications and readiness for an L10 role, she could apply for such a role anywhere in the Company at any time once she joined Amazon, and that if and when an L10 job became available in Professional Services, she also could apply for that role.

55.     Soon, Ms. Warner received an offer from Amazon and was told that although they loved her and she was a great fit, the Company does not hire for L10 positions much, if at all, from outside the organization, and therefore they could only offer her a Level 8 ("L8") position.  Upon information and belief, the decision to hire Ms. Warner as an L8 employee instead of L10 was made by Mr. Weatherby, who was the hiring manager for the job and Ms. Warner's immediate supervisor during her tenure with the Company.

56.     Ms. Warner had been considering a few other opportunities which she had declined in anticipation of Amazon's offer, and though she was disappointed by the significant pay cut she would take and narrower responsibilities she would have as a result of the lower level, she believed the Company's assurances regarding her ability to apply for an L10 position soon after she started.  Amazon's representatives promised Ms. Warner that she was eligible to apply for a promotion without any time constraints.

57.     Ms. Warner started work at Amazon as Global Leader, ProServe Advisory, on or around February 17, 2020.  Ms. Warner was paid the capped salary of $160,000, as well as bonus and stock payments that brought her total annual compensation to approximately $890,000.

58.     Ms. Warner's role was leading Global Advisory Professional Services, referred to as AWS's "tip of the spear," in which her team would work with executive customers to show them how AWS could transform their organizations. In this position, her ambit ultimately falls under Senior Leadership Team member

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1    and Senior Vice President Matt Garman, who leads AWS Sales, Marketing and

2    Service.

3        59.    In her role, Ms. Warner directly reported to Mr. Weatherby who, as

4    noted above, hired Ms. Warner for her role.  In fact, Ms. Warner's offer letter was

5    signed by Mr. Weatherby.  Mr. Weatherby had authority to dictate the scope and

6    nature of Ms. Warner's role.  For example, approximately one week prior to Ms.

7    Warner starting, Mr. Weatherby informed Ms. Warner that he decided that her role

8    would include additional responsibilities pertaining to overseeing ProServe's partner

9    network.   Upon information and belief, Mr. Weatherby was responsible for the

10   hiring and termination decisions for all ProServe employees at Ms. Warner's level,

11   although such decisions also were reviewed and implemented by other Amazon

12   personnel, such as those in Human Resources (HR).  Mr. Weatherby determined the

13   scope of the roles in ProServe at Ms. Warner's level, including assigning the

14   ProServe leaders their specific projects and duties.  Upon information and belief,

15   Mr. Weatherby was the decision-maker regarding compensation decisions for

16   ProServe employees at Ms. Warner's level, including Ms. Warner.

17       60.    Most if not all of the L8 executives at Ms. Warner's level under Mr.

18   Weatherby in ProServe held closely analogous roles with similar if not identical

19   duties managing teams of employees who provided and designed AWS cloud and

20   technology services to private sector clients.  Each of the L8 executive leaders

21   presided over their own team with a set of industry clients, geographic focus, or

22   functional specialty.  This corps of ProServe Director L8 leaders from 2020 to 2021

23   included Ms. Warner, David Lavanty, and Andy Bailey.

24       61.    The ProServe Director positions such as those held by Ms. Warner, Mr.

25   Lavanty, and Mr. Bailey shared core duties and responsibilities.  These Director jobs

26   all required the executives to hire and manage the employees on the teams reporting

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

23

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1   to them, which managed specific parts of the business and oversaw quality control

2   of delivery and profit/loss goals for ProServe.  Directors also were responsible for

3   setting the tone and molding the culture in their group and ProServe as a whole, as

4   well as interfacing with clients, tracking goals on sales, assessing employee

5   performance, and other team and client management tasks.

6   62.   In the Global Advisory group/team (which she was required to take

7   over directly a few months into her tenure), Ms. Warner found that she had been

8   handed an area that previously had four different leaders in four years.  Ms. Warner

9   was also tasked with building out the AWS Amazon Partner Network organization

10  into Professional Services, an effort which had failed several times in the past.  Ms.

11  Warner also was put in charge of Strategic Programs, another area in which several

12  executives had failed to coalesce a strategy that brought the team along.

13  63.   Upon starting at Amazon, in great contrast to her previous roles

14  (including NetApp), Ms. Warner learned that the headcount of her team would be

15  only approximately 50 employees, and that she had no budget or profit-and-loss

16  responsibilities.  Ms. Warner hit the ground running at Amazon and within her first

17  month she established a COVID Business Continuity team in response to shutdowns

18  and remote work arrangements affecting customers and Amazon itself.  She was

19  diving deeper to understand the Strategic Programs that were failing to achieve their

20  objectives and restructured the Advisory Team to create greater clarity of their

21  objectives and provide more value for Amazon's customers.

22  64.   By October 2020, Ms. Warner had thoroughly gotten her arms around

23  her various roles, making headway on the goals with her Advisory area growing,

24  having made some excellent hires, and significantly growing the number of partners

25  in her area as well (including working with the CEO of Accenture).  She was also

26  making a significant impact as an Advisor to the Women@ProServe affinity/ERG

27

28

24

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

that was discussing instances of and addressing the gender bias and obstacles to advancement for women that were and are so pervasive within Professional Services.

**II.    MANAGEMENT REFUSES TO PROVIDE MS. WARNER WITH ADDITIONAL RESPONSIBILITIES OR ALLOW HER TO APPLY OR CONSIDER HER FOR A PROMOTION, IN CONTRAST TO HOW MALE PEERS WERE TREATED**

65.    In light of her progress with her teams, in or around October 2020, Ms. Warner asked Mr. Weatherby for more responsibility, showed him the progress made in her group and explained that she easily could take on more, as the size of the team was comparable to what she was handling 20 years before or longer in the scheme of her career (which Mr. Weatherby would have known from the recruiting process).  She also reiterated that her prior experience had been acknowledged by Mr. Weatherby and Amazon HR as Director-level (L10) in nature, and that she was ready and wanted to be considered for all such opportunities within ProServe.

66.    Yet, Mr. Weatherby turned her down flat.  He refused to give her any more responsibility and simply declared, without any basis or explanation, that she had not proved capable of taking on more responsibility and that she somehow did not understand Amazon's culture (despite the clear headway she had made in previously floundering groups and initiatives).  Mr. Weatherby further asserted (without any concrete basis) that Ms. Warner has "sharp elbows" and that she somehow does not listen well enough.  It was immediately obvious that these were vague, intangible criticisms and rationalizations.

67.    During 2020, Ms. Warner had on occasion asked Mr. Weatherby, "have we considered" various things, which Mr. Weatherby took as her supposedly "being very critical," despite the fact that she was in fact being curious, having a bias for

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

25

1  action, thinking outside the box, and identifying areas for improvement (as one
2  would expect of any new, high-ranking executive).  Indeed, Ms. Warner, who has
3  been a successful member of many teams, asked Mr. Weatherby in response to his
4  brusque rejection of her questions and requests whether she had presented herself
5  inappropriately or offended others at any point, and that she would want to know if
6  that was the case.  Mr. Weatherby could not give any concrete examples at all beyond
7  his visceral feelings towards Ms. Warner.

8      68.    It was apparent that Mr. Weatherby was very uncomfortable with Ms.
9  Warner's presence in his organization due to her outspokenness regarding challenges
10 within Professional Services, her support of other employees, particularly women,
11 and her willingness to escalate issues (including employee observations and
12 concerns regarding bias, bullying, and barriers to advancement, particularly against
13 women in ProServe).  Indeed, Ms. Warner escalated such issues on several occasions
14 during 2020 and 2021, and where appropriate communicated them in terms of
15 apparent discrimination against female employees in the group.

16     69.    By way of example only, in or around March and April 2021, Ms.
17 Warner raised issues to Mr. Weatherby personally as well as to two Amazon HR
18 representatives with respect to pay disparities and provided four examples of specific
19 female ProServe employees (including Amanda Rankin and Sausan Yazji) who she
20 believed were earning less than male employees performing the same work and at
21 the same level.  Ms. Warner was disturbed to learn that there were also male
22 employees at a lower level who were also receiving higher compensation than the
23 four female employees who she had identified, despite their being in similar or lesser
24 roles. Ms. Warner was able to identify the pay disparities through the personal
25 compensation statements of her employees that she reviewed during the managerial
26 compensation review process.

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

26

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

70.     Ms. Warner first raised the issue of the pay disparities for the four female ProServe employees with the Human Resources employee who was supporting ProServe, Ed Salas, in March 2021.  Ms. Warner was going through the compensation review process for her organization with Mr. Salas, whereby they both reviewed the compensation of individual employees.  While doing so, Ms. Warner recognized the pay disparity and directly raised concerns that female employees were being paid less than male employees in equal—and even lesser—roles.

71.     Mr. Salas acknowledged that Ms. Warner's observation appeared to be accurate and that he would "look into it."  After apparently looking into it, he informed Ms. Warner that there was nothing that could be done at the time.

72.     After raising her concerns with Mr. Salas, Ms. Warner proceeded to raise her concerns with Mr. Weatherby during team leadership meetings in early April 2021.  Ms. Warner raised her concerns with Mr. Weatherby because she knew he had the ability to address the pay disparities due to his access to additional funds that could be used to balance compensation and his decision-making authority regarding compensation.  Ms. Warner specifically indicated to Mr. Weatherby and Mr. Salas, as well as Toni Handler, that she believed these four employees were being paid less than several of their male colleagues because of their gender.  Ms. Warner saw the pay disparities affecting these women as glaring, and presented her concerns to Mr. Weatherby and the others as yet another example of inequity and discrimination based upon gender affecting women in ProServe.

73.     Others in ProServe had recognized how helpful Ms. Warner could be in effecting change in the organization based on her experience, integrity without fear, understanding, and the contributions she already had made in her time at the Company.  Colleagues have commented that Ms. Warner was more Amazonian than

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1    other managers and was "a breath of fresh air," among other compliments and

2    endorsements of her approach and style.

3        74.    Indeed, Ms. Warner's Forte 2021 review comments from both peers

4    and her direct reports are effusive, with multiple peers noting how well her prior

5    executive experience fits with her role and the organization's goals, and her team

6    members praising her support and honesty.  Both peers and direct reports alike noted

7    Ms. Warner's passion and willingness to speak plainly, and how quickly she had

8    learned the organization's workings.

9        75.    Peer comments included: "Cindy has incredible energy, brings a lot of

10   positivity and is not afraid to speak her mind, especially when she sees something

11   wrong.  She is a team player, and is a good listener.  She is unafraid to let go of her

12   beliefs and learn;" "Cindy has the best business judgment I've seen in my career;"

13   "Cindy is able to manage diverse perspectives and opinions to draw practical

14   approaches and bring teams together by focusing on what's best for the customer.

15   Her ability to remove emotion from conversations and drive to fact[-]based decision

16   making is a valuable asset for everyone she works with;" and "Cindy thinks big and

17   demonstrates backbone when challenging us to think more long term about

18   ProServe's partner program."  Mr. Weatherby gave Ms. Warner an "Achieves" (i.e.,

19   meeting expectations) rating on her 2021 performance review.

20       76.    In November 2020, when it was announced that Andy Bailey, a peer of

21   Ms. Warner, was leaving, Mr. Weatherby was exploring what to do with Mr.

22   Bailey's role (L8 Director, Global Verticals and Strategic Accounts) running

23   strategic accounts and industry verticals, which came with a 600-employee team.

24   Ms. Warner suggested to Mr. Weatherby that Mr. Bailey's group could be combined

25   with hers (Bailey's group and Ms. Warner's team handle global accounts and

26   industry verticals and have many synergies), which would save headcount.  In

27

28
                                    28
     THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
                                 DAMAGES

addition, it would have given Ms. Warner an opportunity to demonstrate that she could take on more remit and her capabilities (which already were well-established based on her track record and the L10 role Amazon already had recruited her for). Mr. Weatherby again told Ms. Warner without basis that she supposedly, somehow was neither capable nor competent to lead Mr. Bailey's team.

77.     In or around January or early February 2021, Mr. Weatherby had announced to the ProServe leadership that he would be replacing Andy Bailey, an L8 executive and a peer of Ms. Warner in a very similar role.  Mr. Weatherby told the ProServe leadership team that the role would be filled as an L10 role, although the duties and scope would remain the same.  Ms. Warner asked him in the meeting how to apply and he said that people had to contact the recruiter for the job posting. Ms. Warner got the job posting and saw that her experience more than met the experience requirements for the role.  Ms. Warner had read a document showing that an L10 role in Professional Services was being hired from outside the Company. This turned out to be for Mr. Bailey's replacement.

78.     After the leadership meeting, Ms. Warner again told Mr. Weatherby that she was interested in the position and asked him to be considered for the role as Mr. Bailey's replacement at the L10 level, and whether she could formally apply for the role.  As her direct manager at Amazon, Mr. Weatherby had the power to allow or disallow Ms. Warner to apply formally for the role.  At Amazon, an employee's direct manager is informed by the hiring manager for a given job that their subordinate has applied for a job, with the manager having the opportunity to disallow the employee as a candidate for the position.  Mr. Weatherby also was the hiring manager for Mr. Bailey's role, making him the ultimate decision-maker on who would fill that job.  Mr. Weatherby rejected Ms. Warner's candidacy and application for this L10 role out of hand.  As detailed below, he knew she was

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

29

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1  interested and wanted to go through the application process, but as her manager and

2  the person in charge of filling the role, he would not allow her to apply on the same

3  basis as other employees and, further, told her that he would not hire or even formally

4  "consider" her for the role.  Again, this was a rejection of Ms. Warner as a candidate

5  for this L10 position by Mr. Weatherby.

6        79.    Naturally, Ms. Warner thought back to discussions with Amazon

7  during her recruitment, when she was told that L10 roles were only rarely filled from

8  outside the Company, and that she could apply for such roles promptly upon joining

9  Amazon.  Now, Mr. Weatherby was apparently looking outside Amazon for an L10

10  employee and refusing to allow her, one of only two women among the couple of

11  dozen Leadership Team L8 executives in ProServe (there is no Level 9/L9), to apply

12  like anyone else and to consider her on the merits for the role, rather than simply

13  rejecting her for it outright.

14        80.    In late January or on or around February 1, 2021, Ms. Warner spoke

15  with Mr. Weatherby and told him that she wanted to apply and be considered for the

16  L10 Andy Bailey role.  Mr. Weatherby refused to allow her to apply formally, saying

17  that he would not consider her as a candidate for the position and that she supposedly

18  was not "Amazonian" enough yet.  At first, Mr. Weatherby told Ms. Warner that she

19  had not been at Amazon long enough yet to apply for an L10 job.  However, he

20  abandoned this false reasoning when Ms. Warner pointed out the obvious—that she

21  had already been considered for an L10 level when she was applying externally to

22  Amazon and that Weatherby was now considering external hires for the job who had

23  no experience at Amazon at all, much less in ProServe itself.

24        81.    Ms. Warner spoke with Toni Handler of HR about Mr. Weatherby's

25  refusal to allow her to apply.  She also exchanged written electronic messages with

26  Ms. Handler on the subject on or around January 21, 2021 in which she also

27

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

30

28  THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

1   mentioned that the other Director-level woman in ProServe also apparently had not

2   been considered for the Bailey replacement L10 role, and that the commitment to

3   Ms. Warner that she could apply for any L10 role when it opened seemingly was not

4   being honored.  Ms. Warner explicitly told them that she had expressed interest in,

5   asked to apply and be considered for the role and had "thrown her hat into the ring."

6   Ms. Handler asked her what reason was given and told Ms. Warner that Mr.

7   Weatherby's rationale made no sense.  Ms. Handler talked with her boss Lou

8   Manfredo and/or Ian Wilson, and their feedback was that Ms. Warner should go

9   back to Mr. Weatherby and tell him that she was qualified and eligible to apply and

10   be considered for the job.  However, they also stated that it was up to Mr. Weatherby

11   who he would consider, allow to apply through the full process, and hire for the L10

12   jobs in ProServe.

13       82.   Ms. Warner did as they said, followed HR's directions and their

14   specified means of presenting herself as a candidate, and reapproached Mr.

15   Weatherby about her application and candidacy for the Bailey L10 position.  Once

16   again, Mr. Weatherby told Ms. Warner that he refused to consider or interview her,

17   effectively and in reality denying her application and candidacy for the role despite

18   Ms. Warner putting herself forward as an applicant and candidate.  Mr. Weatherby,

19   among other things, said regarding Ms. Warner attempting to pursue her candidacy,

20   "Don't bother, because I'm not going to allow you to do it, and I'm certainly not

21   going to interview you for it."  Mr. Weatherby also said that he was not and would

22   not consider Ms. Warner or anyone else in her "L8 peer group" for an L10 position

23   in ProServe.  This later turned out to be completely and knowingly false.

24       83.   The job description for Mr. Bailey's L10 role was soon distributed

25   externally, contrary to what Ms. Warner had been told by Mr. Weatherby during her

26   recruitment about Amazon's policy against hiring from outside to fill such roles.

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

31

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

The job was described as: "Vice President, Global Verticals and Strategic Accounts to have industry shaping impact by leading a broad scope of strategic, multinational customer accounts and consulting teams at AWS. This executive will provide leadership on the largest and most complex IT transformation projects across a variety of industries, including Media and Entertainment, Health Care and Life Sciences, Industrial…."

84.     Ms. Warner's previous experience (and even what she had done at AWS for the past year) was just about a perfect match for the description of the ideal candidate for the role: "The ideal candidate must be able to lead global teams at scale. They must be a trusted advisor to CxOs with a successful track record of selling/positioning consulting work to the largest global enterprises. The successful candidate will bring a high-level of gravitas, astute judgment, effective negotiation and influencing expertise, and exceptional people leadership skills. This leader will have Digital/cloud transformation experience, as well as the ability to easily distill and sell complex solutions and engagements that will have industry shaping impact."

85.     Ms. Warner has many years of IT advisory experience and leadership of teams of a global scope, including work leading the design and implementation of tech solutions and cloud-based systems across lines of business and for C-suite contacts and Fortune 500 customers in a host of industries (such as Microsoft, GE, Ford, and others).

86.     Indeed, Amazon and its recruiter had recognized that Ms. Warner already was well-qualified for an L10 role at the Company. Ms. Warner's work and excellent track record over more than 30 years, from EY to Salesforce to PwC to IBM, NetApp, and others all provided the precise background called for by Mr. Bailey's position. This was the same experience noted by peers and direct reports

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

32

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1  as pivotal in Ms. Warner's success during her first year at AWS, as further reflected

2  in her Forte feedback.

3          87.    Ms. Warner could see from the job description for the position that she

4  was, if anything, overqualified for the L10 role being filled.  It was after this that she

5  raised the matter with Human Resources (Ms. Handler) in order to make sure that

6  they knew that she was not being allowed to apply for the job and had not received

7  any concrete explanation as to why.

8          88.    When Ms. Warner talked again with Mr. Weatherby, she brought a

9  copy of her resume/CV to go through with him, explaining her experience in order

10  to clear up any misunderstanding and show that she was, in fact, thoroughly qualified

11  for the L10 job.  Ms. Warner pointed out that anyone applying from outside Amazon

12  also would need to demonstrate their qualifications through past experience, and said

13  she was not sure why she would not be considered on the same basis.  In fact, Ms.

14  Warner had the advantage of already having been vetted by the Company for hire

15  and accrued some high-level experience at Amazon, getting to know its organization

16  and culture.

17          89.    In response to these highly reasonable observations and requests, Mr.

18  Weatherby curtly told Ms. Warner that he did not care, that he was not considering

19  Ms. Warner or her "peers," and that he would not consider Ms. Warner until she

20  supposedly showed that she was competent and could handle the job that she already

21  was in, heading a team of 50 full-time employees.  This amounted to Ms. Warner's

22  unsuccessful job interview for the L10 position, albeit a hostile and apparently

23  unwilling one from Mr. Weatherby's direction, as he was excluding one of his very

24  few female executives from formal consideration.

25          90.    When Human Resources (Ms. Handler) had escalated the matter to Lou

26  Manfredo (head of Human Resources for AWS), Mr. Manfredo had declared that it

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

27

28

33

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

1   was up to Mr. Weatherby, that he could do as he pleased, and that if he did not want

2   to consider Ms. Warner for the job, then he did not have to do so.  However, both he

3   and Ms. Handler had encouraged Ms. Warner to go back to Mr. Weatherby and

4   appeal to him again regarding her application for the job.  Of course, whether or not

5   Mr. Weatherby had the authority and discretion to make such a decision did not

6   mean that he lawfully could do so on a discriminatory basis.

7       91.    Soon after these events transpired, Al Opher, an external candidate

8   from IBM and a male, was hired for the job.  Ms. Warner's experience compared

9   favorably with that of Mr. Opher, as he had no experience working at Amazon or

10  AWS, and Mr. Opher's most recent experience was as a General Manager at IBM

11  working in a sales role covering a certain industry (Industrial Markets,

12  Chemicals/Petroleum), and he had not been responsible for client services at all at

13  IBM.  His closest experience to client services was a consulting role in his last 18

14  months at IBM in which he identified service companies as potential acquisition

15  targets for IBM.  By contrast, Ms. Warner had 25 years of experience in professional

16  services before she came to Amazon.

17      92.    The next month, in or around February 2021, Andy Jassy, AWS CEO,

18  emailed Mr. Weatherby about a customer company, Change Healthcare, whose CEO

19  needed AWS's help.  Mr. Weatherby forwarded the message to Ms. Warner and

20  Professional Services Director (at that time) Dave Lavanty.  Mr. Jassy appears to

21  have had a "top to top" meeting with the customer's C-suite executives.

22      93.    Once Mr. Lavanty and Ms. Warner received the email, Ms. Warner

23  shared that she and her team members had been working on the relationship with

24  that same customer for six months, including with people in their C-suite, and that

25  she and her direct reports would be happy to help.  However, Mr. Lavanty decided

26  (clearly sensing an opportunity to swoop in and seize a chance to impress or get the

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

34

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1    attention of Mr. Jassy) that he and his people instead would take over responsibility
2    for the entire customer relationship from Ms. Warner and her team.

3       94.    In fact, Mr. Lavanty stated via email to Doug Smith that, "You and I
4    are going to work on this one together."  Ms. Warner had done nothing wrong and
5    there was no business reason for this change.  Mr. Lavanty was merely moving in to
6    assume what he must have believed was an opportunity to work on a relationship
7    that had the attention of Mr. Jassy.  This was yet another example of the type of
8    bullying behavior that Ms. Warner had observed and had reported to her by women
9    in ProServe for a year, with male executives feeling free to seize assignments,
10   opportunities, and credit from female colleagues, secure in the knowledge that Mr.
11   Weatherby would not discipline them for it, and likely would take their side in any
12   dispute or complaint arising from their conduct.

13   **III.   MS. WARNER IS THE TARGET OF DISCRIMINATORY**
14   **TREATMENT AND UNMISTAKABLY SEXIST EPITHETS IN THE**
15   **PRESENCE OF HUMAN RESOURCES PERSONNEL, WHICH CONDUCT**
16   **WAS REWARDED BY HER MANAGER, DEMONSTRATING THE**
17   **GENDER BIAS AND RETALIATORY ANIMUS OF MANAGEMENT**

18      95.    When Ms. Warner questioned whether the Change Healthcare
19   relationship should simply be handed over to Mr. Lavanty, he became furious.  Mr.
20   Weatherby also got involved, and when it appeared that he might also have doubts
21   about Mr. Lavanty's move, Mr. Lavanty became even angrier and made a false claim
22   about a deliverable that was due to the customer.  Much of these discussions were
23   documented in chats (some including Human Resources) over Amazon's internal
24   messaging platform, Chime.

25      96.    Ms. Warner proposed a call for Monday, February 15, 2021 in an
26   attempt to resolve the issue and ensure there was no negative customer impact in

27
28

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

connection with the deliverable, as Mr. Lavanty had falsely asserted.  Ms. Warner got on the call with Mr. Lavanty and HR representative Ed Salas (who Ms. Warner had asked to be on the line).

97.    On the call, Mr. Lavanty tore into Ms. Warner (who had been criticized by a male colleague for supposed "sharp elbows") and began outright and repeatedly screaming, "Do you know what you've done?  Do you know the mess you've created?  I can't believe you've done this to me!  How dare you do this to me!" and other furious, out of control statements.

98.    Mr. Salas suggested that Mr. Lavanty calm himself.

99.    Instead, Mr. Lavanty, who is a white male, doubled down on his unacceptable and abusive conduct, yelling at Ms. Warner that, **"You are nobody! You've done nothing in this organization!  I'm going to make damn sure you go nowhere in this organization!"**  This was a clear threat directed towards Ms. Warner.  Mr. Lavanty continued, "You and Amanda Rankin [one of Ms. Warner's female direct reports who had been working on the customer relationship] are **idiots**! No one wants to work with either of you."

100.    Mr. Salas interjected by saying, "Dave.  Stop.  Stop now."

101.    Mr. Lavanty then made the nature of his ire very clear, saying: **"I'm not working with her, she's a bitch!"**

102.    Mr. Salas warned Mr. Lavanty again to stop and reminded him that the call was supposed to be about one topic only – the customer relationship.  Ms. Warner pointed out that the call was about only whether a deliverable was due to the customer and ensuring that they did not suffer any negative effects.  Mr. Lavanty then confirmed and admitted, peevishly, that his previous statements regarding a deliverable trying to pin blame on or undermine Ms. Warner had been false, saying, "I don't know if there's a deliverable here.  Don't you ever question me."  Mr.

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1  Lavanty then disconnected from the call, seemingly hanging up on Ms. Warner and

2  Mr. Salas.

3      103.   Mr. Salas was shocked, and said, "I have never ever witnessed an

4  assault on another employee like this in all my years in HR.  Cindy, I need to do

5  something about this.  Yes, I'm taking issue with this."  Mr. Salas asked for Ms.

6  Warner's permission to bring what occurred on the call to the attention of other HR

7  and/or Employee Relations employees.  In response, Ms. Warner expressed her

8  desire for him to do so and gave the go-ahead to escalate the issue of the disturbing,

9  discriminatory incident.  In doing so, Ms. Warner sought to and was opposing Mr.

10 Lavanty's sexually discriminatory conduct and verbal harassment.  Shortly after the

11 call, Mr. Salas sent Ms. Warner a copy of the Company's code of conduct in order

12 to demonstrate that Mr. Lavanty's behavior was not only a violation of the code of

13 conduct's prohibitions of harassment and discriminatory conduct, but also a

14 terminable offense.

15     104.   A member of Employee Relations called Ms. Warner later, and Mr.

16 Salas also followed up with Ms. Warner later that week.  A member of Employee

17 Relations told Ms. Warner that, "Todd [Weatherby] should make a statement here

18 by firing him [Mr. Lavanty]."

19     105.   Ms. Warner could hardly sleep for a week, with Mr. Lavanty's raging,

20 abusive, sexist language and threat ringing in her ears for days afterwards and a new,

21 very present fear of retaliation preoccupying her thoughts.  Mr. Lavanty had

22 unmistakably and with tremendously hostility insulted her specifically as a woman

23 (and threw in another female colleague, Amanda Rankin, for insults at one point for

24 good measure) and had directly threatened her future at the Company.  Mr. Lavanty

25 was known in ProServe as one of two male executives, along with Pravin Raj, who

26 would regularly target employees in ProServe for pressure to force them out of the

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

37
THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

1  organization or other abuse and mistreatment at the behest of Mr. Weatherby. Would
2  the Company and Mr. Weatherby respond and do the right thing?

3      106.   Around two weeks later, Employee Relations contacted Ms. Warner
4  (she had not heard at all from Mr. Weatherby or Mr. Garman) to tell her that the
5  matter had been investigated and escalated all the way to Mr. Jassy.  However,
6  despite the Employee Relations person's admitted disbelief at Mr. Lavanty's
7  conduct and finding that the verbal assault was completely inappropriate, Ms.
8  Warner was told that the ultimate decision on what to do (if anything) was left up to
9  Mr. Weatherby.

10     107.   In these late February 2021 communications, it was expressly
11 discussed with Ms. Warner (including in writing over the Company's internal
12 messaging app, Chime) that Mr. Lavanty's conduct (and her complaint about his
13 sexist tirade against her, which had been escalated and investigated at her request)
14 pointed towards violations of the Company's policy against sexual and other
15 unlawful harassment, as well as its policy against discrimination based upon legally
16 protected characteristics.  Mr. Weatherby and Amazon were well aware of this
17 complaint and opposition by Ms. Warner to and concerning Mr. Lavanty's harassing
18 and discriminatory conduct directed at her gender, which she believed to be and was
19 in violation of relevant anti-discrimination laws.

20     108.   During the week of March 1, 2021, Ms. Warner was called by Toni
21 Handler of HR and told that a meeting was being set up for the following Monday.
22 Ms. Warner received an email from Mr. Lavanty that week to the effect that it
23 seemed he was not at his best during their meeting, and that Ms. Warner
24 misunderstood his intentions ("I realize how my words and/or tone may have been
25 received as dismissive and/or disrespectful."), that he meant no disrespect and he
26 was sorry if Ms. Warner took what he said negatively.

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

38

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

1     109.   Obviously, this evasive, disingenuous non-apology was insult being

2  added to injury (how else for a woman to take being called a "bitch," apart from

3  negatively or as dismissive and disrespectful?), and were it not so distasteful, it

4  would be laughable how closely the formulation of Mr. Lavanty's email resembles

5  so many other insincere, inchoate public "apologies" from powerful men whose

6  sexist, discriminatory behavior has landed them in a position where they might face

7  consequences.  Mr. Lavanty's "apology" message only reinforces the fact of the

8  discriminatory contempt that he felt and exhibited towards Ms. Warner as a female

9  peer in the workplace.  Unfortunately, Mr. Weatherby would soon ratify and even

10  join in Mr. Lavanty's openly displayed discriminatory and retaliatory animus against

11  Ms. Warner.

12     110.   On or around Monday, March 8, 2021, Ms. Warner had a call with Mr.

13  Weatherby, Ms. Handler, and Mr. Lavanty.  Mr. Weatherby turned the call into an

14  opportunity to grill Ms. Warner about why she thought Mr. Lavanty was trying to

15  take over the customer relationship (as though this was not already obvious and an

16  openly declared goal of Lavanty—indeed, it was the cause and reason for the

17  meeting at issue).

18     111.   Ms. Warner forwarded Mr. Weatherby various Chime messages that

19  clearly showed what Mr. Lavanty was doing, with Mr. Lavanty openly expressing

20  his intentions to "take this over" and saying that Ms. Warner had to "turn over your

21  work and get out of the way."

22     112.   Mr. Weatherby appeared determined to avoid the subject of Mr.

23  Lavanty's outrageous, discriminatory attack on Ms. Warner altogether, and instead

24  tried to turn the spotlight on Ms. Warner and suggest (absurdly and offensively) that

25  she had somehow precipitated the barrage from Mr. Lavanty (as though his sexist

26  tirade could be excused in any plausible way).  This gambit by Mr. Weatherby, too,

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

39

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1  demonstrated his clear retaliatory animus against Ms. Warner for opposing Mr.

2  Lavanty's blatantly discriminatory, harassing conduct (which included a vow to

3  make sure she went "nowhere" at Amazon).

4      113.  Ms. Warner finally said, "Are we going to talk about the assault?  I

5  thought that was the nature of this phone call."

6      114.  Extraordinarily, Mr. Weatherby (the head of an organization employing

7  several thousand employees) said nothing in response.

8      115.  Through both her providing information and a witness statement in

9  connection with the investigation of Mr. Lavanty's conduct, as well as her own

10  statements to Amazon's Human Resources and Employee Relations people and Mr.

11  Weatherby objecting to that conduct, Ms. Warner engaged in both opposition to and

12  lodged legally protected complaints regarding Mr. Lavanty's discriminatory,

13  harassment conduct.  In doing so, Ms. Warner directly indicated that she believed

14  she was being subjected to harassment, discrimination, and retaliation.

15      116.  Ms. Handler said that she also thought a discussion of Mr. Lavanty's

16  conduct was the purpose of the call.  Ms. Warner made it clear that Mr. Lavanty's

17  email was not an apology and that she did not misunderstand anything, whether it

18  was his tone, words, threats, etc.  She got all of it, and it was not acceptable.

19      117.  Again, Mr. Weatherby, their mutual supervisor, did not say a word.

20      118.  Ms. Warner said that she would do her best to forge ahead because they

21  are peers, but that her trust in Mr. Lavanty had been diminished.  The call ended

22  without Mr. Weatherby admonishing Mr. Lavanty in any way whatsoever, nor

23  offering any comment on the sexist behavior.

24      119.  In a meeting between Mr. Weatherby and Ms. Warner, Mr. Weatherby

25  openly conveyed his retaliatory animus towards Ms. Warner for her legally protected

26  opposition to and complaint about Mr. Lavanty's sexist tirade by bitterly stopping

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

40

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

their conversation at one point to sarcastically note that he realized that he should not use the word "nobody" around Ms. Warner because she might get offended or complain about him.   This icy statement by Mr. Weatherby foreshadowed the blatant, swift retaliation against Ms. Warner that was just weeks away from being decided upon and carried out by Mr. Weatherby and Amazon.

120.   In a meeting between Mr. Weatherby and Ms. Warner a few days after their meeting with Ms. Handler and Mr. Lavanty, Mr. Weatherby mocked Ms. Warner for her complaint about Mr. Lavanty's sexist tirade and insults.   At one point, Mr. Weatherby said, "It would be great if you can create a definition around our Go To Market, because nobody really understands…," and then stopped.   He then sarcastically said, "Oh, I better not use that word."   Ms. Warner was confused and sincerely asked him what he meant.   Mr. Weatherby sourly responded that, "I better not use the word 'nobody.'   You might take it the wrong way or get offended."   Ms. Warner was stunned and had an immediate sinking feeling, as Mr. Weatherby had blatantly communicated to her that he was angry at Ms. Warner for having made a complaint about her male coworker, even in response to completely obviously unacceptable sexist, professionally terminable conduct.

121.   Just two or three days later, on or around March 10 or 11, 2021, Mr. Weatherby circulated a short announcement that Mr. Lavanty had been promoted to Vice President (L10).   However, rather than including any information about the new or expanded scope of Mr. Lavanty's role in ProServe (which Mr. Weatherby routinely did in announcements of promotions that involved a change or expansion in role), Mr. Weatherby merely gave vague praise of Mr. Lavanty's "connection and collaboration" and "[c]reation of opportunities."   Mr. Weatherby closed his email by describing Mr. Lavanty's elevation as "recognition," seemingly referring to his past contributions, with no reference to new endeavors, projects or responsibilities at all.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

---

41

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1    In fact, no new role or changes to the organization involving Lavanty came along

2    with or followed this announcement at all, and none were forthcoming in the six

3    weeks Ms. Warner continued to work in ProServe, or the several months after which

4    she was still aware and/or kept abreast of developments in the organization.

5        122.   It is common for employees at Amazon (including in ProServe, as seen

6    by Ms. Warner and others) to receive an increase in level without a meaningful

7    change in role, as it is a way to allow managers to increase an employee's

8    compensation beyond a certain point, and employees in similar roles at the Company

9    often can be found across adjacent levels at the Manager (L6), Senior Manager (L7),

10   Director (L8), and Vice President (L10) levels.  HR employees in ProServe have

11   discussed with Ms. Warner that job roles can be similar or the same across two or

12   three different Levels at the Company in a given organization.  The frequently

13   observed situation at Amazon that some employees receive increases in pay and

14   prestige/job title without a change in role, goes along with instances of the opposite

15   situation, with employees at Amazon and elsewhere receiving increases in workload

16   and responsibilities that do not come with a change or improvement in pay or job

17   title.

18       123.   Mr. Weatherby said nothing regarding any changes to Mr. Lavanty's

19   role outside of this March 10, 2021 email, either, whether in meetings or other

20   management discussions.  At the time of his elevation to L10, Mr. Lavanty had about

21   ten years of professional services experience, again compared with Ms. Warner's 25

22   years of comparable experience.  Yet, Ms. Warner was hired by Mr. Weatherby only

23   as an L8, and he would not elevate her or even allow her to participate in the full

24   application process when an L10 position had become available in ProServe.

25       124.   It is well-known at Amazon that Mr. Lavanty has been the subject of

26   various harassment, discrimination, and other complaints at the Company.  Notably,

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

42

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

as indicated by data concerning the numbers of Employee Relations complaints made by employees on the teams of each specific ProServe leader, Mr. Lavanty's team yielded a highly disproportionate number of employee complaints. For the period of January 2021 through April 2021 alone, Mr. Lavanty's team was the subject of eighteen (18) complaints. The median amount among ProServe leaders was two (2) complaints, and the average (mostly increased by Mr. Lavanty's high number) was four (4). During this limited period, employees under Mr. Lavanty filed five (5) complaints regarding "management behavior," five (5) complaints regarding "discrimination," three (3) complaints regarding "misconduct," one (1) complaint regarding "retaliation," and two (2) complaints regarding "harassment." This demonstrates a pattern of discriminatory conduct in ProServe (five discrimination complaints in four months) both generally and regarding the specific male manager close to Mr. Weatherby who was at the center of the discrimination and retaliation that ultimately led to Ms. Warner's ouster from ProServe and Amazon altogether.

125. Upon information belief, the above-mentioned complaint numbers only account for complaints that were not subjectively deemed by Amazon as "lacking merit" and, as a result, exclude a significant number of complaints (companies tend to find most complaints by employees "lack merit," particularly when they implicate potential legal liability). In addition, there almost certainly are many employees with such concerns or complaints who did not raise them to HR or others at the Company. Jeff Bezos himself has noted, "[W]hen the anecdotes and the data disagree, the anecdotes are usually right. There's something wrong with the way you are measuring it."[3] Although here the data is fairly damning to begin with, this logic still applies, where Amazon's cherry-picked data concerning employee

---

[3] See https://www.inc.com/business-insider/amazon-founder-ceo-jeff-bezos-customer-emails-forward-managers-fix-issues.html (last accessed August 6, 2021).

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

complaints (which already reveals frequent complaints about discrimination, retaliation, and harassment in ProServe) is contradicted by the large numbers of employees who have come forward to share their experiences of discrimination, retaliation, harassment, and intimidation in ProServe. Despite Amazon's attempt to cover up the true number of employees making complaints of discrimination, retaliation, and harassment in ProServe, it is undeniable that the data paints a terrible picture of how employees are treated within Mr. Lavanty's team. As discussed in detail below, ProServe in just a few months would be the subject of an anti-discrimination petition that was signed by several hundred employees.

126.  Mr. Weatherby is reputed to have run interference for Mr. Lavanty on several complaints, and it appears that Mr. Lavanty's open eruption of gender-related animus towards Ms. Warner is one of many examples of such shielding from discipline. Rather than face the slightest of consequences, Mr. Lavanty was handsomely rewarded despite his abysmal, even hateful, conduct that violated the Company's Code of Conduct and amounted to terminable offenses. In doing this and outright refusing to discuss Ms. Warner's legally protected opposition to Mr. Lavanty's conduct, Mr. Weatherby excused and intentionally assisted Mr. Lavanty in carrying out his discriminatory conduct, and shielded Mr. Lavanty from the consequences of his actions.

127.  Not only was Mr. Lavanty spared from any discipline or consequences, but he by all appearances he was rewarded for it (or despite his shameful, discriminatory and harassing behavior). Mr. Weatherby had falsely told Ms. Warner that neither she nor any of her other peers would be considered for the L10 level to which Mr. Lavanty was elevated. Therefore, Mr. Weatherby cleared the way for Mr. Lavanty on that score as well, elevating Lavanty despite the merits of any other possible candidates for an open L10 slot (as Mr. Weatherby did not announce that

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

44

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

such an opportunity for elevation was available for others prior to elevating Mr. Lavanty). Again, this reveals that there was no new or second L10 role available to be filled by Mr. Lavanty (with any new responsibilities or duties) once the Andy Bailey replacement role was filled earlier in February 2021. Rather, Mr. Weatherby was merely rewarding a favored male subordinate in the wake of admitted misconduct towards a female colleague.

128. Ms. Warner's record and experience demonstrate that she was undoubtably far more qualified than Mr. Lavanty (including in the area of Professional Services) for elevation to L10 or a genuinely expanded role. For example, Ms. Warner achieved Senior Vice President status at several large public companies and has a track record of managing bigger teams with significantly larger budgets and revenues than those of Mr. Lavanty in ProServe.

129. Amazon's decision to deprive Ms. Warner of opportunities for promotion into an L10 role was particularly egregious because Ms. Warner was already performing functions that amounted to a L10 role.

130. By way of example only, among other responsibilities that were consistent with an L10 role (in addition the various groups and initiatives already noted above, which combined to more than a typical L8 role), Ms. Warner often was used as a surrogate for Mr. Weatherby in meetings with some of Amazon's most senior leaders and business partners, such as Mr. Jassy or Accenture CEO Julie Sweet.

131. As a result of Amazon's decision to promote Mr. Lavanty to an L10 role, Mr. Lavanty began to receive greater compensation while little to no changes were made to his job duties and responsibilities. Therefore, Mr. Lavanty was provided greater compensation than Ms. Warner for performing substantially similar work.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

45

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

132.   In association with his elevation to the L10 role, Mr. Lavanty did not receive any additional substantive responsibilities or greater authority that distinguished the role he was performing from the role that he was already performing or the role Ms. Warner was performing.  Further highlighting that Mr. Lavanty's role had not changed in association with being awarded the "L10" designation, Mr. Lavanty was not supervising any additional employees or overseeing any new projects or responsibilities.  Upon information and belief, this status quo continued well beyond the end of Ms. Warner's employment.  Therefore, Mr. Lavanty was provided with greater compensation while he remained performing a role that was equal to Ms. Warner's role in every substantive respect.

133.   Therefore, Mr. Lavanty's role was still comparable to Ms. Warner's, even in the wake of his elevation to L10.  In fact, Mr. Lavanty's job duties and responsibilities remained similar to Ms. Warner's and if anything covered a smaller scope of work and involved lower-value client relationships than Ms. Warner's role.  For example, Mr. Lavanty and Ms. Warner both were responsible for managing ProServe's most important client relationships.  In doing so, Mr. Lavanty and Ms. Warner both provided the strategy and oversaw the execution of their clients' migration to Amazon's cloud-based infrastructure, which included, among other things, overseeing the training of clients' employees as well as assessing and providing guidance related to governance and risk management.

134.   For example, on at least three occasions, Ms. Warner's team was assigned clients that were previously handled by Mr. Lavanty's team due to Ms. Warner's team being better able to address the clients' needs.

135.   Beyond handling all of the same responsibilities with equally high-level clients as Mr. Lavanty's team, Ms. Warner and her team were responsible for additional duties that Mr. Lavanty did not cover, such as collaborating with the AWS

46

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1  partner network so they could jointly deliver on the execution of projects as well as

2  managing the "People and Change" practice.

3      136.   Amazon therefore required Ms. Warner to perform work that was

4  consistent with an L10 role, while denying her the same compensation and title/level

5  that they provided to her equally or less-experienced male colleagues at the

6  Company who were officially designated as L10 employees (and compensated as

7  much as $1 million or more annually than what Ms. Warner was being paid).  In Mr.

8  Lavanty's case, his new L10 designation did not come with any discernible increase

9  in ambit or responsibility (for instance, he had the same authority over the same

10 group of employees as before, with no change), while clearly giving his direct

11 supervisor, Mr. Weatherby, the ability to justify higher compensation to a favored

12 male subordinate.

13      137.   Later, on March 11, 2021, Ms. Warner had a one-on-one meeting with

14 Mr. Weatherby.  Mr. Weatherby asked Ms. Warner how she thought the Monday

15 meeting with Mr. Lavanty had gone.  Ms. Warner honestly answered that she thought

16 it had been awful, in part because Mr. Weatherby had said nothing about Mr.

17 Lavanty's conduct.  She also let Mr. Weatherby know that others in the group also

18 were shocked by Mr. Lavanty's promotion, particularly because they knew Mr.

19 Lavanty had been the subject of several complaints and investigations by Employee

20 Relations.   Again, Ms. Warner was objecting to and opposing reported

21 discriminatory conduct in ProServe to her direct manager, Mr. Weatherby.

22      138.   Mr. Weatherby also let Ms. Warner know that Mr. Lavanty's promotion

23 had been approved the same day as his outburst, Monday, March 8, 2021, which

24 meant that he had been promoted despite his openly sexist and abusive conduct

25 towards Ms. Warner, which should have proven his unsuitability for a highly senior

26 role in general, as it was very recent and unquestionably violated Amazon's Code of

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

47

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

1   Conduct prohibiting gender-related discriminatory and harassing conduct (along
2   with his other alleged harassing and discriminatory conduct towards other
3   employees).

4       139.   Unbelievably, this promotion made Mr. Lavanty, a man who has called
5   Ms. Warner a "nobody," "of no interest," an "idiot," and a "bitch," technically her
6   superior and in a better position to potentially induce Mr. Weatherby to make good
7   on his threat to make sure she went "nowhere" at Amazon through increased
8   influence and access if only by dint of his new "level" and clear shielding by Mr.
9   Weatherby.  This was a particularly clear and present danger given Mr. Weatherby's
10  apparent endorsement of how Mr. Lavanty had acted, as well as his expressed
11  disdain and even anger towards Ms. Warner for making a protected complaint about
12  Mr. Lavanty's misconduct.

13      140.   Mr. Weatherby apparently believed that it was an acceptable state of
14  affairs in the Professional Services group, to promote a male executive promptly
15  after he saw fit to attack a senior female Director-level employee with a gender-
16  related slur and insult her intelligence (and, notably, that of another female
17  colleague).  This conduct by Messrs. Weatherby and Lavanty demonstrates gender-
18  related and retaliatory animus (on the basis of known legally protected activity in
19  the form of her opposition and complaint) against Ms. Warner.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

48

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

**IV.   THE DISPARATE TREATMENT AND VERBAL ABUSE OF MS. WARNER WAS PART OF WIDESPREAD DISCRIMINATORY AND RETALIATORY CONDUCT AGAINST WOMEN IN THE PROFESSIONAL SERVICES (PROSERVE) GROUP THAT WAS IGNORED AND ABETTED BY AMAZON AND MR. WEATHERBY**

141.   Among Ms. Warner's coworkers in ProServe (including most of the group's female employees), the promotion of Mr. Lavanty was in fact, and was viewed as, a reward to someone who was close with and had been loyal to Mr. Weatherby, and was a ratification of the "white boys' club" in which white men enjoyed a leg up and dominated the upper ranks, and in which social cohesion and conformity (fostered by the demographic homogeneity of hiring and promoting largely white men with whom leadership was comfortable) was prized over new ideas and even results.

142.   Of the approximately 20 L8 Directors in ProServe, only two of them were women (including Ms. Warner), demonstrating a glaring lack of female advancement during Mr. Weatherby's ten years running that organization.

143.   The other female Director in ProServe, Geeta Chaudhary, would regularly speak with Ms. Warner about the "old boys' network" that discriminatorily kept women from advancing in ProServe.  She also discussed with Ms. Warner their conversations with women working in ProServe, including comments made in Women@ProServe meetings that were attended by either or both of them, about "horrifying" harassment of female employees, who would get piled on and ridiculed by male colleagues in meetings and discussions of their work.  This treatment set the tone at the organization and kept women from being recognized for their work, getting opportunities on prime assignments, or moving up the ranks.  Ms. Chaudhary

49

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

herself would at times cry in her talks with Ms. Warner about the abuse that Mr. Weatherby would heap on her for minor issues, which is not how he would speak with or treat his male subordinates.  In fact, Mr. Weatherby was known by many male employees as "Mr. Rogers" for his publicly mild persona, which was not the face he would show female subordinates such as Ms. Chaudhary and Ms. Warner.

144.   Indeed, Mr. Lavanty was given a new L10 rank by Mr. Weatherby and increased compensation despite what Ms. Warner has been told are consistent performance shortcomings on the part of Mr. Lavanty, and despite his blatantly sexist and discriminatory conduct and wild display of inappropriate rage and vow of retribution against Ms. Warner just weeks before.  In granting this promotion, Mr. Weatherby was displaying his own profound disregard for termination-worthy discriminatory/harassing misconduct targeting one of the group's few senior female employees and appeared to join Mr. Lavanty's discriminatory and retaliatory animus against Ms. Warner herself.

145.   Colleagues again discussed, as they had before, the fact that many women in the group who had spoken up about Mr. Lavanty and other issues were often moved, demoted, transferred to another matter, or felt forced to leave the Company altogether because their position was no longer tenable as their prospects had evaporated.  This pattern of retaliation would soon repeat itself with Ms. Warner.

146.   The members of the Women@ProServe group were so disturbed by Mr. Lavanty's elevation that they discussed writing an account of their experiences with gender discrimination to be read at a future Professional Services meeting.  High-ranking female colleagues felt so hopeless and marginalized under Mr. Weatherby's management that they have cried while discussing their experiences with Ms. Warner, including but not limited to Ms. Chaudhary.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

50

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

147.   The Women@ProServe group, in light of the deference given to Mr. Weatherby by Employee Relations and HR, was unsure how to successfully get Amazon to finally address the protection he has given to men who treat female colleagues with open contempt, as well as the fact that even the most qualified and/or accomplished women in the group get few resources and small roles with little authority or influence (such as Ms. Warner herself and a female peer with only a modest team).

148.   For Ms. Warner, the warning signs that women are treated with disregard and are at a sizable disadvantage in Professional Services surfaced early in her tenure.  On or around March 12, 2020, less than a month after she started, Mr. Weatherby and Ms. Warner exchanged Chime messages after a Women@ProServe monthly call.  Mr. Weatherby messaged Ms. Warner about a female employee who had talked about being upset that a male employee had taken credit for her work and published it in his own name.  Mr. Weatherby did not understand why the employee was so bothered by this, or why she would attribute the colleague's blatant mistreatment to her gender.  Ms. Warner observed that there were concerns in the group about the treatment of women and that this was the kind of issue that frequently comes up regarding how women are treated and taken advantage of in an organization (as compared with their male colleagues, who did not suffer such bullying and exploitation at anywhere near the same rate or intensity).

149.   On or around April 7, 2020, Mr. Weatherby asked Ms. Warner to "intervene" in the Women@ProServe Chime room because there had been a number of HR escalations out of the discussions in its chat room.  He singled out one specific female employee as making supposedly unfounded assertions about men taking credit for or otherwise downplaying women's contributions or excluding them from

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1   opportunities to provide input.  Mr. Weatherby was irritated by this and said that the

2   employee's observations and feelings were not accurate or constructive.

3   150.   Ms. Warner later learned that Mr. Weatherby had installed a male "ally"

4   in the Women@ProServe chat who was taking screenshots (of the attendees and

5   comments) and providing an account of the female employees' discussions of

6   discrimination, retaliation, and inequity directly to Mr. Weatherby.  This was not at

7   all so that Mr. Weatherby could address concerns, but rather so he could identify

8   supposed malcontents or purportedly disloyal or troublesome female employees.

9   Ultimately, this male employee was rewarded with a promotion for his service to

10   Mr. Weatherby in helping to squelch complaints and dissent about the widespread

11   gender inequity in ProServe.  This male colleague later expressed regret at having

12   played that role, and conceded to Ms. Warner that, "There is a pattern and history of

13   discrimination against women at ProServe."   This pattern aligns with Mr.

14   Weatherby's practice of rewarding male colleagues who quash (or attempt to quash

15   through bullying or other means) any attempts to call attention to the discrimination

16   occurring in ProServe, which also demonstrates Mr. Weatherby's retaliatory animus

17   against those who raise issues to HR and Employee Relations about his organization.

18   151.   Mr. Weatherby in the first few months of her employment in 2020

19   asked Ms. Warner to reach out to and immediately start working with the President

20   of Women@ProServe, to change the direction of the conversation and make things

21   more positive.  He also named other women who he believed were speaking out of

22   turn by commenting on areas in which they did not work and went so far as to label

23   one person's observations as "toxic."   In doing so, Mr. Weatherby again showed

24   reflexive retaliatory animus and held female employees of ProServe to a different

25   standard with respect to the candor that they were allowed to speak with regarding

26   the workplace dynamics within the ProServe organization, particularly with regard

27

28
                                          52
        THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
                                 DAMAGES

to gender-related discrimination and inequities.  About female employee Amanda Rankin, a co-leader of Women@ProServe, Mr. Weatherby wrote to Ms. Warner on June 17, 2020: "Help! Amanda is asserting that several women left the Women@ProServe initiative because 'Leadership isn't doing enough', (sic) and she's stopped me/us from scheduling the working meetings on the listening circle work-streams, so we're stalled on those.  I suspect that some of the women have pulled back because of Amanda.  I thought Diya was the president of the group, not Amanda.  . . . Amanda has requested a meeting w/ the whole LT to discuss but isn't willing to write anything down, just wants a discussion.  Any insights?"  Mr. Weatherby was clearly entirely concerned with fallout and inconvenience, as opposed to any real discussion regarding why women would be unsatisfied with his organization's supposed initiatives to let them air their concerns.

152.   Ms. Warner objected to Mr. Weatherby's attempts to silence the employees of Women@ProServe, said that she refused to shut down the discussions or bat down such complaints, and indicated that she believed that their consistent and frequent complaints regarding favorable treatment of male employees were supported by her own observations.  This was an early example of protected activity by Ms. Warner reporting concerns regarding gender discrimination to Mr. Weatherby.

153.   Mr. Weatherby appeared panicked that the women were having these discussions in a public, open forum, and urgently wanted it to end.  In particular, he said that the assertion that men were taking credit for the work of female employees and suppressing their visibility and leadership "is the part I'm most concerned about."  Mr. Weatherby did not want the concerns addressed – he wanted the discussion of such concerns to be cut off.  Demonstrating Mr. Weatherby's awareness that the complaints were related to issues of discrimination, Weatherby

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

specifically noted to Ms. Warner that he was concerned about the complaints of Women@ProServe worsening perceptions in other parts of Amazon that Mr. Weatherby's organization had widespread issues pertaining to gender equity.

154.   Later in April 2020, Mr. Weatherby blocked the rehire of a former Amazon employee, Mike Owens, who had been vocal about issues in Professional Services, including the bullying, discriminatory conduct of male employee Pravin Raj (whose discriminatory and harassing conduct has been complained of by several other employees as well).  Despite the fact that the hiring loop for Mr. Owens was "inclined" to hire (including Ms. Warner, the hiring manager, who had worked with Mr. Owens at two other companies), Mr. Weatherby refused to allow him to be rehired, offering only a vague criticism of his resume.

155.   To Ms. Warner, it appeared that it was Mr. Owens's willingness to speak up that Mr. Weatherby did not like, again demonstrating retaliatory animus and an instinct on the part of Mr. Weatherby to silence employee complaints.  Ms. Warner escalated the issue regarding Mr. Weatherby's blocking of the hire, as it was against policy, but nothing was done.  As an indication of how solid and well-suited a candidate he was, Mr. Owens was hired by a different part of Amazon around six months later.

156.   On or around June 2, 2020, within three months of her being on the job, Ms. Warner ferreted out an Advisory employee who had been at the Company for well over a year (March 2019) but was working full-time as a partner for a consulting firm while also "working" at Amazon full-time.  This employee was previously assigned to report to Mr. Weatherby and then was assigned to report to Ms. Warner. The employee, a white male, was chronically absent from meetings, did not follow up on assignments from Mr. Weatherby, and was described by Mr. Weatherby to Ms. Warner as merely "disconnected."  This person also had been rated as meeting

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

54

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1  expectations by Mr. Weatherby.  Mr. Weatherby had to admit that, "I'm feeling
2  pretty stupid for that happening under my nose."  The permissiveness of Mr.
3  Weatherby towards this male employee contrasted strongly to the harshness with
4  which female employees were treated by Mr. Weatherby and other male executives
5  for even minor, perceived infractions.

6       157.   When female employees (including senior women such as Ms. Warner
7  or another female peer) missed a meeting or call for any reason, Mr. Weatherby
8  railed against and berated them (even if, say, a call with a client went long—as
9  happened with multiple female executives who Ms. Warner talked with about such
10 incidents).  Yet, the absentee white male employee had been allowed to skate by
11 barely working and being chronically absent for well over a year (and who knows
12 how much longer it would have been if Ms. Warner had not zeroed in on him), for a
13 good while under Mr. Weatherby's direct supervision.

14      158.   The absentee employee was soon terminated after Ms. Warner
15 discovered and revealed his conduct, and Ms. Warner took over his group, which
16 had gone through several unsuccessful managers in recent years, including Pravin
17 Raj.

18      159.   By way of example only, regarding common manifestations of
19 disparate gender-based attitudes and treatment in ProServe, on or around June 15,
20 2020, Mr. Weatherby scolded Ms. Warner over Chime for not having read a paper
21 in its entirety before a call even though she had only received it late the night before
22 and thought it would be reviewed on the call (he called it a "fuzzy discussion").
23 Days later, on or around June 17, 2020, Mr. Weatherby told Ms. Warner via Chime
24 that, "I like your tone today!  You are asking questions, showing curiosity and not
25 making statements or judgments.  Keep it up."

26

27

28

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

160.   Clearly, Mr. Weatherby wanted Ms. Warner, a rare female team leader/Director in his organization, to be submissive and unassertive, which, based upon his protection of Mr. Lavanty and lack of such feedback to male members of the ProServe leadership team, is not what he expects from his male direct reports. Mr. Weatherby also requires Ms. Warner to get his approval on any significant decisions and action, whereas her male peers go about their business without oversight (as illustrated by the incident with the absentee employee and many others).

161.   By way of another example, Mr. Weatherby leveled the weak criticism that Ms. Warner was not "demonstrating frugality" because she sent out holiday care packages to employees as a teambuilding effort, while many of her male peers were doing similar things. This critique rang particularly hollow during 2020, a year when the Company avoided so many of the usual expenses associated with having employees in the office and it was incumbent on managers to foster a feeling of connectivity and team spirit while people were working remotely.

162.   In contrast, during Leadership Meetings with the same ProServe executives, when Ms. Warner's male colleagues discussed utilizing their budget for similar team-building expenditures, they were praised by Mr. Weatherby. This included Mr. Lavanty and other male colleagues who spent significantly higher sums of money – into the six figures – on expenditures to support the morale of their teams, including hiring persons in new positions to carry out support functions. As a result of the contrasting reactions, it was clear to Ms. Warner that she was not permitted to utilize the team's budget to support her team in the same manner that her male colleagues were permitted to do.

163.   In late August 2020, Ms. Warner directly raised to one of the HR professionals responsible for ProServe that a male executive exhibited extreme bias

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

56

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1  in how he treated his subordinates, breaking rules for those who he liked (i.e., his

2  white male subordinates) or ignoring conventions altogether, whereas employees

3  who he did not favor (a group predominantly composed of women and persons of

4  color) were held to strict standards of performance and conformance to Amazon

5  policy.

6       164.   A further example of this type of disparate treatment (which echoed

7  concerns of other female ProServe employees, too) occurred in or around October

8  2020, after Ms. Warner took the opportunity to visit with several employees (in a

9  properly socially distant manner) while she was on the road traveling from her

10 Michigan home to spend several months at her California home.  She blogged about

11 the trip and visits to her team members, and the effort she made to meet them even

12 amid the pandemic was a hit with her reports and she got great feedback that it

13 created a feeling of connection and caring.  When Ms. Warner mentioned these

14 meetings during a Leadership Team meeting, Mr. Weatherby panned the idea and

15 said that he was not sure what sort of "obsession" this demonstrated, and said he

16 found it odd.  Ms. Warner said to the group that she believed it demonstrated

17 employee obsession (a phrase used by Amazon's top leadership) and that she felt

18 that the Company's leadership principles should account for that as well.

19      165.   Just one month later, Mr. Lavanty suggested a 15th leadership principle

20 within Professional Services called "Employee Obsession," and said he had

21 someone on his team write a short narrative introducing the idea.  Mr. Weatherby

22 was enthusiastic and "inclined" about this and told Mr. Lavanty to form a team

23 around the idea, which later was implemented.  A clearer illustration of the

24 professional concerns of the women in Professional Services with regard to their

25 contributions being coopted and then credit and opportunity instead going to a white

26 male colleague could hardly be presented.

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

57

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

166.   Also on June 17, 2020, Mr. Weatherby sent Ms. Warner a Chime message asking her for help due to female employees having left the group Women@ProServe and saying that "leadership isn't doing enough." Mr. Weatherby complained that another female employee had stopped listening circles from being scheduled and he blamed that employee for some women not wanting to be part of Women@ProServe (which would further dent the appearance that his group was making efforts or taking any effective steps in the area of diversity, equity, and inclusion). Mr. Weatherby raised the idea of disbanding the Women@ProServe group altogether. Of course, the point of an ERG like Women@ProServe is to provide a forum for raising and addressing employee concerns, including regarding discrimination and equity, rather than to serve as window dressing or to provide cover for management that has a long record of employee complaints. Ms. Warner collaboratively and supportively pointed out that bumps in the road were to be expected and should not dissuade one from further efforts to achieve equity or take away from progress that is made.

167.   Ms. Warner advised Mr. Weatherby not to leap to the conclusion that the group's efforts were for naught or counterproductive. Mr. Weatherby responded, "Ok, I'll not leap. But I am on the ledge and need you to pull me back!" In this same exchange, Mr. Weatherby made it clear that his primary concern was that his perceived progress on inclusion and diversity at AWS would be tainted.

168.   In August 2020, a few months later, Mr. Lavanty and another AWS executive, Pravin Raj, apparently were the unnamed subjects of a LinkedIn blog post by a former employee, who published and signed the posting with his full name. The post discussed the use of homophobic language and other abusive, harassing, and discriminatory conduct in ProServe.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

58

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

169.    A female ProServe employee later communicated with Ms. Warner on Chime about the LinkedIn post and the type of discriminatory and harassing behavior it highlighted, asking Ms. Warner whether the Company would ever implement a "No Tolerance" policy for such misconduct.  This employee noted (all in pertinent part) that, "So much shitty behavior is accepted here in the name of "keep rocking and rolling for our customers" … (sic) and the very real fear of retaliation.  We all know that viral LinkedIn post in August was referring to Pravin and yet he's still in his position bullying people out of their roles.  So what gives?"  Ms. Warner acknowledged that, "I do not think there is support candidly [for a "zero tolerance" policy regarding harassment or discrimination].  There is clearly a social cohesion boys club here and unless or until that gets broken up things will not change."  The employee responded, "I really do hope we have a follow up call on that discussion because honestly it was the first time I heard others speaking up about similar situations or perspectives outside my small support group" and "Speaking of breaking up the boys club here, isn't it interesting that pretty much all the new leadership roles announced are all males?  The S-Team and our LT have some great chances to insert diverse leaders and yet I keep seeing white males announced."  The employee also wrote to Ms. Warner, "I'm pretty sure everyone is afraid to speak up in fear of it impacting their career here or being put in PiP!  It's absurd . . . ."

170.    Ms. Warner learned that Mr. Lavanty had allegedly used homophobic language and that the LinkedIn post was referring to that incident.  The post attracted much attention among employees and management at AWS and, in late August 2020, a Diversity & Inclusion ("D&I") leader raised the blog post at a meeting in order to discuss with Professional Services employees how it made them feel and what portions of the post were true.

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

171.   Mr. Weatherby and Mr. Lavanty became furious at this, with Mr. Lavanty yelling at the Black female D&I leader, "How dare you bring this up, that guy is a piece of shit—in front of the Leadership Team!"  In response, the D&I person evenly and calmly stated that the employees in the group should have an honest conversation about the post.  Mr. Lavanty proceeded to express homophobic views by discounting the opinion of the gay male employee who authored the post due to the "choices he had made in his life."  Those present, including Ms. Warner, understood clearly that Mr. Lavanty was commenting negatively on that person's LGBTQ+ status and his (in Mr. Lavanty's view) non-gender-conforming (i.e., homosexual as opposed to heterosexual) sexual preferences.  Through context and tone, Mr. Lavanty was clearly stating that the gay male employee's sexual orientation was an undesirable, blameworthy lifestyle "choice," and therefore called his credibility, judgment, and perception of reality into question.

172.   Ms. Warner was shocked and hurt by Mr. Lavanty's discriminatory remarks (in an open meeting with a D&I person present, no less), and by the fact that, again, Mr. Lavanty's volatile, hateful behavior was permitted to go unchecked. Notably, after this blow-up and demonstration of retaliatory animus, the female D&I employee soon turned in her resignation and moved to an entirely different group.

173.   Despite all of this, Ms. Warner was undaunted in raising with Mr. Weatherby how her status as a woman seemed to affect perceptions of her work (and that of other women in Professional Services).  In doing so, Ms. Warner was directly noting the disparate treatment to which she and other women in ProServe were being subjected.  Mr. Weatherby and other members of the Leadership Team are generally very complimentary of the work of other white males, but when someone such as the Black female D&I employee raises a different perspective, they are quick to pile on and even attempt to humiliate and intimidate the person.  This phenomenon in

60

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1  ProServe was demonstrated quite clearly by Mr. Weatherby's furious tirade against
2  the Black female D&I employee who had called a meeting to help quell a
3  controversy affecting ProServe, and was echoed later in Mr. Weatherby's and Mr.
4  Lavanty's angry, animus-filled statements and retaliatory treatment of Ms. Warner
5  just several months later.

6      174.   In multiple routine one-on-one meetings with Mr. Weatherby, Ms.
7  Warner has defended her work product and pointed out examples of work by male
8  colleagues that was lackluster (especially by comparison).  She has pointed out to
9  Mr. Weatherby that, because she is a woman, she can expect and will get a public
10  flogging and humiliating treatment, whereas "one of the boys" will get praise.  In
11  response to these observations, which she has made more than once, Mr. Weatherby
12  generally merely shrugs and declines to respond.  This provides another example of
13  Mr. Weatherby's indifference and disdain for his subordinates' concerns and
14  complaints regarding potential gender-based discrimination and inequity in his
15  organization.

16      175.   Ms. Warner has personally observed and learned from her own personal
17  experience that Mr. Weatherby tends to criticize women for conduct that goes
18  unremarked when male managers do the same and much worse.  Although Mr.
19  Weatherby has chided Ms. Warner for having "sharp elbows," a line parroted and
20  hurled at her by Mr. Lavanty, there is ample evidence that aggression and totally
21  unprofessional displays of volcanic anger by men are ignored or seen as par for the
22  course.  Other men in the group also appear to have taken their cues from the top
23  male managers (Mr. Weatherby and others on the Leadership team, including Mr.
24  Lavanty) in their bullying behavior, deriding an employee as a "minor league player"
25  and ridiculing praise for employees who are not part of the in-group (particularly
26  those who are not white males).

27

28

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WIGDOR LLP
85 FIFTH AVE, FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

176.   When Ms. Warner pointed out the inappropriate nature of such conduct, Mr. Weatherby called out Ms. Warner in their next one-on-one meeting, saying, "You were wrong to do that."  On such occasions and others, Mr. Weatherby would resort to the vague refrain and excuse that, "You need to learn the culture here."  Needless to say, the "culture" at Amazon should not include ridicule, abuse, disregard for employees' concerns on discrimination and feelings of marginalization.  ProServe's "culture" also should not ratify displays of retaliatory animus when people raise legitimate concerns.  Nor should the "culture" include barely (if at all) disguised retaliatory animus towards anyone who raises issues regarding unequal treatment or bias (conscious or not), which Mr. Weatherby displayed regularly towards Ms. Warner when she raised not just bullying but disparate treatment of female employees.

177.   As discussed above, Mr. Weatherby openly showed his displeasure with Ms. Warner regarding her speaking up about improper, discriminatory conduct in the weeks leading up to her termination by him and Amazon.  During a one-on-one meeting with her in early March 2021, when Mr. Weatherby had asked about the call with Mr. Lavanty, he was reviewing Ms. Warner's goals for 2021.  This shows that, at least as of early March 2021, Mr. Weatherby anticipated that Ms. Warner would remain working at Amazon and in ProServe well past April and June 2021.

178.   At one point, Mr. Weatherby said, "It would be great if you can create definition around our Go to Market, because nobody really understands…."  He suddenly stopped and then sarcastically said, "Oh, I better not use that word."  Ms. Warner genuinely asked which word he meant.  Mr. Weatherby then sourly said, "I better not use the word 'nobody.'  You might take it the wrong way or get offended."

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

179.   This was a pointed, caustic reference to Ms. Warner's objection and complaint to Mr. Lavanty calling her a "nobody" (along with another, even more hateful and expressly gender-based epithet, which Weatherby did not mention). Needless to say, this was unmistakable evidence of lingering anger and animus towards Ms. Warner for her legally protected complaint about Mr. Lavanty regarding his discriminatory, harassing conduct.  Immediately, and almost certainly as intended, Mr. Weatherby's hostile statement caused great anxiety and apprehension of retaliation in Ms. Warner.  Mr. Weatherby clearly held it against Ms. Warner that she was willing to stand up against unacceptable, discriminatory conduct when committed by one of Mr. Weatherby's white male lieutenants, even when the conduct was obviously sexist and outrageous and was directed against her personally.   The full extent of Defendants' retaliatory animus and the reckless measures they were willing to take to punish and attempt to silence Ms. Warner would soon become clear.

180.   In or around April 2021, Mr. Weatherby repeated his practice of permitting his male reports to marginalize and/or abuse female members of ProServe, this time with Ms. Warner.

181.   Ms. Warner spent months working on a project called "Strategic Program Leaders."   In connection with the project, Ms. Warner developed job descriptions for positions she would be hiring in order to implement the program. During numerous discussions about the project, Ms. Warner's male colleagues (Mr. Bailey, Mr. Lavanty, and Mr. Raj) would demean and belittle Ms. Warner's ideas and plans for advancing under-represented groups in ProServe.

182.   The blatantly demeaning treatment of Ms. Warner was so open and striking that two other colleagues commented on it, with one questioning why these male employees were treating Ms. Warner in this inappropriate way, while another

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

63

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

remarked that he would "get the popcorn" for the next meeting, because every time, these male employees took the opportunity to treat Ms. Warner with blatant contempt and hostility (which they did not do among each other).

183.   This treatment and the embarrassment of such public humiliation left Ms. Warner feeling demeaned and belittled, and it unquestionably undermined her authority in ProServe.

184.   Ultimately, Mr. Weatherby gave Ms. Warner's male colleagues the go-ahead to take over the Strategic Program Leaders project, without so much as informing Ms. Warner, much less consulting her on the move.   This showed extraordinary disregard for a Director-level employee by Mr. Weatherby, and was highly unusual treatment of a female Director that Ms. Warner had not seen visited upon any of her male colleagues by her manager.   Adding insult to injury, Ms. Warner's male colleagues utilized the very job descriptions and plans of hers that they openly tore apart in the previous team meetings, showing that their abusive conduct had nothing to do with the substance of Ms. Warner's work product, but rather that they were simply motivated by hostility to a senior woman among their ranks.

185.   Another woman in ProServe experienced very similar patterns of gender discrimination and retaliation throughout 2020 when dealing with Mr. Weatherby and one of his white male subordinates in the wake of complaints about gender-related bias and disparate treatment of women in ProServe as compared to the men.

186.   After her supervisor had pushed two female employees off the team in ProServe, this employee realized that her supervisor was engaging in a pattern of targeting female employees for performance management and removal from the team.   In August 2020, when she soon realized that this supervisor was about to

WIGDOR LLP
85 FIFTH AVE, FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

64

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1 engage in a similar pattern with two other female employees on the team, the female
2 employee confronted her supervisor with her concerns that he was targeting female
3 employees and chasing them off the team.

4     187.   Immediately after this employee confronted her supervisor about his
5 seemingly targeted and discriminatory pattern of pushing female employees off of
6 his team and/or out of Amazon altogether, the supervisor began to retaliate against
7 the female employee by micromanaging her and attempting to fabricate performance
8 deficiencies.

9     188.   This employee ultimately filed a complaint with Human Resources in
10 August 2020.

11     189.   Looking for additional assistance and fearing further retaliation, this
12 employee sought to speak to a high-level female in ProServe leadership. Ms. Warner
13 was the only woman in such a post at the time. As such, this employee reached out
14 to Ms. Warner and scheduled a meeting with her for August 28, 2020.

15     190.   Prior to the female employee's scheduled meeting with Ms. Warner,
16 the employee met with Mr. Weatherby to discuss the complaint of discrimination
17 that she filed. During their discussion, Mr. Weatherby appeared to acknowledge that
18 complaints about systemic gender bias were occurring throughout ProServe.

19     191.   The employee told Mr. Weatherby that she intended to speak with Ms.
20 Warner about her concerns regarding gender bias against and disadvantages for
21 women in ProServe. This employee also intended to talk with Ms. Warner about
22 transferring to her team so she could escape the retaliation on her current team,
23 hoping that a team run by a female leader would provide a better environment. In
24 response, Mr. Weatherby directed the employee to cancel the meeting with Ms.
25 Warner. The employee complied with Mr. Weatherby's demand. Mr. Weatherby,
26 after all, was the head of ProServe, and this employee was yet another target of his

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

retaliatory animus and intimidation intended to silence the employees in his organization.

192.   In October 2020, this employee was pushed out of ProServe by the manager she complained about.   Despite being on a different team, this female employee later was subjected to further discrimination and retaliation that included a decreased compensation award.   This female employee confirmed with her subsequent manager that the decreased compensation was based upon feedback of the supervisor who she filed protected complaints about.

193.   On April 19, 2021, this employee relayed her complaints about the continued retaliation to Ms. Handler, the HR Representative who was supporting Mr. Weatherby and his organization.   Rather than address this employee's concerns, neither Mr. Weatherby nor any other leaders in his organization did anything about the clear retaliation against the female employee.

194.   Mr. Weatherby's retaliatory impulses were further confirmed by his conduct and statements to Ms. Warner regarding the Women@ProServe group, which he viewed with suspicion and paranoia whenever it served as a forum for female employees to discuss gender-related bias or inequity in ProServe.

195.   From October 2020 until August 2021, another high-level employee in ProServe—who at points reported directly to Mr. Lavanty and then Mr. Raj—made several complaints about pay disparities with respect to female employees in ProServe.

196.   This employee recognized that several female employees had been down-leveled and/or were receiving less compensation than their male colleagues who were in similar roles.   After raising his concerns with HR and in open discussion forums throughout the time period of October 2020 through August 2021, Amazon terminated this employee's employment.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

66

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

## V.     AMAZON AND MR. WEATHERBY TERMINATE MS. WARNER IN AN ACT OF OPEN RETALIATION FOR HER RECENT PROTECTED COMPLAINTS AND COMING FORWARD WITH LEGAL CLAIMS OF GENDER DISCRIMINATION AGAINST DEFENDANTS

197.   On or around April 7, 2021, Amazon received a letter from Ms. Warner's counsel informing the Company that she was now represented by attorneys and which detailed her allegations of gender discrimination and retaliation against the Defendants. In this letter, Amazon was specifically informed that Ms. Warner alleged that Amazon's conduct constituted violations of both Title VII and the EPA. The letter to Amazon's General Counsel (on which Mr. Weatherby's direct supervisor Matt Garman and several other executives, including Andy Jassy, were copied) provided a detailed account of Ms. Warner's observations and knowledge of discrimination against women in ProServe (including widely acknowledged and reported bullying of women and lack of resources and opportunities given to women in ProServe compared with their male colleagues) and the gender-related and retaliatory animus and disparate treatment (including denial of her candidacy for the L10 position and elevation of Lavanty despite the down-leveling of Ms. Warner in her hiring) directed at Ms. Warner by Mr. Weatherby. The letter also describes in detail the incident in which ProServe executive David Lavanty angrily called Ms. Warner a "bitch" and her and a female colleague "idiots" in a work meeting, Ms. Warner's legally protected complaint regarding Lavanty's discriminatory tirade against her, and the retaliatory animus displayed by Mr. Weatherby in direct response to her complaint.

198.   By way of example only, the April 7, 2021 attorney letter on its first page stated the nature of Ms. Warner's legal claims that "she has been subjected to

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1   unlawful discriminatory treatment based upon her gender and LGBTQ+ status by
2   male executives Todd Weatherby … and Dave Lavanty," and pointed out that Ms.
3   Warner allegedly being hired discriminatorily at a level lower than her experience
4   and the job posting she applied to would result in millions of dollars in lost income
5   over time, and that she was the subject of a sexist, harassing tirade at work.  From
6   pages 5 to 7 of the letter, the sequence of events regarding Mr. Weatherby's denial
7   of Ms. Warner's candidacy for the Andy Bailey L10 position were described, and
8   the events surrounding Mr. Lavanty's "bitch" tirade and further disparate treatment
9   of Ms. Warner were detailed on pages 7 to 9.  From pages 10 to 13, the letter
10  discusses the discriminatory and retaliatory practices in ProServe that kept women
11  from advancing in and that had driven them out of the organization, as well as
12  evidence of Mr. Weatherby's unlawful animus, placing Ms. Warner in clear
13  opposition to such practices.

14        199.   The letter closes on pages 14 and 15 by explaining that by retaining
15  counsel, Ms. Warner is opposing "[t]he discriminatory practices of Ms. Warner's
16  managers" and that she is prepared to "file claims" for the conduct described if the
17  parties could not reach an agreement or remedy concerning the unlawful treatment
18  and conditions to which Ms. Warner was being subjected.   Whether or not
19  Defendants or any third party agreed with the factual substance or legal merit of Ms.
20  Warner's claims of discrimination at that point or since, Ms. Warner was expressing
21  legally protected complaints through her attorneys that opposed discriminatory and
22  retaliatory practices that she believed violated Title VII and other applicable federal
23  and state laws.

24        200.   A member of HR responsible for ProServe at this the time confirmed
25  to Ms. Warner that Mr. Weatherby had been informed of and was fully aware of the
26  April 7, 2021 letter from Ms. Warner's attorneys and its contents, which alleged

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

27
28
                                    68
          THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
                                 DAMAGES

1 discriminatory and retaliatory conduct by him and other male executives against Ms.

2 Warner and other women in ProServe, before Ms. Warner's termination.  He also let

3 Ms. Warner know that Mr. Weatherby would have been notified quickly of Ms.

4 Warner's retention of attorneys.  The HR representative's confirmation of Mr.

5 Weatherby's advance knowledge of the attorney letter was based upon the HR

6 representative's direct knowledge.  In addition, based upon Ms. Warner's

7 participation in and observation of other terminations in ProServe, Mr. Weatherby's

8 approval, at a minimum, would have been necessary to carry out her termination,

9 and Ms. Warner also observed (including with Mr. Lavanty just weeks before) that

10 managers were quickly informed of discrimination complaints lodged by employees

11 against them.

12      201.   On April 14, 2021, Ms. Warner also informed Mr. Weatherby, as well

13 as Toni Handler and Ed Salas of HR in writing via email or Chime that her

14 unhappiness with her time in ProServe was connected to "systemic bias, racism and

15 discrimination that I have witnessed in ProServe."  This email was based upon and

16 harkened back to multiple recent discussions with Mr. Weatherby and ProServe's

17 HR personnel regarding significant pay disparities affecting women versus men in

18 equal or lesser roles, and other disparate treatment of women in ProServe.  Ms.

19 Warner was not making a sweeping, standalone statement regarding unlawful

20 practices in ProServe, but was renewing her concerns and her desire and expectation

21 to discuss discrimination against women in the organization that she had raised and

22 discussed before in detail.

23      202.   Indeed, on April 14, 2021, Ms. Warner exchanged messages with Mr.

24 Weatherby in which she noted the "loyal social cohesion team that you have built in

25 ProServe" and made several express references to Mr. Weatherby's retaliatory

26 animus, including: "Any feedback is taken as "being critical" and is regarded as

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

69

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1   threatening and is dismissed;" "As long as you and the loyal team of long term

2   leaders regard those of us that are newer as a threat to the empire that has been built,

3   nothing will change;" "I came here to help, not to get my head handed to me when I

4   shared my observations."

5   203.   Mr. Weatherby wrote at one point in this April 14, 2021 message

6   thread, "In closing of our Apr7 discussion I noted again your decision to leave the

7   ProServe organization. I shared that I believe that you moving on would be best for

8   you and the business."

9   204.   Ms. Warner responded: "Let me be abundantly clear, my desire to move

10   on within Amazon has everything to do with how horribly I have been treated since

11   joining ProServe. It also has to do with the systemic bias, racism and discrimination

12   that I have witnessed in ProServe. It is the worst I have seen in my career. I plainly

13   did not think such poor cultures even existed in business today."  It will not be the

14   best for the BUSINESS for me to move on, as I have clearly made a significant

15   impact in my short tenure here.  I suggest you re-read my Forte and you will find the

16   impact I have made.  While you find no ability to appreciate the impact I have made

17   (even despite the data proving the same), there is abundant evidence of my impact."

18   Mr. Weatherby did not argue with or contradict Ms. Warner on these final points in

19   his response.

20   205.   Unbelievably, just <u>three weeks</u> after receiving her attorneys' letter

21   outlining her legal claims of discrimination (and <u>two weeks</u> after other legally

22   protected complaints by Ms. Warner regarding pay equity for and discriminatory

23   treatment of women in ProServe), on or around April 28, 2021, Ms. Warner was

24   notified that she was being terminated from her position in ProServe at Amazon.

25   206.   On the call communicating her termination, Ms. Handler and Mr. Salas

26   told Ms. Warner that she was no longer in her position in ProServe and that her work

27

28

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

was being taken away from her.  There is no plausible scenario in which Mr. Weatherby was unaware of and did not personally make or strongly contribute to this decision and action concerning Ms. Warner, a Director leading teams in ProServe over whom he had direct oversight.  Ms. Warner asked why this was being done, and Ms. Handler said that it was "because of your unhappiness."  This confirms the connection between Ms. Warner's termination and her very recently made protected complaints, including her attorneys' letter, which explained that the unlawful treatment and animus "may require her to find a new place at the Company." (emphasis added).

207.  Afterwards on the same day, Ms. Warner participated in an all-hands video call with her team and Mr. Weatherby and Ms. Handler, during which Mr. Weatherby told her team "about a leadership change," and that Ms. Warner would no longer be leading the Strategy & Advisory group.  Mr. Weatherby asked Ms. Warner if she had anything to say and she bid a fond, professional farewell to her team members.  Mr. Weatherby's prompt participation in this video call also demonstrates his advance knowledge of and participation in her termination.

208.  The approval of Mr. Weatherby and other Amazon officials was necessary to terminate Ms. Warner, a Level 8 Director employee, per Company policy and practice. This was confirmed by the above-mentioned HR representative, and is consistent with Ms. Warner's knowledge of Amazon policy and practice based upon her time as a manager at the Company, and other terminations witnessed and participated in by Ms. Warner.

209.  Ms. Warner's termination was swift, blatant retaliation by Mr. Weatherby and Amazon itself for her engaging in legally protected activity in objecting to discrimination against women and herself in ProServe and retaining counsel to pursue and assert legal claims of discrimination.  The removal of her from

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1    her position and termination came just weeks after she retained counsel, a couple of

2    months after she spoke out against the discrimination and abuse she endured on

3    account of her gender by Mr. Lavanty, and just days after she attended her last

4    Women@ProServe meeting, at which issues of equity and discrimination against

5    women were discussed by Ms. Warner and others.

6         210.   Mr. Weatherby's retaliatory animus against Ms. Warner was

7    demonstrated multiple times in the weeks leading up to her termination.  In a March

8    2021 meeting with Ms. Warner and Ms. Handler of HR, he baselessly tried to blame

9    Ms. Warner for Mr. Lavanty's sexist attack on her, and just days before his elevation

10   of Lavanty to L10 he ruefully mocked Ms. Warner for her complaint regarding

11   Lavanty's conduct, darkly saying that he had to be careful about using the word

12   "nobody" around her.  These statements and conduct clearly showed his continuing

13   anger against Ms. Warner for her February 2021 gender-based harassment

14   complaint.  There also is a strong, direct connection between Ms. Warner's most

15   recent complaints of and opposition to gender discrimination against women in

16   ProServe and harassment by Lavanty (including her attorneys' retention and letter)

17   and her firing, demonstrated by the swift termination of her employment just weeks

18   later, as well as the explanation of her termination as due to her "unhappiness" in

19   ProServe (unmistakably referring to her complaints of gender-based inequity and

20   discrimination).

21        211.   Mr. Weatherby engaged in this retaliation and displays of retaliatory

22   animus against Ms. Warner against the backdrop of many other instances where he

23   showed retaliatory animus against women who raised concerns and complaints

24   regarding gender-based inequity and discrimination against women in ProServe

25   during 2020 and 2021.

26

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

72

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

212. As discussed above, Mr. Weatherby arranged the surreptitious monitoring of the Women@ProServe ERG by another male employee at his direction, so he could learn which women were raising complaints of discrimination, and he on several occasions expressed anger and frustration to Ms. Warner about female employees who were outspoken and raised concerns about gender discrimination and equity, calling at least one the women "toxic" on that basis. Mr. Weatherby and the ProServe organization therefore had a well-established *modus operandi* of retaliation against women who raised complaints and concerns regarding gender-related discrimination, mistreatment, and inequity.

213. On April 11, 2021, the man who had monitored Women@ProServe meetings for Mr. Weatherby shared on an email thread of ProServe leadership (which included Mr. Weatherby and Ms. Warner) that a woman in a very recent meeting had said, "My perspective from these and other calls/discussions I have attended/observed since being part of this community, over a year ago, is that there are indeed challenges on gender equality, that we (Amazon, AWS and ProServe) need to continue to work on. There are a few women who might have felt it more than others, who have been very vocal with their individual concerns/frustrations. In my discussions with many other women at ProServe, on a regular basis, I don't hear the same severity of the concerns shared by other women. This is just anecdotal. Amazon diversity has been on the news more as of lately, which I believe adds to it."

214. Ms. Warner responded 10 minutes later, noting that the call had started with a discussion of a recent high-profile article of race at Amazon led by a Black employee and revisited a suggestion for a "No Tolerance" policy to effect rapid change. As to the female employee quoted in the previous message, she wrote: "I will say that the comment about this being somewhat isolated (Robert…clearly my

73

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1  words not yours) I do not believe is accurate.  Think you have those that have the
2  courage to be vocal and those that don't. I received comments after the call and one
3  specifically was: ["]I'm pretty sure everyone is afraid to speak up in fear of it
4  impacting their career here or being put in PiP![""] It's absurd but I'm hopeful with
5  all of our heads put together on that we could do something."  It is very clear that
6  Ms. Warner was repeatedly and unashamedly raising issues of gender discrimination
7  and equity in ProServe, including with Mr. Weatherby directly (this email went to
8  him as well), and as late as mid-April 2021.

9      215.  Indeed, Ms. Warner had noted to a male colleague on or around April
10 14, 2021 that the Women@ProServe group might as well disband if the ProServe
11 Leadership Team (led by Mr. Weatherby) insisted on having someone sit in on those
12 meetings to "monitor" them and ensure that nothing too controversial or difficult
13 was discussed—which obviously defeated the entire purpose of such a forum for
14 women in ProServe.  This provided a strong illustration of the animus of Mr.
15 Weatherby towards women in his department, who he apparently viewed as disloyal
16 subversives if they expressed negative views about their treatment in ProServe, and
17 employees' awareness of his retaliatory attitude.

18     216.  In a strange and futile attempt at disguising a blatantly retaliatory
19 termination, Amazon HR representatives told Ms. Warner that she had to find a new
20 job outside of Professional Services within two months or she would be out of the
21 Company entirely.  Therefore, Ms. Warner was essentially terminated with two
22 months' notice, and had to find a new job.  Notably, it had taken five months for Ms.
23 Warner to enter her job at Amazon even when she was being actively and personally
24 recruited—Amazon knew that two months is a completely inadequate period in
25 which to find a new position, particularly a high-level job like the one held by Ms.
26 Warner.

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

74

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

1  217.   No alternative positions were offered by Amazon, nor was Ms. Warner

2  offered any assistance in finding a new position.  Indeed, the sudden and abrupt

3  removal of Ms. Warner from her job caused a tremendous stir in ProServe and

4  beyond, which greatly damaged her reputation and ability to find a new position.

5  218.   Subsequently, Amazon transferred all of Ms. Warner's responsibilities

6  to at least two of her peers, and reportedly up to three separate L8 employees were

7  employed to run what Ms. Warner previously oversaw, underlining the higher-level

8  scope of Ms. Warner's former remit and areas of responsibility.  Ms. Warner's

9  immediate, temporary replacement as head of her work group was a male employee,

10  Ken Sansom, and once her employment fully ended after June 2021, a male L10

11  employee, David McCann, was brought over to ProServe from the Advisory

12  organization to take over Ms. Warner's group.  Mr. McCann was already at the

13  higher L10 level when he was tapped to replace Ms. Warner, and he had no prior

14  services experience and retired and/or resigned approximately one year later.

15  Therefore, following her termination Ms. Warner was replaced in her position not

16  once, but *twice*, by men, with the "permanent" replacement being at the L10 level

17  that Ms. Warner should have been hired at and elevated to all along based upon her

18  experience and role.

19  219.   Many of Ms. Warner's coworkers and subordinates contacted Ms.

20  Warner to express their shock and dismay regarding her abrupt termination, as well

21  as to offer words of thanks and compliments.  By way of example only, on or around

22  May 14, 2021, a female employee formerly in ProServe wrote to Ms. Warner to say

23  that, "I am genuinely sorry to see you leave the organization. I was pinning my hopes

24  on change within my 'old' organization on you. Too much of an old boys club (in

25  my opinion)."

26

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1    220.   Indeed, some of these employees later led an effort to circulate an
2    electronic petition in June and July 2021 in an attempt to address the concerns of
3    women in ProServe regarding what they saw as a clear pattern of gender-based
4    discrimination and retaliation against those who spoke up, as discussed further
5    below.

6    221.   Additionally, the fact that the Company's system now reflected that Ms.
7    Warner (an L8 employee at the time) had no direct reports clearly communicated to
8    hiring managers across Amazon that there were unspecified issues surrounding Ms.
9    Warner's status at the Company, and that they should stay away.  This was unlawful
10   retaliation by Amazon and any employees and officials who directed, approved
11   and/or carried out this action against Ms. Warner.

12   222.   Indeed, Ms. Warner contacted several Amazon managers about jobs
13   that she was qualified and well-suited for, but after friendly, promising initial
14   conversations, they did not get back to her (likely after looking into the background
15   of the situation and/or inquiring with management in ProServe).

16   223.   Ms. Warner applied for at least six roles at Amazon after being stripped
17   of her duties and direct reports.  Ms. Warner had all of the necessary qualifications
18   for the roles she applied to, and in fact, was arguably over-qualified for most of the
19   roles.  Yet, with respect to four of the applications, Ms. Warner was never contacted
20   regarding her candidacy.[4]

21   224.   With respect to one of the roles she applied for (Director, Global
22   System Integrator Sales), Ms. Warner spoke with the hiring manager – an employee
23   with whom she had a good working relationship – who, after telling Ms. Warner that
24

25   _____
26   [4]   Ms. Warner was never contacted regarding her application for the following roles that she
     applied for on the specified dates: HR Director (L8) on May 18, 2021; Head of Corporate
27   Sourcing (L8) on May 18, 2021; Director, Office of Information Security (L8) on June 2, 2021;
     and Director of Last Mile, Pre-Station Planning (L8) on June 3, 2021.

76
28   THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
     DAMAGES

she was a good fit for the role, proceeded to stop engaging with Ms. Warner and completely ignored her follow-up messages. This sharp change can only be explained by the hiring manager noticing the oddities in Ms. Warner's profile in the system, including that Ms. Warner had no direct reports assigned to her and/or his learning of Ms. Warner's complaints.

225. With respect to only one of the six roles that Ms. Warner applied to did Ms. Warner receive an explanation for why she was not going to be considered for the role.

## VI. AMAZON IGNORED PROSERVE EMPLOYEES' OUTCRY CONCERNING SYSTEMIC GENDER DISCRIMINATION IN PROSERVE AND THE RETALIATORY TERMINATION OF MS. WARNER, AND REJECTED MS. WARNER'S GOOD FAITH REQUESTS FOR AMAZON TO REVERSE COURSE ON ITS RETALIATION

226. In every instance where Ms. Warner communicated with Amazon regarding her concerns, she never indicated that it was her intent to leave Amazon. As a result, Amazon's reaction to her complaints – whereby they pushed her out of the Company altogether – was not in any way provoked by representations made by Ms. Warner regarding a desire to resign from her role at Amazon. Ms. Warner never expressed a desire to be involuntarily removed from her position in ProServe or to leave her position without any replacement or any transition to another role. In addition, before she was removed from her job, Ms. Warner, through counsel, informed Amazon that she in fact would like to stay in ProServe and aid in addressing the problems in the department.

227. On June 22, 2021, in an additional good faith attempt at preventing Amazon from continuing down a path of retaliation and offering to participate in

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1  improving employment practices in ProServe, Ms. Warner emailed a letter to Jeff
2  Bezos and Andy Jassy.  Ms. Warner requested that her correspondence be distributed
3  to other members of Amazon's Board of Directors.

4  228.  In her letter, Ms. Warner indicated that she was writing to Amazon's
5  Board as "a proud AWS executive and experienced business leader who wants to
6  help rectify an increasingly alarming situation within Professional Services."

7  229.  Hoping that Amazon's Board would respond or intervene, Ms. Warner
8  detailed Amazon's ongoing efforts to push her out of the Company in response to
9  the allegations included in her April 7, 2021 letter, as well as an explanation
10  regarding this federal lawsuit:

> I had to seek legal representation and sent a letter to Amazon
> asking for help and offering to be part of the solution. Three
> weeks later, I was removed from my role in ProServe and told
> that I had two months to find a new job, or my employment
> would end.

16  230.  Ms. Warner used the opportunity to, once again, stress that she wanted
17  to stay at Amazon and work with the Company to address her concerns:

> On June 28, despite my best efforts to find a new post, it is very
> likely that my employment with Amazon will involuntarily end
> next week as I hit that two-month mark. I still hold out hope that
> I will get a chance to help turn around the situation in ProServe,
> retain many of the outstanding team members I know work there,
> and resume achieving great results for AWS.

231.  In closing, Ms. Warner reiterated in her letter to Mr. Bezos and Mr.
Jassy that she welcomed the opportunity to sit down with any of the Board members
to discuss how they could "work together" to find a solution to the concerns she
raised and which were echoed by many other employees in ProServe.

78

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

1    232.   Despite the conciliatory message of her letter, Ms. Warner received no

2 response from anyone at Amazon.

3    233.   During this time, ProServe employees who were outraged by Amazon's

4 imminent discriminatory and retaliatory termination of Ms. Warner organized an

5 effort to collectively express their objections to ProServe's "culture of systemic

6 discrimination, harassment, bullying and bias against women and under-represented

7 groups."[5]

8    234.   The efforts of these employees culminated in a petition that was

9 supported by more than five-hundred and fifty (550) ProServe employees (as of July

10 23, 2021) calling for Amazon to change its unfair practices of addressing

11 discrimination claims in a manner that were "set up to protect the company and the

12 status quo, rather than the employees filing the complaints."

13    235.   The petition specifically cited Ms. Warner, highlighting that the

14 organizing efforts of these employees were, at least in part, inspired by Amazon's

15 discriminatory and retaliatory termination of her and the Company's failure to

16 investigate discrimination complaints.

17    236.   Notably, this petition was active prior to Ms. Warner's official end date

18 at Amazon, and therefore Amazon (once again) was aware of and provided with an

19 opportunity to examine its unlawful treatment of Ms. Warner and reverse course on

20 pushing her out of the Company.

21    237.   In a July 16, 2021 email to Andy Jassy and Adam Selipsky (Jassy's

22 successor as CEO of AWS), one of the leaders of Women@ProServe, Diya Wynn

23 wrote of the employee petition that it "represents a collective concern and desire to

24 holistically address bias, discrimination, harassment, bullying, and retribution that

25

26 _____

[5]    A recent article in the Washington Post details the efforts of these employees. See
https://www.washingtonpost.com/technology/2021/07/23/amazon-gender-discrimination-
investigation/ (last accessed August 6, 2021).

27

79

28    THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

exists within the organization," referring to AWS Professional Services. The petition itself noted "growing concern among ProServe employees about an underlying culture of <u>systemic</u> discrimination, harassment, bullying and bias against women and under-represented groups." (emphasis added).

238.   Amazon was not swayed by the appeal of several hundred ProServe employees to the Company that it re-examine the retaliation and discrimination in ProServe, as Amazon refused to even delay Ms. Warner's termination and properly conduct an investigation into Ms. Warner's complaints that would include an interview of Ms. Warner herself.  Shockingly, Ms. Warner was never interviewed by Amazon regarding the allegations she raised in the April 7, 2021 letter sent by her counsel (even before her termination three weeks later or in the following two months), nor was there any serious attempt by the Company before that to obtain an account from her about what happened on the call with Mr. Lavanty and in ProServe generally in response to her other complaints and reports.  This evidences a desire by Amazon to avoid creating a record of such alleged unlawful conduct and any detailed employee complaints.

239.   Amazon also failed to provide an open forum for the hundreds of ProServe employees to voice their concerns regarding the unlawful discriminatory conduct that was and is regularly occurring in ProServe.

240.   Despite presiding over the ProServe organization, Mr. Weatherby was largely absent from all public discussions pertaining to the complaints of widespread discrimination and retaliation that were raised by ProServe employees in their widely circulated petition.

241.   Upon information and belief, after Ms. Warner's lawsuit was filed in May 2021, Mr. Weatherby canceled most (if not all) public appearances, including a Women@ProServe meeting, the department's "all-hands" meetings, and an "Ask

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1    Todd Anything" event scheduled for early June 2021 in which employees would

2    have had an opportunity to ask Mr. Weatherby questions in an open forum.

3        242.   Instead, Amazon replaced the "Ask Todd Anything" event with a

4    virtual event run by HR (renamed "Ask the Leaders Anything") on a platform not

5    typically used by Amazon for similar events.  Upon information and belief, during

6    this event, employees were muted, unable to turn on their video cameras, and unable

7    to contribute to a group chat or directly message each other.  Instead, HR

8    representatives provided answers to pre-screened questions, and to the extent that

9    they addressed questions and concerns submitted by participants (which only the

10   event organizers could see), they rephrased the employees' questions in a manner

11   that enabled them to avoid addressing issues that they wanted to ignore or did not

12   want to address publicly.[6]

13       243.   Additionally, Amazon engaged in a deliberate effort to silence

14   employees who sought to speak out against Amazon's unlawful treatment of Ms.

15   Warner.   Upon information and belief, Amazon specifically notified several

16   ProServe employees not to put anything in writing pertaining to Ms. Warner's case

17   or they would face termination and that they should stop communicating with Ms.

18   Warner.  This further demonstrates Defendants' retaliatory policies, practices and

19   animus towards Ms. Warner and others who raise and discuss concerns regarding

20   discrimination and other unlawful treatment of employees.

21       244.   Despite the outcry of ProServe employees and numerous attempts by

22   Ms. Warner to persuade Amazon to reverse course, Amazon proceeded with its plan

23   to end Ms. Warner's employment.

24

25

26   [6]    Amazon's rephrasing of employees' questions was confirmed by employees in offline
     discussions in which they told each other the actual questions they were submitting, and which
27   questions had been altered by the Company representatives.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

81

28   THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
     DAMAGES

245.   As intended by Amazon and for the reasons discussed above, Ms. Warner was unable to secure a new role at Amazon within the 60-day period that Amazon had dictated to her.

246.   On June 30, 2021, Ms. Handler emailed Ms. Warner to inform her that her employment with Amazon would end effective that day, and that the separation was on an involuntary basis.  Ms. Handler's communication inaccurately noted that Ms. Warner's termination was a result of her supposed "unwillingness" to work within the ProServe organization.  This was patently false and clearly contradicted by multiple communications by Ms. Warner (including her letter to Amazon's Board of Directors just the week before and representations made by her counsel).  Ms. Handler's representations therefore were knowingly false and intended to aid and abet Amazon's discriminatory conduct.[7]

247.   In response to Ms. Handler's email, Ms. Warner indicated that she did not desire to leave ProServe, but that she instead desired to no longer be subjected to discrimination, retaliation, and harassment in ProServe.  Referring to discussions that occurred before she retained counsel, Ms. Warner wrote:

> To be clear, I never indicated "your (my) unwillingness to work within the ProServe organization", nor was I not doing my job within ProServe. What I clearly communicated in writing to yourself and Todd is that I was not desirous of working in an environment so rife with harassment, discrimination and bias. As such, I was clear I would begin to look for another role in Amazon. I was further clear this could take 6 months since an executive position is a bit harder to find. Additionally, I made it clear that I would keep both yourself and Todd apprised of my progress in finding a new position until such time as I had secured

---

[7]   After satisfying all necessary procedural prerequisites, Ms. Warner amended this Complaint to include additional claims, including, but not limited to, aiding and abetting discrimination under FEHA.

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

one. I further indicated that I would ensure there was a smooth transition so that I would not leave any sort of mess.

At the time that you terminated my role, on April 28, I was fully engaged in doing my job. We were planning for OP1 and had many other great projects in flight across the business that I managed.

In the event that I was not doing my job in ProServe, it is my understanding that I would have been subject to a performance improvement process that would have concluded in a Pivot point to either stay doing my job, or exit the company. That is the process I was trained and told I must use for all employees that were not performing their roles either in part or in total. It is curious why if I was not doing my job, this process was not afforded to me?

248.   Upon information and belief, Ms. Handler never addressed Ms. Warner's response.

249.   The final involuntary termination of Ms. Warner's employment came and was carried out just over a month after she filed her initial federal complaint with this Court alleging violations of and claims under the EPA and CEPA for equal pay discrimination.

250.   Amazon and managers such as Mr. Weatherby, Mr. Lavanty, and Ms. Handler very clearly believe they are untouchable and can terminate employees for discriminatory and retaliatory reasons with impunity.  In doing so, Amazon shows that it will not be bothered or inconvenienced for even a brief time by retaining a "squeaky wheel" employee in order to comply with its legal obligations under the country's anti-discrimination laws or to help them retain talent and keep the organization running smoothly.  It is Ms. Warner's hope that, through this blatant retaliation against her, Amazon's dangerous sense of invincibility may finally be put to the test and shattered.

83

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

251.   Although Ms. Warner is disheartened and devasted by Amazon's actions, she remains dedicated to her lifelong commitment to fighting for an equitable workplace for all.  In one last attempt to appeal to the leaders of Amazon, Ms. Warner published an open letter to Amazon CEO Andy Jassy and CEO of Amazon Web Services Adam Selipsky on July 23, 2021.[8]   In her letter, she congratulated Mr. Jassy and Mr. Selipsky on their new roles and urged them to address the persistent discrimination and retaliation that plagues ProServe.

## FIRST CAUSE OF ACTION
### (Sex/Gender Discrimination under Title VII of the Civil Rights Act of 1964)
### *Against Amazon.com, Inc. and Amazon Web Services, Inc.*

252.   Plaintiff hereby repeats, reiterates, and realleges each and every allegation in the preceding paragraphs, as though set forth fully within.

253.   Defendants Amazon.com, Inc. and Amazon Web Services, Inc. have discriminated against Plaintiff on the basis of her sex/gender (female/woman) in violation of Title VII by subjecting her to disparate treatment and discriminatory denial of advantageous terms and conditions of employment available to male employees, including, but not limited to, subjecting her to disparate working conditions, denying her terms and conditions of employment equal to that of her coworkers who do not belong to the same protected categories, as well as, but not limited to, by paying her less than her comparable and/or similarly situated colleagues in sufficiently similar and/or equivalent positions, failing to hire and/or promote her to an appropriate job level, denying her the ability to apply and/or be considered for the same job positions as male colleagues, and denying her the opportunity to work in an employment setting free of unlawful discrimination.

---

[8]   See https://medium.com/@cindylwarner1/amazon-fired-me-for-reporting-gender-bias-now-others-are-speaking-out-e1ca420c3692 (last accessed August 6, 2021).

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

254.   These actions are in direct violation of Title VII of the Civil Rights Act of 1964, as amended.

255.   Additionally, the termination of Plaintiff's employment by Defendants constitutes discrimination based on sex/gender and violated Title VII.

256.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

257.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

258.   Defendants' unlawful discriminatory and wrongful conduct constitutes a willful and wanton violation of Title VII, was outrageous and malicious, was intended to injure Plaintiff, and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### SECOND CAUSE OF ACTION
**(Retaliation in Violation of Title VII)**
***Against Amazon.com, Inc. and Amazon Web Services, Inc.***

259.   Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

260.   By the actions described above, among others, Defendants retaliated against Plaintiff for complaining about unequal treatment of herself and others on the basis of sex/gender by altering her working conditions and terminating her employment.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

85

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

261. As a direct and proximate result of the unlawful retaliatory conduct committed by Defendants in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

262. As a direct and proximate result of the unlawful retaliatory conduct committed by Defendants in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

263. Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Violations of the Equal Pay Act)
#### *Against All Defendants*

264. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

265. During Plaintiff's employment, Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions, and paid Plaintiff a rate of pay, including, but not limited to, salary and securities awards or grants, less than such male employees.

266. Defendants engaged in patterns, practices, and/or policies of employment which discriminated against Plaintiff on the basis of her gender by

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

86
THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

1  paying Plaintiff a lesser rate of pay, including, but not limited to, salary and securities

2  awards or grants, than that paid to male employees performing the same or

3  substantially similar job duties which require equal skill, effort, and responsibility,

4  and under the same working conditions.

5      267.  As a direct and proximate result of Defendants' unlawful discriminatory

6  conduct in violation of the EPA, Plaintiff has suffered, and continues to suffer, harm

7  for which she is entitled to an award of monetary damages, liquidated damages,

8  interest, and other relief.

9      268.  Defendants' conduct was willful, and they knew that their actions

10  constituted unlawful violation of the EPA and/or showed reckless disregard for

11  Plaintiff's statutorily protected rights.

12  **FOURTH CAUSE OF ACTION**
    **(Retaliation in Violation of the Equal Pay Act)**
13  ***Against All Defendants***

14      269.  Plaintiff hereby repeats, reiterates, and re-alleges each and every

15  allegation as contained in each of the preceding paragraphs, as though fully set forth

16  herein.

17      270.  By the actions described above, among others, Defendants retaliated

18  against Plaintiff for complaining about unequal pay on the basis of sex by altering

19  her working conditions and terminating her employment.

20      271.  As a direct and proximate result of Defendants' unlawful retaliatory

21  conduct in violation of the EPA, Plaintiff has suffered, and continues to suffer, harm

22  for which she is entitled to an award of monetary damages, interest, liquidated

23  damages, and other relief.

24      272.  Defendants' conduct was willful, and they knew that their actions

25  constituted unlawful violation of the EPA and/or showed reckless disregard for

26  Plaintiff's statutorily protected rights.

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

87

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

**FIFTH CAUSE OF ACTION**
**(Discrimination in Violation of FEHA)**
***Against Amazon.com, Inc. and Amazon Web Services, Inc.***

273.   Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

274.   At all times herein mentioned, California's Fair Employment and Housing Act ("FEHA"), Cal. Government Code § 12940 *et seq.*, was in full force and effect and fully binding upon the relevant Defendants.  Plaintiff was a member of a group protected by the statute, in particular § 12940(a), prohibiting discrimination in employment based on sex/gender.

275.   Defendants Amazon.com, Inc. and Amazon Web Services, Inc. have discriminated against Plaintiff on the basis of her sex/gender (female/woman) in violation of FEHA by subjecting her to disparate treatment and discriminatory denial of advantageous terms and conditions of employment available to male employees, including, but not limited to, subjecting her to disparate working conditions, denying her terms and conditions of employment equal to that of her coworkers who do not belong to the same protected categories, as well as, but not limited to, by paying her less than her comparable and/or similarly situated colleagues in sufficiently similar and/or equivalent positions, failing to hire and/or promote her to an appropriate job level, denying her the ability to apply and/or be considered for the same job positions as male colleagues, and denying her the opportunity to work in an employment setting free of unlawful discrimination.

276.   Additionally, the termination of Plaintiff's employment by Defendants constitutes discrimination based on sex/gender and violated FEHA.

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

277.    As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings, equity, and other employment benefits and has incurred other economic losses.

278.    As a further direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered emotional distress, humiliation, shame, and embarrassment all to the Plaintiff's damage in an amount to be proven at time of trial.

279.    Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights or safety of Plaintiff and others.  Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

### SIXTH CAUSE OF ACTION
**(Retaliation in Violation of FEHA)**
***Against Amazon.com, Inc. and Amazon Web Services, Inc.***

280.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

281.    At all times herein mentioned, California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §§ 12900, *et seq.*, was in full force and effect and was fully binding upon Defendants.  Specifically, § 12940(h) makes it an unlawful employment practice for an employer to discriminate against any person because the person has opposed any practices forbidden under this part, including by, among other things, terminating their employment or refusing to allow them to be considered on the same basis for available jobs, as with Ms. Warner.  As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer losses in earnings, equity and other employment benefits and has incurred other economic losses.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

89

282.   As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered substantial emotional distress, humiliation, shame, and embarrassment, all to the Plaintiff's harm and damage in an amount to be proven at the time of trial.

283.   Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others.  Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

## SEVENTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of FEHA)
### *Against Defendant Weatherby*

284.   Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

285.   At all times herein mentioned, California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §§ 12900, *et seq.*, was in full force and effect and was fully binding upon the relevant Defendants.  Specifically, § 12940(i) makes it unlawful for any person "to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so."

286.   Defendant Weatherby aided and abetted the discriminatory conduct of Mr. Lavanty and Defendants Amazon.com, Inc. and Amazon Web Services, Inc., including but not limited to by participating in the termination of her employment.

287.   As a direct and proximate result of Defendant Weatherby's unlawful discriminatory conduct in violation of FEHA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages, liquidated damages, interest, and other relief.

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

90

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

288.   Defendant Weatherby's conduct was willful and he knew that his actions constituted unlawful violation of the FEHA and/or showed reckless disregard for Plaintiff's statutorily protected rights.

### EIGHTH CAUSE OF ACTION
**(Violations of California Equal Pay Act)**
***Against All Defendants***

289.   Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

290.   During Plaintiff's employment, Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions, and paid Plaintiff a rate of pay, including, but not limited to, salary and securities awards or grants, less than such male employees.

291.   Defendants engaged in patterns, practices, and/or policies of employment which discriminated against Plaintiff on the basis of her gender by paying Plaintiff a lesser rate of pay, including, but not limited to, salary and securities awards or grants, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions.

292.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of CEPA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages, liquidated damages, interest, and other relief.

293.   Defendants' conduct was willful, and they knew that their actions constituted unlawful violation of the CEPA and/or showed reckless disregard for Plaintiff's statutorily protected rights.

91
THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

## NINTH CAUSE OF ACTION
### (Retaliation in Violation of California Equal Pay Act)
### *Against All Defendants*

294.   Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

295.   By the actions described above, among others, Defendants retaliated against Plaintiff for complaining about unequal pay on the basis of sex by altering her working conditions and terminating her employment.

296.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the CEPA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages, liquidated damages, interest, and other relief.

297.   Defendants' conduct was willful, and they knew that their actions constituted unlawful violation of the CEPA and/or showed reckless disregard for Plaintiff's statutorily protected rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A.   A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of California.

B.   An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

C.   An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or

92

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

1    compensatory damages, including, but not limited to, compensation for Plaintiff's

2    emotional distress;

3          D.     An award of liquidated damages equal to the amount of Plaintiff's past

4    and future lost wages;

5          E.     An award of punitive damages in an amount to be determined at trial;

6          F.     Prejudgment interest on all amounts due;

7          G.     Post-judgment interest as may be allowed by law;

8          H.     An award of Plaintiff's reasonable attorneys' fees and costs; and

9    Such other and further relief as the Court may deem just and proper.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WIGDOR LLP
85 FIFTH AVE., FIFTH FLOOR
NEW YORK, NEW YORK 10003
(212) 257-6800

93

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND
DAMAGES

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 19, 2024

Respectfully submitted,

**WIGDOR LLP**

By: _____
Lawrence M. Pearson
(Admitted *pro hac vice*)

85 Fifth Avenue, Fifth Floor
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
lpearson@wigdorlaw.com

**GIRARD BENGALI, APC**

Omar H. Bengali

355 S. Grand Street, Suite 2450
Los Angeles, CA 90071
Telephone: (323) 403-5687
Facsimile: (323) 302-8305
obengali@girardbengali.com

*Attorneys for Plaintiff Cindy Warner*

THIRD AMENDED COMPLAINT SEEKING DECLARATORY RELIEF AND DAMAGES